**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 14-CV-60649-GOODMAN**
**[Consent Case]**

JENNIFER LEE, *et al.*,
on behalf of themselves and
all others similarly situated,

      Plaintiffs,

v.

OCWEN LOAN SERVICING, LLC, *et al.*,

      Defendants.

_____/

## ORDER GRANTING FINAL APPROVAL
## TO CLASS ACTION SETTLEMENT

This Court held a June 11, 2015 hearing to consider the parties' request that the Court approve the proposed class action settlement, consider the the objections to it and also approve and Class Counsel's fee application (the "Final Fairness Hearing"). The Court granted preliminary approval of the settlement on January 23, 2015. [ECF No. 125.] The hearing was held pursuant to Federal Rule of Civil Procedure 23(e)(1)(A), which mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." The Court has carefully considered

the parties' written submissions, including significant post-hearing memoranda and exhibits, the evidence and arguments presented, and the applicable law.

Class Counsel argue that a recent Eleventh Circuit Court of Appeals decision has, for all practical purposes, mooted the primary objections -- that the settlement should not be approved because it is based on a *claims-made* methodology (referred to interchangeably as "claims process" and "claims-made process") and that the attorney's fees should not be approved for the same reason. The Undersigned does not interpret this recent case, *Poertner v. Gillette Co.*, No. 14-13882, 2015 WL 4310896 (11th Cir. July 16, 2015),[1] as broadly as class counsel and therefore does not agree that it effectively forecloses the primary objections. Nevertheless, *Gillette*, which involves a significantly different type of lawsuit than the one here, is certainly *helpful* to Class Counsel. In addition, other district courts, including district courts in this Circuit, have approved claims-based class action settlements involving lender-place insurance -- the type of case at issue here -- and those cases are certainly persuasive.

The primary objector contends that a claims-made process is not necessary because Defendant Ocwen Loan Servicing, LLC ("Ocwen") *does* have the ability, on a systemwide borrower-by-borrower basis, to identify borrowers who have paid the

---

[1]    The parties call the case **Batman v. The Gillette Company (or Co.)** (e.g., ECF Nos. 175, 181), but the unofficial version of this unpublished case (available on Westlaw) uses **Poertner.** The Undersigned will use the *Poertner v. Gillette Co.* citation style and will refer to the case as *Gillette.*

amounts or some portions of the amounts invoiced them for lender-placed insurance, or those who still owe those amounts. Therefore, the primary objector argues, Ocwen could therefore *directly* pay Ocwen borrowers. But Plaintiffs and Defendants view this objection as merely a baseless theory submitted by counsel who has a financial interest in causing the proposed settlement to be rejected. Moreover, Plaintiffs describe the objection as little more than an incorrect, self-interested hunch, belied by deposition testimony submitted after the Fairness Hearing (and also contradicted by similar testimony in other cases from other mortgage loan processors).

The Court has afforded the primary objector, Margo Perryman, more than ample opportunity to pursue her objections, permitting her to submit myriad memoranda [ECF Nos. 146, 173, 181], even though neither she nor her counsel appeared at the final fairness hearing.

For the reasons outlined below, the Court **approves** in full the proposed class action settlement and Class Counsel's fee application and **overrules** all objections.

## <u>INTRODUCTION</u>

Homeowners are often required by the terms of their mortgage contracts to maintain insurance coverage on the properties securing their loans.  If the homeowner does not maintain the required insurance, then the lender is authorized by the mortgage contract to obtain new insurance to cover its interest in the property and the loan.

Lenders do this by contracting with insurance carriers for the insurance's automatic issuance.  This is what is commonly referred to as "lender-placed insurance" ("LPI"), though Plaintiffs often brand the practice as force-placed insurance. The Court will use the term lender-placed insurance, or LPI.

This case is one of many lawsuits that have been filed around the country against various lenders, servicers, and insurers regarding LPI programs.  These suits, like this one, principally allege that lenders and insurers colluded to create a scheme of "kickbacks" in the form of unearned commissions and other benefits that artificially inflate LPI premium rates.  In recent years, some of these suits have been settled on a class-wide basis. Of these class action settlements, many have been structured to require class members' submission of claim forms to obtain the settlements' monetary relief, usually some percentage of the LPI premium charged.

Although these settlements have drawn objections -- including that the claims process is supposedly unnecessary -- the Parties have advised the Court that no court has yet to disapprove an LPI class settlement structured this way. In addition, Defendant American Security Insurance Company ("ASIC") has further advised that no state or federal regulator voiced opposition to such a structure (even though the proposed settlement agreement was forwarded to them). ASIC explained that regulators sometimes *do* object, so ASIC contends that the lack of any objection here is particularly significant.

By the parties' count, district courts have granted final approval to at least eight LPI class action settlements with the same structure as the Settlement here, as well as several others that are structured differently and provide much *less* monetary relief to class members. Indeed, one district court touted settlements like this -- that provide near-complete relief to class members on a claims-made basis -- as extraordinary, and particularly so when compared to direct-pay force-placed insurance settlements that compensate all members of a settlement class, but provide far less relief to each class member and with payments that bore little, if any, relation to the actual losses suffered by individual class members. *See Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372, 2014 U.S. Dist. LEXIS 130903, at *35-37 (D. Or. Sept. 18, 2014).

On January 23, 2015, this Court granted preliminary approval to the proposed class action settlement set forth in the Stipulation and Settlement Agreement (the "Settlement Agreement")[2] between Plaintiffs Jennifer Lee, Douglas A. Patrick, Gerald Coulthurst, Lisa Chamberlin Engelhardt, Enrique Dominguez, Frances Erving, Johnnie Erving, John Clarizia, and Shelia D. Heard ("Plaintiffs"), on behalf of themselves and all members of the Settlement Class, and Defendants Ocwen, Assurant, Inc. ("Assurant"), ASIC, Standard Guaranty Insurance Company ("SGIC"), Voyager Indemnity Insurance

---

[2]      Unless otherwise indicated, all capitalized terms used herein have the same defined meaning assigned to them in the Settlement Agreement, ECF No. 144-1 ¶¶ 2.1-2.51, and all ECF citations refer to the Lee Litigation docket.

Company ("VIIC"), and American Bankers Insurance Company of Florida ("ABIC") (Assurant, ASIC, SGIC, ABIC, and VIIC are collectively referred to herein as the "Assurant Defendants"). The Court also provisionally certified the Settlement Class for settlement purposes, approved the procedure for giving Class Notice to the members of the Settlement Class, and set a Final Approval Hearing to take place on June 11, 2015. The Court finds that the Class Notice substantially in the form approved by the Court in its preliminary approval order was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate.

On June 11, 2015, the Court held a duly noticed Final Approval Hearing to consider: (a) whether the terms and conditions of the Settlement Agreement are fair, reasonable, and adequate; (b) whether a judgment should be entered dismissing the Named Plaintiffs' amended complaint on the merits and with prejudice in favor of the Defendants and against all persons or entities who are Settlement Class Members herein who have not requested exclusion from the Settlement Class; and (c) whether and in what amount to award Attorneys' Fees and Expenses to Class Counsel for the Settlement Class, and whether and in what amount to award a Case Contribution Award to the Named Plaintiffs.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Court has personal jurisdiction over the Parties and the Settlement Class Members, venue is proper, the Court has subject-matter jurisdiction to approve the Settlement Agreement, including all exhibits, and to enter this Final Order.

2.     The Court finds that the prerequisites for a class action under Federal Rules of Civil Procedure 23(a) and 23(b) have been satisfied for settlement purposes for each Settlement Class Member in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Named Plaintiffs are typical of the claims of the Settlement Class they seek to represent; (d) Named Plaintiffs have and will continue to fairly and adequately represent the interests of the Settlement Class for purposes of entering into the Settlement Agreement; (e) the questions of law and fact common to the Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; (f) the Settlement Class is ascertainable; and (g) a class action settlement is superior to the other available methods for the fair and efficient adjudication of the controversy.

3.     Pursuant to Federal Rule of Civil Procedure 23, this Court hereby finally certifies the Settlement Class, as identified in the Settlement Agreement, which shall consist of the following:

> All borrowers in the United States who, within the Settlement Class Period (defined below), were charged by Ocwen under a hazard, flood,

flood gap or wind-only LPI Policy for residential property, and who, within the Settlement Class Period, either (a) paid to Ocwen the Net Premium for that LPI Policy or (b) did not pay to and still owe Ocwen the Net Premium for that LPI Policy. Excluded from the Settlement Class are: (a) individuals who are or were during the Settlement Class Period officers or directors of the Defendants in the Action or any of their respective Affiliates; (b) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (c) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or to the borrower's escrow account; and, (d) all borrowers who file a timely and proper request to be excluded from the Settlement Class.

The Settlement Class Period shall commence on January 1, 2008 and shall continue through and including January 23, 2015.

4.     The Court finally appoints the law firms of Kozyak, Tropin, & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman LLP as Class Counsel for the Settlement Class.

5.     The Court finally designates Named Plaintiffs Jennifer Lee, Douglas A. Patrick, Gerald Coulthurst, Lisa Chamberlin Engelhardt, Enrique Dominguez, Frances Erving, Johnnie Erving, John Clarizia, and Shelia D. Heard as the Class Representatives.

6.     The Court makes the following findings on notice to the Settlement Class:

(a)     Federal Rule of Civil Procedure 23(c)(2) requires that notice to Settlement Class Members be the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." However, "even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice." *Juris v. Inamed Corp.*, 685 F. 3d 1294, 1321 (11th

Cir. 2012). Instead, notice need only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

(b) The Court finds that the distribution of the Mail Notice, Summary Publication Notice (published in *USA Today*), Internet media campaign, the creation of the IVR toll-free telephone number system, and creation of the Settlement Website, all as provided for in the Settlement Agreement and Preliminary Approval Order, (i) constituted the best practicable notice under the circumstances to Settlement Class Members, (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Litigation, their right to object or to exclude themselves from the proposed Settlement, and their right to appear at the Final Approval Hearing, (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice, and (iv) complied fully with the requirements of Federal Rule of Civil Procedure 23, the United States Constitution, the Rules of this Court, and any other applicable law.

7. The Parties have complied with their notice obligations under the Class Action Fairness Act, 28 U.S.C. § 1715, in connection with the Settlement. Defendants

timely sent notices of the proposed Settlement, including the materials required by that Act, to the appropriate state and federal officials.  [ECF Nos. 114-1; 115-1].

8.     The Settlement Agreement is finally approved as fair, reasonable, and adequate pursuant to Federal Rule 23(e). The terms and provisions of the Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable, and adequate as to, and in the best interests of, each of the Parties and the Settlement Class Members.

9.     There is a strong judicial policy favoring the pretrial settlement of class actions. *See, e.g., In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement").[3] A class settlement should be approved if it is "fair, reasonable, and adequate," Federal Rule 23(e)(2), and "not the product of collusion." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). While Fed. R. Civ. P. 23(e) itself does not particularize standards for approval, those standards have been articulated in the case law. They include "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible

---

[3]     All Fifth Circuit decisions issued prior to the close of business on September 30, 1981, are binding precedent upon the Eleventh Circuit. *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Id.*; *see also Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011).

(a)      This Court, like others, "considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness." *Hall v. Bank of Am., N.A.*, No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014). Obviously, "a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014); *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).

(i)      This Settlement has met with near-universal approval.   A total of 399,843 Notice Packages were initially mailed to Settlement Class Members on March 13, 2015 [ECF Nos. 158-1, ¶ 5; 144-4, ¶ 8], with thousands more Notice Packages re-mailed with updated mailing addresses. [ECF Nos. 158-1, ¶ 7; 144-4, ¶ 10]. In *any* class of this size, it would be no surprise if a settlement produced numerous objections and exclusions. Yet here, only four objections were filed by five Class Members -- a trivial fraction of the Class -- and only 160 timely Requests for Exclusion were received from Class Members. [ECF No. 158-1, ¶ 9]. Two of the objectors, Shane and Cecelia

Valdez, have since **withdrawn** their joint objection [ECF No. 162], and the Court approved the withdrawal of that objection from consideration [ECF No. 163], leaving just three live objections filed by Class Members Margo Perryman [ECF No. 146], Michael Hobbs [ECF No. 148], and Jon Hansen [ECF No. 153]. Neither the United States Attorney General, the Director of the Consumer Financial Protection Bureau, the Comptroller of the Currency, nor a single state attorney general or insurance commissioner objected, although they were all notified of the opportunity to do so.

(ii)     These responses of stakeholders to the Settlement are powerful indicia that the Settlement is fair, reasonable and adequate, and deserves final approval. *See Hall*, 2014 WL 7184039, at *5 (where objections from LPI settlement class members "equates to less than .0016% of the class" and "not a single state attorney general or regulator submitted an objection," "such facts are overwhelming support for the settlement and evidence of its reasonableness and fairness"); *Hamilton v. SunTrust Mortg, Inc.*, No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (where "not a single state attorney general or regulator submitted an objection," combined with few objections to LPI class settlement, "such facts are overwhelming support for the settlement"); *Burrows v. Purchasing Power, LLC*, No. 12-22800, 2013 WL 10167232, at *7 (S.D. Fla. Oct. 7, 2013) ("No members of the Settlement Class oppose the settlement, nor have any governmental agencies filed opposition").

(b)      "The next two *Bennett* factors are the range of possible recovery and the point on or below the range at which a settlement is fair, adequate and reasonable." *Lipuma*, 406 F. Supp. 2d at 1322. "In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Id.* "The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality." *Id.* at 1323. "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id.* (internal quotation marks omitted).

(i)      The Settlement is generous to Class Members, providing relief approximating a trial win and, for many Class Members, **exceeding** a trial win.  In LPI class actions like this, plaintiffs have not challenged the right to place LPI or sought the return of the entire LPI charge, but have sought only the portion of the charge allegedly "inflated" by defendants' compensation arrangements.  In this Settlement, for each LPI Policy, Class Members may obtain a refund or credit of 12.5% of the LPI's Net Premium [ECF No. 144-1, ¶¶ 4.6.2, 4.6.3], a percentage that the Court finds not only approximates Class Members' alleged damages, but is comparable to or exceeds refund and credit percentages allowed in multiple LPI class settlements approved in this District and elsewhere. *See, e.g., Hamilton*, 2014 WL 5419507, at *4 (10.5%); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-60721, 2014 WL 5488167, at *4 (S.D. Fla. Oct. 29, 2014) (7% or 11%); *Saccoccio*, 297 F.R.D. at 693 (12.5%).

Unlike some consumer class settlements, this is not a low-dollar value or "coupon" settlement. In many instances, perhaps most, the Claim Settlement Relief will be worth hundreds of dollars to the average Claimant.

(ii)     Even if a Class Member did not pay any part of her LPI Premium, that Class Member is nevertheless entitled to recover full Claim Settlement Relief, the only difference being the manner in which relief is provided. And Class Members are eligible to receive Claim Settlement Relief merely by submitting a streamlined Claim Form and confirming their identity in one of several ways. Detailed information -- like coverage periods, total charges, or amounts paid -- need not be supplied. [ECF No. 144-2 Ex. C]. To the contrary, although Defendants reserve the right to audit claims for evidence of fraud, the Parties will accept as truth Class Members' affirmations that they paid any portion of the Premium.[4]

---

[4]     It is the **Settlement Administrator**, not Defendants, that exercises discretion to deny Claims. The Settlement Agreement confers on Defendants only a limited right to "notify the Settlement Administrator as to the inaccuracy of a Claim prior to the deadline for processing the Claim," while "also providing written notification of the inaccurate Claim to Class Counsel." [ECF No. 144-1, ¶ 7.3.1]. In turn, the Administrator "shall confirm that each Claim Form submitted is in the form required, that each Claim Form includes the required affirmations, information, and, where appropriate, identity confirmation," as well as confirm "that each Claim Form was submitted in a timely fashion, and that the Claimant is a member of the Settlement Class." [*Id.*, ¶ 7.2].

The Administrator, not Defendants, "shall make a determination as to the amount of the Claim." [*Id.*, ¶ 7.3]. The Administrator is a neutral third party [*id.*, ¶ 2.1]; it "shall not receive any incentive for denying claims." [*Id.*, ¶ 7.2]. Claims determined to

(iii)     The Settlement also offers substantial injunctive relief.  [ECF No. 144-1, ¶¶ 4.2-4.4].  For a five-year period, Ocwen will not receive any commissions paid as a result of the placement of LPI, enter into any quota share reinsurance arrangements on new or renewal LPI policies, accept payments from any LPI insurer or LPI vendor for any administrative or other service associated with LPI, or place LPI through an insurer or vendor affiliated with Ocwen.  [*Id.*, ¶ 4.2.1(i)-(iv)]. LPI policies will be dual interest for any coverage for which Ocwen attempts to recoup from borrowers the LPI premiums paid by Ocwen to the LPI insurer; "dual interest" means that the borrower will have the right to file a claim under the policy.  [*Id.*, ¶ 4.2.1(v)]. And the Settlement requires other conduct from Ocwen.  [*Id.*, ¶ 4.2.1(vi)-(viii)].

Similarly, the Settlement will prohibit the Assurant Defendants for a five-year period from providing to Ocwen hazard LPI commissions, LPI quota share reinsurance arrangements, or payments for administrative or other services associated with hazard LPI or other LPI-related services.  [*Id.*, ¶ 4.3.1(i)-(iii)]. Nor may the Assurant Defendants accept payments from Ocwen for below-cost or free outsourced services provided to Ocwen in connection with hazard LPI. [*Id.*, ¶ 4.3.1(iv)]. Similar injunctive relief has been found to constitute "important changes that will help homeowners" and to "have

---

have inaccurate information will thus be "processed in accordance with the information from Defendants' records" [*id.*, ¶ 7.3.1], but the processing and any resulting denial is the **Administrator's** prerogative, not Defendants. *See Saccoccio*, 297 F.R.D. at 696-97 (overruling objection to audit right in comparable LPI settlement).

significant value to the class members nationwide." *Hamilton*, 2014 WL 5419507, at *4; *see also Hall*, 2014 WL 7184039, at *5 ("The Court finds the injunctive changes provided in the Settlement Agreement are important and have significant value to the class members nationwide."). *See also Gillette*, 2015 WL 4310896 (explaining benefits of injunctive relief).

(c)     The Court also must consider the likelihood and extent of any recovery from Defendants absent the Settlement.

(i)     The Settlement's terms were achieved notwithstanding many courts disagreeing about whether the underlying theories of liability even state valid claims for relief.  Indeed, there is "no doubt that recent federal appellate decisions have changed the climate for Plaintiffs' class action attorneys pursuing force-placed insurance claims." *Montoya v. PNC Bank, N.A.*, No. 14-20474, 2014 WL 4248208, at *2 (S.D. Fla. Aug. 27, 2014). *See also Rothstein v. Balboa Insur. Co.*, 794 F.3d 256 (2d Cir. July 22, 2015) (reversing denial of order denying motion to dismiss LPI case because the filed rate doctrine barred the claim).

The Eleventh Circuit itself has rejected LPI-related claims similar to the ones alleged here.  *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-11 (11th Cir. 2014); *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1340-42 (11th Cir. 2000).  And this Court emphasized in another LPI lawsuit that while plaintiffs' mail and wire fraud allegations may be "barely" sufficient to withstand a motion to dismiss by "a razor-thin margin,"

there are "strong headwinds" that will test plaintiffs' "less-than-obvious causation theory" and purported "fraudulent scheme" at later stages in the litigation. *Montoya v. PNC Bank, N.A.*, No. 14-20474, 2015 WL 1311482, at *13-16, *24-26 (S.D. Fla. Mar. 23, 2015); *see also Wilson v. Everbank, N.A.*, No. 14-22264, 2015 WL 1600549, at *2-6 (S.D. Fla. Apr. 9, 2015) (dismissing comparable LPI mail and wire fraud-based claims); *Hall*, 2014 WL 7184039, at *4 (noting that "a number of courts have dismissed" comparable LPI claims, so "there exists a potential that the class could endure a long and expensive trial only to come away with nothing"); *Saccoccio*, 297 F.R.D. at 692 (observing that "there is strong authority to suggest that Plaintiff may not have prevailed" in similar LPI class litigation).[5]

---

[5]    After the Fairness Hearing, the Court directed the parties to file a list of all cases, from both the trial and appellate levels, from April 1, 2012 to the present, in which courts have approved settlements in LPI cases, rejected them and/or ruled on motions to dismiss or for summary judgment, in whole or in part. The parties complied. [ECF Nos. 164; 165; 167].

   As the Court suspected, there are *many* rulings, most entered in the past three years, ranging all across the country, granting motions to dismiss, sometimes with prejudice, and defense-filed summary judgment motions. These rulings confirm United States District Judge Federico Moreno's weather-oriented observation that LPI class action plaintiffs face "headwinds." *Saccoccio,* 297 F.R.D. at 693. The Court appreciates counsel's diligent work in tracking down the information and putting the results in a user-friendly chart form. The project was worthwhile, as it confirmed that LPI lawsuits face significant legal obstacles. To continue with Judge Moreno's weather metaphor, the possible fate of LPI class action lawsuits can now certainly be described accurately with a reference to metereological-focused song lyrics sung by Billie Holiday (i.e., "Don't

(ii)     Defendants also have strong affirmative defenses. For example, Defendants made arguments based upon the filed rate doctrine that could have been dispositive at later stages of the Litigation.  Some courts, including appellate courts, have found this defense theory dispositive. "The filed rate doctrine (also known as the 'filed tariff doctrine') 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.'" *Hill v. BellSouth Telecommc'ns, Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004) (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). "Therefore, causes of action in which the plaintiff attempts to challenge the terms of a filed tariff are barred by the filed rate doctrine." *Id.* Moreover, "even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." *Id.* at 1317. Defendants here argue that the filed rate doctrine applies to filed insurance premium rates like the LPI premium rates at issue here, and there is surely authority to support that position. *See, e.g., Rothstein*, 794 F.3d 256*; Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-81373, 2013 WL 139913, at *12 (S.D. Fla. Jan. 10, 2013); *Morales v. Attorneys' Title Ins. Fund Inc.*, 983 F. Supp. 1418, 1426 (S.D. Fla. 1997).

---

know why there's no sun up in the sky/ **Stormy weather**") and the Allman Brothers Band (i.e., "They call it **Stormy Monday**, but Tuesday's just as bad").

(iii)   Many courts have applied the filed rate doctrine to dismiss comparable LPI claims, including fraud-based claims, at the pleadings stage.  *See, e.g., Johnson v. Green Tree Servicing LLC*, No. 15-18, 2015 WL 2452680, at *2 (N.D. Miss. May 22, 2015); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 553-54 (S.D.N.Y. 2014); *Curtis v. Cenlar FSB*, No. 13-3007, 2013 WL 5995582, at *3 (S.D.N.Y. Nov. 12, 2013); *Singleton v. Wells Fargo Bank, N.A.*, No. 12-216, 2013 WL 5423917, at *2 (N.D. Miss. Sept. 26, 2013); *Roberts v. Wells Fargo Bank, N.A.*, No. 12-200, 2013 WL 1233268, at *13 (S.D. Ga. Mar. 27, 2013); *Decambaliza v. QBE Holdings, Inc.*, No. 13-286, 2013 WL 5777294, at *6-7 (W.D. Wis. Oct. 25, 2013); *Stevens v. Union Planters Corp.*, No. 00-1695, 2000 WL 33128256, at *3 (E.D. Pa. Aug. 22, 2000).  And even if (as here) Plaintiffs survived an early motion to dismiss,[6] it is "apparent that the filed rate doctrine is an issue that must be addressed" eventually, whether at summary judgment, trial, or in another posture. *Kunzelmann*, 2013 WL 139913, at *12.  In the context of a nationwide class, ruling on the filed rate doctrine under the differing laws of the 50 states would be exceedingly complicated, and could yield disparate results. "To determine whether, and to what extent the filed-rate doctrine is applicable would require an analysis of each state's

---

[6]     In *Rothstein,* the plaintiffs initially survived a motion to dismiss when the district court rejected Defendants' filed rate doctrine theory. But the district court, noting a conflict of authority, certified its decision for interlocutory appeal, and the Second Circuit then (very recently) accepted the filed rate doctrine argument and remanded the case for **dismissal.** 794 F.3d 256.

formulation of the doctrine and may require examination of the regulatory proceedings involved in approving the rate filed." *Id.*

(iv)   For the same and other reasons, Plaintiffs' ability to obtain certification of a litigated class is less than certain. It does not appear that any court, state or federal, has granted a contested motion to certify a nationwide class of borrowers asserting comparable LPI claims.  Many courts have declined to do so.  *See Hall*, 2014 WL 7184039, at *4 (noting that "most courts have denied class certification in lender-placed insurance cases, and none have certified a nationwide class"); *Kunzelmann*, 2013 WL 139913, at *4-12 (denying class certification of comparable LPI claims); *Gordon v. Chase Home Finance, LLC*, No. 11-2001, 2013 WL 436445, at *6-12 (M.D. Fla. Feb. 5, 2013) (same); *accord Rapp v. Green Tree Servicing LLC*, 302 F.R.D. 505, 509-20 (D. Minn. 2014) (same); *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 535-50 (C.D. Cal. 2013) (same); *cf. Montoya*, 2015 WL 1311482, at *27 (recognizing "need to again confront the filed-rate doctrine argument when analyzing [a] class certification motion").

(v)   The Settlement thus avoids fundamental uncertainties with Plaintiffs' claims.  Litigating these claims to resolution would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to have prevailed in litigation, that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the

expenditure of millions of dollars by both sides. This factor also weighs in favor of approving the settlement. *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this second . . . factor weighs strongly in favor of granting final approval to the Settlement Agreement").

Put simply, the agreed Settlement relief here is nearly what (and in many cases, more than) Plaintiffs could have obtained in a contested resolution of the Litigation. That relief will be available immediately, without protracted proceedings. "Significantly, none of the objectors disputed that these obstacles exist and are formidable. In light of the recovery to the class, as well as the significant litigation risk Plaintiffs faced absent settlement, the settlement is fair, reasonable and adequate." *Hall*, 2014 WL 7184039, at *4.

(d)     The complexity, expense, and duration of continued litigation is another factor weighing heavily in favor of final approval. Many of Plaintiffs' claims were highly complex. *See Saccoccio*, 297 F.R.D. at 692, 693 (characterizing comparable LPI claims as "highly complex" and "quite complex"). A massive effort would be necessary to conclude the Litigation under the auspices of a jury, and have that result reviewed on appeal. To reach the trial stage, the Parties would unquestionably engage

in substantial motion practice, including discovery motions, briefs and expert opinions for and opposing certification of a class, motions for summary judgment, and a series of motions *in limine*. The Court would be presented with numerous pre-trial legal and evidentiary disputes. Moreover, a trial of this Litigation would take substantial time, likely straining the patience of even the most engaged jurors. "Complex litigation – like the instant case – can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *U.S. Oil*, 967 F.2d at 493.

      (e)    The Court considers the stage at which the Settlement was reached. "The stage of the proceedings at which a settlement is achieved is evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324. "Early settlements are favored," however, and "'vast formal discovery need not be taken.'" *Saccoccio*, 297 F.R.D. at 694 (quoting *Lipuma*, 406 F. Supp. 2d at 1324). "Information obtained from other cases may be used to assist in evaluating the merits of a proposed settlement of a different case." *Lipuma*, 406 F. Supp. 2d at 1325.

      (i)    Class Counsel were well-positioned to evaluate the merits of Plaintiffs' claims, as well as the appropriate basis on which to settle them, as a result of their participation in years of similar LPI litigation in this District and elsewhere, and review of over 30 million pages of documents and over 30 depositions in similar

22

litigation [ECF Nos. 144-3, ¶ 46; 161, pp. 54:17-56:21], including repeated depositions of Ronald Wilson (vice president of account management for several of the Assurant Defendants) and other representatives of the Assurant Defendants.  [ECF Nos. 144-3, ¶¶ 16, 39; 161, pp. 54:17-55:7, 108:17-25]. Some of the discovery obtained in those other LPI cases included discovery concerning Ocwen. [*Id.*].

(ii)   In this Litigation, Class Counsel conducted extensive formal and informal discovery before and during the Lee Mediation.  [ECF Nos. 144-3, ¶¶ 11, 15, 16, 44; 161, pp. 55:14-25]. Among other things, Defendants provided Class Counsel with details about the functions and capabilities of the systems on which they retain borrowers' financial data, including Defendants' inability to query those systems for information about which borrowers may have paid or still owe amounts for LPI charges. [*Id.*, ¶¶ 15, 37]. Defendants also provided Class Counsel with information concerning Ocwen's hazard, flood, and wind LPI programs, including detailing the compensation arrangements between Defendants, the number of LPI Policies in force, and aggregate Premiums. [*Id.*, ¶ 15].

(iii)   After negotiating the Settlement Agreement, Defendants publicly filed declarations by Mr. Wilson [ECF No. 154-1] and Jason Jastrzemski (Ocwen's director of mortgage servicing oversight) [ECF No. 134-1] confirming that it is not feasible to determine systematically whether LPI premiums were paid or are still

owed by any given Class Member.[7] On June 25, 2015, after the Fairness Hearing (and

perhaps because of questions which arose during the hearing), Class Counsel took Mr.

Jastrzemski's deposition to test the statements made in his declaration, the transcript of

which has now been publicly filed. [ECF No. 169-1]. Although these evidentiary

---

[7]     Mr. Jastrzemski describes Ocwen's processes and accounting of transactions in borrowers' escrow accounts as they relate to LPI. [ECF No. 134-1, ¶ 1]. He explains that Ocwen maintains escrow and other account information in RealServicing, Ocwen's servicing system. [*Id.* ¶ 4]. As with other escrow items, debits for the cost of LPI premiums are recorded in a borrower's escrow account history in RealServicing. [*Id.*, ¶ 5]. The data record in RealServicing does not allow Ocwen to identify, by means of an electronic search through all borrower files, which of the borrowers whose escrow accounts were charged to reimburse Ocwen for the cost of LPI premiums subsequently paid those charges, or which of the borrowers still owe the charges. [*Id.*]

For example, a payment into a borrower's escrow account (whether from the borrower or some third party) is not attributed in RealServicing to *specific* escrow charges, so payment to an escrow account will not be reflected in RealServicing as a payment for LPI. [*Id.*]. Escrow account credits also reflect more than payments from the borrower, and include credits reflecting accounting adjustments and payments received from third parties. [*Id.*]. As a result, the fact that there is a credit before or after an LPI debit does not mean necessarily that a borrower actually reimbursed Ocwen for LPI premiums. [*Id.*]. In addition to escrow credits resulting from payments by borrowers or on their behalf, borrowers' escrow balances might be credited with certain amounts in a number of circumstances, including when there has been a loan modification, or when loans are liquidated as part of a short sale or deed-in-lieu of foreclosure transactions. [*Id.* ¶ 7]. Still other such circumstances exist, as detailed in the Jastrzemski declaration. [*Id.*].

*W*here it would be possible, on an individual basis, to determine whether LPI premiums were paid or are still owed by a borrower, the determination would require a manual review of transactions in the borrower's escrow account. [*Id.* ¶ 8]. Given that there are hundreds of thousands of unique loans, many with multiple LPI placements, within the Settlement Class, an individualized review could take years to accomplish. [*Id.*].

materials were not available at the time the Settlement Agreement was negotiated, they **confirm** the factual premises upon which the Settlement was based. Plaintiffs also publicly filed declarations from the Settlement Administrator regarding the number of Class Members, Claimants, and Requests for Exclusion.  [ECF Nos. 144-4; 158-1].

(f)    The Court next considers whether the Parties colluded in negotiating the Settlement Agreement. "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). The Court is satisfied that this Settlement is not the product of collusion, explicit or subtle.

(i)    "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio*, 297 F.R.D. at 692. "There is a presumption of good faith in the negotiation process." *Id.* That presumption has not been rebutted here. The Settlement Agreement was the result of arm's-length negotiations, assisted by a well-known mediator for class actions, Rodney A. Max [ECF No. 150-1]. As the Court stated at the Final Approval Hearing, Mr. Max is a "highly respected mediator" [ECF No. 161, p. 84:21-22], "one of the top mediators in Florida," and, indeed, "probably one of the top mediators in the country."  [*Id.*, at p. 60:2-3]. This Court is not alone in its estimation of Mr. Max. *See, e.g., Curry v. AvMed,*

*Inc.*, No. 10-24513, 2014 WL 7801286, at *2 (S.D. Fla. Feb. 28, 2014) (favorably observing that class settlement negotiations were "presided over by the highly experienced third-party neutral Rodney A. Max"); *Burrows*, 2013 WL 10167232, at *7 (finding no evidence of collusive class settlement based in part on testimony of mediator Rodney Max). Notably, Mr. Max has mediated to resolution other LPI class settlements that have received final approval in this District. "Parties colluding in a settlement would hardly need the services of a neutral third party to broker their deal." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001).[8]

(ii)     Settlement discussions proceeded in three phases. First, before formal mediation the Parties engaged in multiple telephonic negotiating sessions and exchanged significant amounts of information under Mr. Max's supervision. [ECF Nos. 144-3, ¶¶ 11, 13, 15; 150-1, ¶¶ 2-9, 11, 13]. Second, on November 6, 2014, the parties participated in an in-person mediation session. [ECF Nos. 144-3, ¶ 13; 150-1, ¶¶ 11-12]. The Parties reached an agreement in principle on November 13, 2014 [ECF Nos. 144-3, ¶¶ 17; 150-1, ¶ 15], culminating in the 114-page Settlement Agreement. [ECF Nos. 144-1; 144-2]. As Mr. Max has attested, there was no collusion among the Parties. [ECF No.

---

[8]     The objector in *Gillette* asserted a self-dealing contention because of the "clear-sailing" provision, which is also found in the instant settlement. The appellate court rejected the argument, noting that "the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced, court-appointed mediator." 2015 WL 4310896, at *6.

150-1 ¶¶ 11-12, 14, 17-19]. "To the contrary," he attested, "at each point during these negotiations, the settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." [*Id.*, ¶ 17].

(iii)   In addition, the Court personally observed the Parties' counsel during the litigation and has no reason to doubt their professionalism or integrity. Moreover, the Court is familiar with Class Counsel and most of the defense lawyers and they all enjoy impeccable reputations. There is simply no evidence of self-dealing, collusion or other unethical behavior, want of skill, or lack of zealous advocacy.

(iv)   The Settlement Agreement's section on Attorneys' Fees and Costs contains a so-called "clear-sailing" provision, whereby Defendants agree not to oppose or otherwise object to an application by Class Counsel for an award of Attorneys' Fees and Expenses in an amount not to exceed $9.85 million. [ECF No. 144-1, ¶ 15.2].  Some courts have suggested that a clear-sailing provision may be a warning sign of a collusive bargain. "The inclusion of such a 'clear sailing' provision within the settlement agreement's terms, however, merely justifies the Court's application of heightened scrutiny when evaluating the class counsel's ultimate fee request; it should not be read as an independent ground for withholding approval of the entire settlement." *Matter of Skinner Group, Inc.*, 206 B.R. 252, 263, n.14 (N.D. Ga. 1997). Indeed, while a clear-sailing provision could indicate that the settling parties compromised class members' interests to give class counsel favorable treatment on attorneys' fees, it could

just as easily be included for purposes of finality and risk avoidance. *See Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985) (a clear-sailing provision "is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged").

(v)     The Court has already found that the Settlement was negotiated at arm's-length. The Settlement's relief -- which replicates a model approved in multiple other LPI class settlements -- independently confirms the absence of collusion.  Class Members here will receive the same sort of deal multiple judges have already found to be fair. Furthermore, the Parties began negotiating attorney's fees only *after* they had finished negotiating the Settlement itself [ECF Nos. 150-1, ¶ 18; 144-3, ¶ 71], another ground for rejecting the notion of collusion. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 335 (3d Cir. 1998) (overruling objection to clear-sailing provision since there was "no indication the parties began to negotiate attorneys' fees until after they had finished negotiating the settlement agreement"); *Ingram*, 200 F.R.D. at 693 (finding no collusion where attorneys' fees were "negotiated separately from the rest of the settlement, and only after substantial components of the class settlement had been resolved").

(vi)     With or without giving the Settlement heightened scrutiny, the Court finds the clear-sailing provision to be immaterial. Based on the factual record, the Undersigned finds that there was no collusion among the Parties. And where there

is no collusion, a clear-sailing provision should not bar a class settlement's approval. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 n.4 (11th Cir. 1999); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 425-26 (6th Cir. 2012); *Fladell*, 2014 WL 5488167, at *4 ("[A]lthough the Settlement Agreement includes a 'clear-sailing' provision, that is immaterial. There was no collusion in the settlement negotiations and the Parties began negotiations regarding attorneys' fees only after finishing negotiating the Settlement itself").

10.     The Court has carefully considered the objectors' arguments, particularly regarding the Settlement's claims-made structure and potential claims rate, and those objections are **overruled**. While the Court "must extend to the objectors leave to be heard," it need not "open to question and debate every provision of the proposed compromise" and, accordingly, the Court "may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Cotton*, 559 F.2d at 1331. The Court has "examine[d] the settlement in light of the objections raised" and will now "set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response." *Id.*

(a)     Objector Jon Hansen, acting *pro se*, objects that the Release's "wording 'or could have been raised in the case' leaves the reality of recorded court documents and settles into the potential fantasy land of conjecture and legal council

29

[sic] imagination." [ECF No. 153, p. 1]. Mr. Hansen did not appear at the Final Approval Hearing, personally or through counsel.

        (i)     His objection overlooks that "a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint. And it has been held that even when the court does not have power to adjudicate a claim, it may still approve release of that claim as a condition of settlement of an action before it." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (internal quotation marks omitted); *see also Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 420 (11th Cir. 2009) ("Given a broad enough settlement agreement . . . and provided that [a class member] had notice of it and an opportunity to opt out, it is perfectly acceptable for the [settling class] action to preclude his claims, even if they could not have been part of that action itself."). This is consistent with ordinary principles of *res judicata*. *See Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 892 (11th Cir. 2013) ("The doctrine of *res judicata*, or claim preclusion, bars the parties to an action from litigating claims that were or could have been litigated in a prior action between the same parties").

        (ii)    Furthermore, Mr. Hansen's (and the others') "objections lack merit because the objectors can **simply opt out** if they have concerns about releasing their claims." *In re Managed Care Litig.*, No. 00-1334, 2003 WL 22850070, at *5 (S.D. Fla.

Oct. 24, 2003); *Diaz v. HSBC USA, N.A.*, No. 13-21104, 2014 WL 5488161, at *3 (S.D. Fla. Oct. 29, 2014); *see also Faught*, 668 F.3d at 1241-42 (objection that "the settlement is unreasonable because it strips class members of their class rights while failing to resolve their individual claims" and "that the settlement does not adequately compensate them" deemed "unconvincing" since class members were "free to opt out of the class and still have the option of . . . filing an individual suit"); *In re CP Ships Ltd., Secs. Litig.*, 578 F.3d 1306, 1318 (11th Cir. 2009) (rejecting objection "that the district court erred in approving the settlement because foreign class members have potential for a greater recovery" in Canadian litigation since settlement class members "wishing to pursue the Canadian Actions could opt out of the instant settlement").[9]

(b)     Objector Margo Perryman has been the most active objector, although she did not appear at the final fairness hearing. She is the named plaintiff in a parallel, though later-filed, class action pending in the United States District Court for the Northern District of California. As such, she is among "the small and vocal minority of class members who have objected[,] fueled by would-be class counsel in competing lawsuits, so their objections are suspect." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d

---

[9]     Mr. Hansen and another objector, Michael Hobbs [ECF No. 148], also characterize (without analysis) the amount of the Attorneys' Fees and Expenses as disproportionate to the relief afforded Class Members. The Court overrules that objection since the value of the relief afforded Class Members merits the Attorneys' Fees and Expenses awarded.

1292, 1315 (S.D. Fla. 2007). Although she principally challenges the Settlement's claims-made structure, members of Ms. Perryman's counsel[10] served as co-counsel in four other LPI class actions that were settled and granted final approval in this District, **all using the same claims process the Parties have agreed to use in this Litigation.** In April 2015, the Court denied Ms. Perryman's motion for discovery relating to the necessity of the Settlement's claims-made structure [ECF No. 131], concluding that, among other things, Class Counsel had confirmed a claims-made settlement is the best possible structure for Settlement Class Members.  [ECF No. 145].  Like the other remaining objectors, Ms. Perryman did not appear at the Final Approval Hearing, personally or through counsel.[11]

---

[10]    Three of Ms. Perryman's attorneys have informed Class Counsel that they no longer represent Ms. Perryman in this matter. Her objection was filed by her two remaining counsel, Mr. Himmelstein and Ms. Kelly, with Mr. Himmelstein taking the lead. Attorney Alexander Owings, an Arkansas-based attorney who is a Florida Bar member and who served as "local counsel" for Ms. Kelly and Mr. Himmelstein, filed a motion for leave to withdraw [ECF No. 182]. The motion did not provide any grounds for the requested withdrawal, but no objections were filed, and the Court granted the motion, giving the two out-of-town attorneys 10 days to find substitute local counsel. [ECF No. 183].

[11]    Like Ms. Perryman, former objectors Shane and Cecilia Valdez are plaintiffs in a similar LPI action pending in the Central District of California against some of the same Defendants in this Litigation. The Court overruled as premature the Valdezes' earlier objection to the Settlement's preliminary approval.  [ECF No. 119 at 2-4].  Although they raised a scattershot of grievances, principally taking issue with the Settlement's claims-made process, the Valdezes have since withdrawn their objection to the Settlement's final approval.  The objection having been "surrendered on terms that do not affect the

32

"[C]ourts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *Dennis v. Kellogg Co.*, 09-CV-1786-L, 2013 U.S. Dist. LEXIS 163118, at *11 (S.D. Cal. Nov. 14, 2013) (citation omitted).

Mr. Himmelstein and his local counsel, Ms. Kelly, represent Ms. Perryman in a competing class action in California, which has been stayed pending approval of the Settlement here. Plaintiffs say these two attorneys have a clear financial interest in convincing this Court to reject or delay the Lee Settlement with an appeal to our Eleventh Circuit in order to leverage fees from Class Counsel. Such tactics are common in class action practice and disapproved of by the courts. *See, e.g., In re Hydroxycut Mktg. & Sales Practices Litig.*, MDL No. 09-md-2087, 2013 U.S. Dist. LEXIS 133413, at *71 n.3 (S.D. Cal. Sept. 17, 2013) (criticizing objecting counsel for attempting to leverage fees with objection and noting that "this type of abuse of the objection process is not uncommon") (citing MANUAL FOR COMPLEX LITIG. § 21.643 (4th ed.) ("Some objections, however, are made for improper purposes, and benefit only the objectors and their attorneys (e.g., by seeking additional compensation to withdraw even ill-

---

class settlement," Fed. R. Civ. P. 23(e), 2003 advisory comm. notes, the Court has approved its withdrawal from further consideration. [ECF No. 163]. *See also Fladell*, 2014 WL 5488167, at *3 (granting request to withdraw objections to comparable LPI class settlement). The Court will nonetheless indirectly address the Valdezs' concerns to the extent the Court addresses Ms. Perryman's substantively overlapping objection.

founded objections). An objection even of little merit can be costly and significantly delay implementation of a class settlement")); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1361 n.30 (S.D. Fla. 2011) (collecting authority disapproving of objections brought with ulterior motive by those "whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto").

(c)    As noted above, Ms. Perryman focuses her objection on the Settlement's claims process, characterizing claims-made structured class settlements like this one as "disfavored" and "generally disapproved." [ECF No. 146, p. 6]. She advocates an alternative direct-payment structure. [*Id.*].

(i)    This objection is unconvincing. Ms. Perryman has now submitted, at the Court's direction, a declaration conceding that she "has no personal knowledge as to whether a claims process is truly necessary." [ECF No. 173-2]. Moreover, two appellate decisions entered in recent months undermine her argument that a claims-made settlement methodology is improper: *Gillette and Rothstein.*

Ms. Perryman's counsel, Mr. Himmelstein, challenges the Settlement on two fronts. (1) he objects to its claims-made structure, arguing that a direct-pay structure should instead be employed (but never addresses whether Defendants would have agreed to direct-pay), and (2) he argues that the Settlement is inadequate because Class Counsel's proposed fee will be disproportionate to the total monetary relief that Defendants pay out to class members. [ECF Nos. 146; 173, p. 1.] The Eleventh Circuit

addressed both objections in *Gillette,* which, though unpublished, is persuasive (even though arising in a different context).[12]

*Gillette* involved objections to a settlement that provided for monetary and injunctive relief to a nationwide class of purchasers of certain Duracell batteries. The district court had overruled objections to the claims-made structure of the settlement, as well as the allocation of settlement benefits among the class, Class Counsel, and *cy pres* designees. As here, among other things, the objectors had argued both that "the total monetary value that [would] personally accrue to class members [wa]s relatively small as compared to the attorney's fees," and that "there should be a way to provide monetary relief to a greater number of Class Members." *Poertner v. Gillette Co.*, No. 6:12-cv-803-Orl-31DAB, 2014 U.S. Dist. LEXIS 116616, at *8-9 (M.D. Fla. Aug. 21, 2014).[13]

The Eleventh Circuit unequivocally rejected both objections. First, the court concluded that the district court had not abused its discretion in holding that a claims-made structure was fair, reasonable, and adequate, because **"the use of a claims**

---

[12]     *Rothstein*, which agreed with Defendants' filed rate doctrine defense and directed the dismissal of an LPI case, is a powerful illustration of the hurdles that the plaintiffs here would have faced if they had continued with litigation. 794 F.3d 256. Thus, the case supports final approval. [As an interesting or coincidental aside, Attorney Frank Burt and other attorneys at his firm (Carlton Fields Jorden Burt, P.A.) represented ASIC in its capacity as *amicus curiae* in *Rothstein.* They represent ASIC in this case as a named party defendant].

[13]     This is quoted from the lower court's decision, prior to the Eleventh Circuit's ruling in *Gillette*, 2015 WL 4310896.

**process is not inherently suspect[,]"** and the amount to be paid to class members who submitted claims "exceeded the damages that an average class member would have received if the class had prevailed at trial." *Gillette*, 2015 WL 4310896, at *4 (citation omitted) (emphasis added). The Eleventh Circuit also rejected the objector's contention that the defendants could pay some portion of the class directly, because, even if that had been true, "that does not mean that the district court lacked the discretion to approve the settlement as fair absent the identification of these class members." *Id.* at *5.

Nevertheless, *Gillette* is not the slam-dunk case that Class Counsel portray, as the facts are significantly different. First, the lawsuit there was a consumer class action involving a national class of nearly 7.6 million persons who had not been identified. Indeed, the appellate court noted that Gillette "did not have any personal information about the unnamed class members," which meant that class notice was provided by publication through national periodicals and popular internet sites. *Id.* at *2. As the district court noted, "Gillette does not sell at retail, so it has records from which to identify actual purchasers of Ultra batteries." *Id.* at *5. In addition, that case involved a *cy pres* award, where Gillette agreed to donate $6 million of batteries to charities. There is no *cy pres* award in the instant case.

On the other hand, the primary objector there, like Ms. Perryman here, challenged the claims-made methodology. He argued that the identities of many class members *could* be ascertained by subpoenaing the customer records of a handful of

major retailers. Therefore, he concluded that the settling parties could provide individualized notice or direct payment to at least some class members. The appellate court rejected that argument, holding that the district court nevertheless had discretion to approve the settlement as fair absent the identification of these class members. *Id.* at *5.

Ms. Perryman argues that the claims-made methodology in *Gillette* was **necessary** (because the potential claimants in the nationwide consumer class action lawsuit could not be adequately identified), suggesting that the methodology would not be necessary here. To be sure, Ocwen can easily identify the mortgagors whose loans were being serviced, so it did not confront the same "unidentified claimant" scenario present in *Gillette.* But Class Counsel argue that, for all practical purposes, the claims-made approach *is* necessary here because Ocwen lacks the ability to efficiently track down the necessary information about each mortgagor's situation.

In the Court's view, the claims-made methodology was absolutely necessary in *Gillette* because no other approach would have worked, while the methodology was, *in effect,* necessary here because the information, while perhaps theoretically available, would have required a massive amount of file-by-file review which would have derailed the settlement.

The Undersigned does not interpret *Gillette* to stand for a rule that all claims-made class action settlements are acceptable at all times, nor do I view it as an opinion

which "forecloses" challenges to the methodology. Instead, the case stands for the rule that the use of a claims process is not inherently suspect even though monetary relief would be available only to those class members who actually submitted claims. A claims-made process might or might not be fair and reasonable, depending on the specific facts and circumstances and the *Bennett* factors analysis.

But other courts approved claims-made class action settlements before the recent *Gillette* opinion. For example, as noted in *Hall,* "there is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.'" 2014 WL 7184039, at *6 (quoting *Saccoccio,* 297 F.R.D. at 696). "Filing a claim form is a reasonable administrative requirement which generally does not impose an undue burden on members of a settlement class." *Hamilton*, 2014 WL 5419507, at *6.  The Court, along with other judges in this District and elsewhere, holds the view that "'criticism of the claims-made structure' does 'not impact the fairness, reasonableness, or adequacy of the proposed settlement.'" *Id.* (quoting *Casey v. Citibank, N.A.*, No. 12-820, 2014 WL 4120599, at *2 (N.D.N.Y. Aug. 21, 2014)).

*Gillette* also rejects the notion that the Court must identify the payment structure that would provide *optimal* relief to the class, or that a claims-made process may be employed only if the parties show that it is necessary. The Court's job instead is to determine whether the settlement as presented is fair, reasonable, and adequate. *See id.* at *5 (district court had discretion to approve claims-made settlement without

38

identifying class members who could be paid directly); *Casey v. Citibank, N.A.*, No. 13-cv-820, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014) ("The Court does not have the authority to impose a preferred payment structure upon the settling parties").

The *Gillette* court also rejected an objection that class counsel's fee request was too large when compared to value of the actual payout to the settlement class as "based on [a] flawed valuation of the settlement pie: limiting the monetary value to the amount of [Defendant's] actual payments," while excluding the value of the injunctive and other negotiated relief. *See Gillette,* 2015 WL 4310896, at *6; *see also id.* at *4 (district court correctly concluded that injunctive relief and *cy pres* award "were part of the settlement pie"). This also undermines Ms. Perryman's challenge (or her counsel's challenge) to Class Counsel's requested fee here, which Plaintiffs say is based on pure speculation as to the actual amount that will be paid to class members, [ECF No. 173, p. 1], and excludes any consideration of the valuable injunctive relief made available to the nationwide class.

*Gillette's* approval of counsel's fees also assists class counsel here because the payout structure was arguably more favorable to counsel than the proposed settlement here. In the *Gillette* nationwide consumer class action lawsuit settlement, class members who filed valid claims -- on a one-page form submitted either online or by mail -- would receive $3 per pack of batteries, up to four packs with proof of purchase and two packs

without proof. The claims administrator reported that 55,346 class members made claims totaling **$344,850** -- and the attorney's fees and costs were **$5.68 million**.

To be sure, the *Gillette* Court also factored in the injunctive relief and the $6 million *cy pres* award. But the objector challenged the value of the injunctive relief as illusory, noting that Gillette was no longer selling the batteries in question when it agreed to stop putting the allegedly misleading statements on the batteries' packaging. The appellate court rejected that argument, noting that Gillette's decision to stop selling the batteries was motivated by the lawsuit.

In addition, courts consider the value of injunctive relief and monetary relief together in assessing whether a class action settlement provides sufficient relief to the class. *Gillette*, 2015 WL 4310896 (affirming approval of class action settlement based on, in addition to monetary payments, the inclusion of injunctive and *cy pres* relief). Class Counsel has not placed a specific dollar value on the injunctive relief, though it notes, in its proposed order approving the settlement [ECF No. 172-1, p. 20], that it add "considerable value to the settlement." In its motion for approval [ECF No. 144, p. 18], Class Counsel note that the injunctive relief prohibits the Ocwen Defendants "from

continuing to implement the practices challenged in the First Amended Complaint, which reaped millions of dollars in revenues for Defendants during the class period."[14]

If the $6 million *cy pres* award were added to the $344,850 in claims, that would yield $6.34 million. With a fees and costs award of $5.68 million, this ratio is substantially more skewed toward a greater fees and costs award than the ratio in the instant case -- and this evaluation does not include the value of the injunctive relief. At bottom, the ratio of financial relief provided to the class members here is comparatively greater than the relief provided in *Gillette,* a significant factor which mitigates in favor an approval here.

(ii)   An objector like Ms. Perryman "must do more than just argue that she would have preferred a different settlement structure, as this court's review of the settlement structure is even more narrow." *Uhl v. Thoroughbred Technology & Telecommc'ns, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002). "Perhaps there could have been an even more creative settlement or, alternatively, one that is more traditional.  But that is not the question we must resolve." *Id.* at 987. After all, "whether another team of negotiators might have accomplished a better settlement is a matter equally comprised

---

[14]    Class Counsel concede [ECF No. 144, p. 18] that some of these practices were already prohibited by a settlement reached with New York regulators before this settlement was reached, but they note the New York injunction applies only to New York borrowers and binds only the Assurant Defendants, "leaving Ocwen free to continue its practices with another insurer."

of conjecture and irrelevance." *Corrugated Container*, 643 F.2d at 212. "'While a direct payment structure would obviously result in more, and possibly all, class members receiving a share of the monetary relief in the settlement, there is no reason to believe the defendants would agree to such terms' and, in any event, the Court 'does not have the authority to impose a preferred payment structure upon the settling parties.'" *Fladell*, 2014 WL 5488167, at *4 (quoting *Casey*, 2014 WL 4120599, at *2-3).

(iii)    The Settlement has been designed to incentivize Class Member participation.  It is substantively fair, offering complete relief (or better) to every interested Claimant who submits a valid Claim Form. Ms. Perryman does not appear to contest that 12.5% of the Net Premium approximates the Settlement Class Members' alleged damages. That Settlement Claim Relief will be worth hundreds of dollars to the average Claimant. The Settlement also is procedurally fair. The approved Claim Form should take no more than a few minutes for the average Class Member to review and complete and requires the submission of no supporting materials that would be required in an individual lawsuit. *See Hall*, 2014 WL 7184039, at *8 (similar claim form in LPI class settlement would take just "a few minutes" to complete); *Hamilton*, 2014 WL 5419507, at *5 (same). As District Judge James Cohn aptly stated in the context of a comparably structured LPI class settlement:

> Where, as here, a claims-made process is a reasonable method for providing prompt and substantial relief to the class, requiring class members to file claim forms also maximizes the relief available to class members who opt to submit a claim.  A settlement's fairness is judged by

42

the **opportunity** created for the class members, **not by how many submit claims.** What matters is the settlement's value to each class member – it is ultimately up to class members to participate or not.

*Id.* at *7.[15] (emphasis supplied).

        (iv)    A hypothetical direct-payment structured settlement -- the kind Ms. Perryman urges -- is not necessarily any fairer. Defendants have represented [ECF No. 154, p. 6], and the Court has no reason to believe otherwise, that such a direct-

---

[15]    *De Leon v. Bank of America, N.A.*, No. 09-1251, 2012 WL 2568142 (M.D. Fla. Apr. 20, 2012), *report and recommendation adopted*, 2012 WL 2543586 (M.D. Fla. July 2, 2012) -- a decision on which Ms. Perryman relies -- is not to the contrary. In the class settlement proposed there, class members would receive, at most, $28 in settlement of their claims; many would receive less. 2012 WL 2568142, at *1. "Several factors assure that few settlement class members will submit a claim form to obtain, at most, a $28.00 cash payment." *Id.* at *19. According to the *De Leon* court, "a maximum $28.00 payment is not likely to induce class members to submit a claim." *Id.* at *19. But "most importantly," that court found, "the proposed revised claim form requires the class member to provide specific factual details, under the penalty of perjury, regarding the credit card account, the method of payment used and the late payment fee, finance charge, or other fee or penalty assessed on a credit card payment made between April 1, 2005 and October 19, 2006" -- more than five years earlier. *Id.*

    Furthermore, the settling parties in *De Leon* submitted no evidence demonstrating the need for a claims-made settlement structure. *Id.* at *20. This Settlement is not analogous to the flawed *De Leon* settlement. The amounts available to Class Members here are, on average, likely to be in the hundreds of dollars, not a maximum of $28. Indeed, for this Settlement, there is no maximum recovery. And unlike the *De Leon* settlement, which required claimants to know and submit arcane data, Class Members here are eligible to receive Claim Settlement Relief merely by submitting a streamlined Claim Form and confirming their identity in one of several ways. Detailed information -- like coverage periods, total charges, or amounts paid -- need not be supplied. [ECF No. 144-2 Ex. C]. In addition, unlike the settling parties in *De Leon*, the Parties here submitted ample evidence demonstrating the need for a claims process, as discussed more fully in this Final Order.

payment settlement structure would have been negotiated to provide recovery at a much lower percentage of Settlement Class Members' LPI Net Premiums.  Negotiating for a smaller amount to go to Class Members would, in effect, unfairly reward some Class Members for their own indifference at the expense of those who would take the minimal step of returning the simple Claim Form to receive the larger amount. While a claims-made settlement structure does not guarantee an award to all class members, it does tend to maximize the opportunity available to each class member.  *See Faught*, 668 F.3d at 1242 (affirming approval of claims-made settlement where class members could receive full compensation "rather than mere pennies on the dollar for a uniform cash payment"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 250-51 (3d Cir. 2001) (explaining why a defendant can offer a higher percentage recovery in a claims-made class settlement). Moreover, as discussed more fully below, "determining the amounts to be paid under a direct-pay structure would potentially make settlement more costly than litigation." *Hamilton*, 2014 WL 5419507, at *6.

          (v)     It is significant that, in the context of LPI class settlements, *no* court has disapproved this Settlement's relief model.  Just the opposite is true. Many courts have approved claims-made processes in LPI cases like this one. *See Hall*, 2014 WL 7184039, at *6. "Indeed, district courts routinely approve reasonable claims-made settlements, including those involving lender-placed insurance." *Hamilton*, 2014 WL

5419507, at *7.  Ms. Perryman has not demonstrated how this case is materially different from those other LPI settlements or why the Court should deviate from them.

(d)     A settlement structured to make direct payments to Class Members was never a realistic option.  Using a claims-made process is the only practicable means of administering this Settlement. The Settlement offers cash relief to borrowers who paid *any* portion of Premium charges assessed to their mortgage escrow accounts and a credit to those who did not and who still owe those charges. But many Settlement Class Members have not, and will never, pay or continue to owe Premiums.  Many are no longer Ocwen borrowers. Those Class Members should not receive a windfall from the Settlement, but Ocwen cannot query its systems to identify on a class-wide basis whether class members had paid or still owed some portion of the amounts they were charged for LPI -- *i.e.*, showing that a claims-based process is necessary.  Substantial evidence supports this finding.  [ECF Nos. 154-1, ¶¶ 7-9; 134-1, ¶¶ 5-8; 144-3, ¶¶ 37-39; 169-1, pp. 26:11-34:25].

(i)     Unsatisfied, Ms. Perryman asserts additional challenges to the record evidence, including the declaration of Jason Jastrzemski [ECF No. 134-1], Ocwen's director of mortgage servicing oversight. She would like "Mr. Jastrzemski to explain what calculations can be performed manually that cannot be performed equally well by a computer program." [ECF No. 146 at 13]. But Mr. Jastrzemski has already explained which relevant "calculations" can be systematically performed by a computer

-- none. [ECF No. 134-1, ¶ 5]. He never suggested that a manual review could precisely determine this information, only that it would be impossible for a computer to do so systematically. In fact, Mr. Jastrzemski pointedly attested that a manual review might be useful only "[i]n cases where it would be possible, on an individual basis," to make the relevant determinations. [*Id.*, ¶ 8]. A computer cannot identify the source of funds paid to satisfy LPI charges; a manual review might do better, but there is no guarantee of accuracy. And because escrow accounts all differ, it is impossible to systematically reverse-engineer whether some or all of an LPI charge was paid.

(ii)    Ms. Perryman also is mistaken in arguing that because Ocwen can determine the source of the borrowers' escrow funds, it can determine whether funds from a third party were applied to an LPI charge.  [ECF No. 146, p. 14]. Ocwen cannot systematically determine the source of funds, even if in some cases Ocwen can do so via a manual review. [ECF No. 134-1, ¶¶ 5, 7]. Moreover, for borrowers who paid something into the escrow account, Ocwen does not attribute those payments to specific escrow items like LPI premiums.[16]

---

[16]    An escrow account is a running balance, much like a credit card, as Mr. Jastrzemski explained in his deposition at pages 26-27 [ECF No. 169-1]:

> And by way of example, this is – when I try to explain escrow to people, this is the easiest way I can get people to relate: If you started with a credit card balance of zero, and today I went out and bought a pair of shoes for a hundred dollars, I bought a belt for a hundred dollars, and a shirt for a

(iii)   Ms. Perryman further relies on declarations filed in the HSBC Bank LPI class settlement by a law professor and a "computer forensic expert" that supposedly "contradict the Jastrzemski declaration." [ECF No. 146 at 11]. But Ocwen was not a party to that other servicer's settlement and neither of those declarants claimed, nor demonstrated familiarity with Ocwen's electronic records systems. [ECF Nos. 146-1 Ex. F, ¶¶ 4-20; 146-1 Ex. G, ¶¶ 1-3]. They opined only about what HSBC's systems theoretically *should* do, not what the systems actually *could* do. The Court cannot credit the speculation of two untested "experts" submitted in a different case involving a different servicer using a different electronic records system. Moreover, both declarants in the HSBC settlement rested their opinions on the false assumption that if an escrow account ever ceased to have a deficiency following the payment of the last LPI charge, then the borrower would necessarily have paid the charge because the deficiency created by the advancing of premiums by the servicer would have been covered by the borrower's subsequent payments. [ECF Nos. 146-1 Ex. F, ¶ 93; 146-1 Ex. G, ¶¶ 20-23]. As Mr. Jastrzemski attests, that assumption is unwarranted for RealServicing. There are several common situations in which a

---

hundred dollars, and next month I make a hundred dollar payment to my credit card. I can't for certain say that I paid for the shoes, for the shirt or for the belt. I just paid a hundred dollars to pay down my balance. And that's very similar to the way an escrow account works, because of the commingle nature of taxes and insurance.

borrower was charged but never actually paid for LPI, which Defendants are incapable of identifying systematically. [ECF Nos. 134-1, ¶¶ 5-7; 169-1, pp. 26:11-34:25].

(e)     Having failed to refute the record evidence directly, Ms. Perryman attempts to do so indirectly.  She argues that, "[m]ore importantly," the existence of LPI class settlements "which provide direct payments to class members" somehow proves that the Parties cannot "justify a claims-made settlement in this case." [ECF No. 146, p. 10]. Ms. Perryman spotlights class settlements in *Weller v. HSBC Mortgage Services, Inc.*, No. 13-185 (D. Colo.), and *Ellsworth v. U.S. Bank, N.A.*, No. 12-2506 (N.D. Cal.), where several of the Assurant Defendants and their servicer co-defendants (not Ocwen) agreed to make direct payments to settlement class members. She reasons that "if a manual review of each loan file was *truly necessary* to ascertain the class members' damages in *all* LPI litigation," then the Assurant Defendants "in *Weller* would not elect to undertake such a herculean effort in their settlement calculus." [*Id.*, at p. 11].

(i)     At least in one respect, Ms. Perryman is correct. The Assurant Defendants advised the Court that they would not elect to undertake an onerous manual review of each loan file in the *Weller* settlement or any others, like *Ellsworth*. As they have explained, that is why the Assurant Defendants did not elect to do so in those settlements, instead assuming the risk of providing windfall payments to class members who never paid any portion of the LPI charge. Unlike this Settlement's $140 million of available Claim Settlement Relief, the total monetary payment in the

48

*Weller* settlement is just $1.8 million, while the total monetary payment in *Ellsworth* is even less. [ECF Nos. 154, p. 11; 161, pp. 98:2-8, 100:3-17, 106:16-107:18]. Rather than tending to prove that this Settlement could do without a claims process, the *Weller* and *Ellsworth* settlements only tend to prove that, to avoid an onerous manual review, the Assurant Defendants have been willing to overcompensate a small group of borrowers a small amount of money in a small class settlement, but are unwilling to overcompensate a large group of borrowers a large amount of money in a large class settlement.

(ii)     Ms. Perryman relies further on the LPI class settlement in *Arnett v. Bank of America, N.A.*, without relating that part of the *Arnett* settlement *did* include a claims process. *See* No. 11-1373, 2014 WL 4672458, at *7 (D. Or. Sept. 18, 2014). She also fails to relate that direct payments in *Arnett* were possible *not* because the defendant bank could systematically identify class members who paid or still owed a portion of their LPI charge, but because the bank did not draw those distinctions at all. As a result of the direct-payment structure, *Arnett* class members who should have recovered nothing likely received windfalls. And as a result of that structure, *Arnett* class members received a much smaller percentage of the LPI charge than the percentage this Settlement allows. In this Settlement, Class Members who submit valid Claim Forms will receive 12.5% of Net Premiums -- essentially a full recovery of their alleged damages. [ECF No. 144-1, ¶¶ 4.6.2, 4.6.3]. By contrast, *Arnett* class members

49

received just "2.28 percent of premiums paid," 2014 WL 4672458, at *12, less than a fifth of this Settlement's percentage.

(f)     "And the Settlement Agreement's claims process is needed for other reasons, including to ensure that only aggrieved individuals receive monetary relief and to reduce the risk of fraud, waste, and abuse that might arise from sending unsolicited checks to unverified addresses and recipients." *Hall*, 2014 WL 7184039, at *6. "Sending unsolicited checks to unverified addresses and recipients increases the risk of misappropriation. Non-class members could endorse over to themselves misdirected settlement checks. Attempting to recover money from individuals who fraudulently cash checks is impracticable. This is particularly important where a case presents a class of this size, and determining the amounts to be paid under a direct-pay structure would potentially make settlement more costly than litigation." *Hamilton*, 2014 WL 5419507, at *6.

(g)     In addition, under a hypothetical direct-payment structure without the Claim Form, the risk of waste increases. As the Court remarked at the Final Approval Hearing, this is a "practical point." [ECF No. 161, p. 73:3-17].

(i)     From an administrative standpoint, disbursement activity in a direct-payment structured class settlement, including printing and mailing of checks, can be quite expensive. Checks in larger amounts (*e.g.*, over $100) are likely to be printed on higher-quality paper using security features. Returned checks can be

expensive to process. And the accounting and bank fees associated with large volumes of returned and re-mailed checks also would be significant.

(ii)     Unsolicited mail is more likely to be discarded or set aside. Printing and mailing checks to hundreds of thousands of Settlement Class Members who never asked for them could significantly increase the cost and effort of administering the Settlement. The Claim Form's verifications are the best chance at ensuring that the right persons receive the right payments at the right addresses.

In this Court's judgment, a claims-made settlement here offers Settlement Class members the best relief possible from this Settlement. Defendants state that they did not and would not have agreed to a direct-pay model for a class of this size because the costs of administration and the risk of fraud would have been prohibitive. Even had Defendants agreed, the additional costs and increased risk would have reduced the amounts paid to individual class members. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593-94 (N.D. Ill. 2011) (approving claims-made settlement with costs associated with investigating how much was owed each class member; "[h]ad the onus of that process been placed on Defendant, there may have been less money available for them to pay claims"); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 198 (D.D.C. 2011) ("the case might not have settled if a condition of the agreement required [a defendant] to mine [its] computer systems for such data"). The proposed claims-made structure will

provide class members who opt to submit claims with extraordinary relief and, as such, is fair, reasonable, and adequate.

As such, this case is distinct from oft-cited recent opinions from the Seventh Circuit because, unlike the settlement here, those settlements were rife with indicia of collusion between the parties and other questionable conduct. In *Eubank v. Pella*, for example, Judge Posner rejected a claims-made settlement so problematic that he termed "inequitable—even scandalous." 753 F.3d 718, 721 (7th Cir. 2014). The settlement reflected "almost every danger sign in a class action settlement," including "fatal conflicts of interest"; opposition by named plaintiffs; a provision requiring class members to risk recovering nothing by submitting their claims to arbitration, where the defendants had reserved defenses, in order to be eligible for any meaningful settlement distribution; an award of only coupons to a portion of the class; twelve- to thirteen-page claim forms requiring class members to submit "a slew of arcane data, including the 'Purchase Order Number,' 'Product Identity Stamp,' and 'Unit ID Label'"; and an unnecessarily complex settlement notice. *Id.* at 725-26. Because the settlement "flunked the 'fairness' standard by the one-sidedness of its terms and . . . fatal conflicts of interest[,]" *see id.* at 729, it could not survive the closer scrutiny that might be warranted where "kicker" and "clear-sailing" provisions are part of a class action settlement.

The Seventh Circuit similarly rejected the settlement in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), because the district court had valued the settlement to include

the costs of notice to the class and attorney's fees, 772 F.3d at 781, and of the $5.63 million to be made available to the class, approximately $4.77 million was reserved solely for counsel fees and expenses, notice costs, and *cy pres* and service awards, with only $865,284 left for the settlement class, which amounted to only seven cents per class member. *See id.* at 780, 783-84. The court also criticized the claim form and filing requirements as too onerous when weighed against the "low ceiling on the amount of money that a member of the class could claim[,]" *id.* at 783; the *cy pres* award as excessive when weighed against the minimal relief made available to class members, *id.* at 784; the potential ineffectiveness of the proposed injunctive relief, *id.* at 785; and the court's sense that class counsel and the defendants had colluded to "sell out the class by agreeing . . . to recommend that the judges approve a settlement involving a meager recovery for the class but generous compensation for the lawyers[,]" *see id.* at 787 (citing *Eubank*, 753 F.3d at 720).

The relief provided by this Settlement stands in stark contrast to the relief provided in *Eubank* and *Pearson* in almost every respect. For example, the Settlement here: (1) offers every class member 12.5% of the amounts that they paid or still owe, which constitutes near-complete recovery; (2) employs a simple and straightforward claim form, which requires class members only to check a box and affirm by their signature that the information provided is accurate, and does not require *any* supporting materials, documents or data, (3) involved no collusion or conflicts of

interest; and (4) provides monetary and injunctive relief that was negotiated and will be paid separate and apart from Class Counsel's fees and costs and settlement administration expenses.

(h)     The Claim Deadline will not run until 60 days after the Settlement has been finally approved or any resulting appeal has been resolved.  [ECF No. 144-1, ¶¶ 2.9, 2.24]. Ms. Perryman urges the Court not to approve the Settlement without knowing the claims rate, stating that "these settlements have resulted in less than four percent of class members submitting claims by the time of the final approval hearing." [ECF No. 146, p. 6]. Yet the very example she cites -- the SunTrust LPI class settlement -- *received final approval*. *See Hamilton*, 2014 WL 5419507, at *5 ("The Court finds that even a low claims rate at this stage does not compel the conclusion that the settlement is not 'fair, reasonable, or adequate.'"). Moreover, Ms. Perryman relies on an *interim* claims rate even though, as Class Counsel explained at the Final Approval Hearing [ECF No. 161, pp. 26:1-27:1], that rate will increase -- even accelerate -- after final approval. *See Hamilton*, 2014 WL 5419507, at *5 (observing that "the claims period will not be complete until next year and that based upon the experience of Class Counsel with other lender-placed settlements, claims will be increased after final approval").

(i)     Class Counsel anticipates that the final claims rate will range between 10% and 15%. [ECF No. 161, p. 13:21-23]. Yet even if it does not reach that range, there is nothing inherently unfair about a single-digit claims rate in a class

54

settlement. Indeed, "courts in this district have approved claims-made settlements where the participation rate was very low." *Saccoccio*, 297 F.R.D. at 696; *see also Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) (approving 10.3 million-member settlement class when less than 119,000 -- approximately 1.1% -- filed claims). Single-digit claims rate settlements also are routinely approved outside this District. *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (approving 35 million-member settlement class when only 1.183 million -- less than 4% -- filed claims; "settlements have been approved where less than five percent of class members file claims"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (noting evidence that claims rates in consumer class settlements "rarely" exceed 7%, "even with the most extensive notice campaigns").

(ii)     Ms. Perryman's objection to the potential claims rate has been overruled before. "District courts often grant final approval of class action settlements before the final claims deadline." *Hamilton*, 2014 WL 5419507, at *4; *see also Hall*, 2014 WL 7184039, at *7; *Fladell*, 2014 WL 5488167, at *4; *Casey*, 2014 WL 4120599, at *2; *Saccoccio*, 297 F.R.D. at 696; *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13-21107, 2014 WL 3738013, at *1 (S.D. Fla. July 28, 2014). After all, "an LPI class settlement that offers significant monetary relief, as this one does, 'requiring only that class members submit a claim form,' can be 'fair and reasonable independent of the number of claims filed.'" *Hamilton*, 2014 WL 5419507, at *4 (quoting *Saccoccio*, 2014 WL 3738013, at *1);

*Hall*, 2014 WL 7184039, at *7 ("The Court also rejects the objectors' argument that the Court cannot grant final approval without knowing the final number of claims that are submitted.").  "The question for the Court at the Final Fairness Hearing stage is whether the settlement provided to the class is 'fair, reasonable, and adequate,' not whether the class decides to actually take advantage of the opportunity provided." *Hamilton*, 2014 WL 5419507, at *5. Further, setting the Claim Deadline after the Final Approval Hearing has the salutary effect of maximizing the claim period's duration.

        (iii)    This Settlement is therefore fair, reasonable, and adequate independent of the number of Claim Forms submitted or Defendants' ultimate payout. LPI settlements like this one provide class members who paid or still owe their premiums the opportunity to obtain relief rivaling or, in many cases, exceeding what they could have obtained at trial. Defendants will pay all valid Claimants without any liability cap, ensuring that any Class Member who submits a Claim Form will be made whole. *See Faught*, 668 F.3d at 1240-42 (affirming approval of claims-made settlement where final payout was unknown at time of approval); *Prudential Ins.*, 148 F.3d at 323 (although "the structure of the settlement and the uncapped nature of the relief provided make it difficult to determine accurately the actual value of the settlement," district court did not abuse its discretion "when it found that the remedies available under the proposed settlement provided extraordinary relief"); *Cotton*, 559 F.2d at 1334 (where a class settlement will make claimants whole, an objection "that the compromise

must fall for lack of a specified sum for the settlement" of claims is "meritless"). *See generally Bennett*, 737 F.2d at 986 (5.6% recovery was fair and adequate in view of the risks of further litigation and litigation objectives).

      (i)    Nor, at least in this instance, does the claims rate measure anything especially meaningful, which means that a single digit rate is not automatically problematic.

      (i)    In LPI settlements like this one, class members may choose not to file claims for a variety of reasons irrelevant to the settlement's fairness.

> There may be many reasons or no reasons why class members decide to participate in a settlement, *e.g.*, a desire not to be involved in litigation, ideological disagreement with the justice system, their individual experiences with lender-placed insurance, or sympathy for the defendant. Further, class members may not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form.  Whatever the underlying reason, that is a decision to be made by each class member.  Those decisions, however, do not affect whether the settlement provided to the Class is fair, adequate, and reasonable.

*Hall*, 2014 WL 7184039, at *8. Moreover, "based upon the claims filed in similar lender-placed insurance class settlements, a significant number of additional claims are expected, particularly from class members who are waiting to see if the settlement is finally approved." *Id.* at *7; *see also id.* at *8 ("many factors affect response rates and this ratio should not be given great significance") (internal quotation marks omitted).

      (ii)    This Settlement's unique circumstances make the claims rate misleading. Here, the Parties cannot know which, or how many, Class Members are

even *eligible* to seek Claim Settlement Relief. Some Class Members paid some or all of their Premiums; others have not paid, but still owe, their Premiums; still others paid no Premiums and never will. The Parties cannot systematically distinguish between or tabulate these categories. In other words, an unknown number of "class members may not have paid lender-placed insurance charges and therefore elected to forego the opportunity to submit a Claim Form." *Id.* Mathematically speaking, dividing a numerator (Claim Forms submitted) by an over-inclusive denominator (*all* Settlement Class Members) will yield a deceptively low claims rate.

(j)     Another of Ms. Perryman's objections is that Class Counsel did not conduct formal, adversarial discovery to ensure "that the claims-made structure was necessary," and instead "relied solely on the defendants' untested representations at mediation and in a declaration executed months after preliminary approval had already been granted, as well as inapplicable discovery taken in other cases." [ECF No. 146, p. 9]. "It is, in effect, argued that without discovery, the class representatives were not in a position of equality with negotiators for the defendants. From this we are asked to conclude that settlement[] resulting from this putative inequality of knowledge must be, as a matter of law, inadequate." *Corrugated Container*, 643 F.2d at 211.

(i)     The same basic objection -- that formal, adversarial discovery is necessary to ensure a class settlement's fairness -- has been rejected in this Circuit.

"It is true that very little formal discovery was conducted and that there is no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted. At the outset, we consider this an appropriate occasion to express our concern over the common belief held by many litigators that a great amount of formal discovery must be conducted in every case. Thus, we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table. Because the plaintiffs did have access to information, this case cannot be characterized as an instance of the unscrupulous leading the blind." Even assuming there was an imbalance of information between the defendants and the plaintiffs at the bargaining table, this would not in itself invalidate the settlements.

*Id.* (quoting *Cotton*, 559 F.2d at 1332). To avoid squandering the parties' resources,

informal discovery can be *preferred* in class settlements. This Circuit's precedents have

debunked the myth

that a great amount of formal discovery must be conducted in every case. Often has this Court reviewed records of cases which attest to this commonly held fallacy. We have often seen cases which were "over discovered." In addition to wasting the time of this Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party…. Being an extra-judicial process, informality in the discovery of information is desired. It is too often forgotten that a conference with or telephone call to opposing counsel may often achieve the results sought by formal discovery.

*Cotton*, 559 F.2d at 1332.

(ii)    Here, "notwithstanding the status of discovery, plaintiffs'

negotiators had access to a plethora of information regarding the facts of their case."

*Corrugated Container*, 643 F.2d at 211. As described above, Class Counsel amassed a

wealth of information in other LPI class settlements, including repeatedly deposing

Ronald Wilson (vice president of account management for several of the Assurant Defendants) and other representatives of the Assurant Defendants.  [ECF Nos. 144-3, ¶¶ 16, 39; 161, p. 108:17-25].  In this Litigation, Class Counsel conducted formal and informal discovery before and during the Lee Mediation concerning, *inter alia*, Defendants' inability to query their electronic records systems for information about which borrowers paid or still owe LPI charges.  [ECF No. 144-3, ¶¶ 11, 15, 16, 44].  Post-Settlement, Defendants supplied declarations by Mr. Wilson and Mr. Jastrzemski confirming that it is not feasible to determine specific information about LPI payments except on a member-by-member basis. [ECF Nos. 145, p. 7; 144-3, ¶ 38; 134-1; 154-1].  Also post-Settlement, Class Counsel took Mr. Jastrzemski's deposition, which further confirmed that fact. [ECF No. 169-1, pp. 26:11-34:25].

(iii)    These depositions and declarations are made under penalty of perjury and would be competent evidence, for example, at a summary judgment hearing.  *See* Fed. R. Civ. P. 56(c). More is not required. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) ("[T]he district court properly recognized that, although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information"); *In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991) (although "no formal discovery had occurred," the "evidence obtained through informal discovery yielded sufficient undisputed facts to support" settlement's approval); *Lipuma*, 406 F. Supp. 2d at 1316 (although "minimal discovery" was taken

about a released claim, in light of "Class Counsels' other sources of information, and knowledge about the relative strengths and weaknesses of the [released] claim, this objection should not bar approval of the settlement").

(iv)    The Court finds that extensive formal discovery about the necessity of a claims process was unnecessary when the Settlement was negotiated and it remains unnecessary today. This is not a case in which a single unsophisticated lawyer with no prior experience walked into a negotiation uninformed. In this Litigation, no fewer than 17 lawyers have entered their appearances for Plaintiffs; many of these attorneys are highly sophisticated. Class Counsel were well-positioned to evaluate the merits of Plaintiffs' claims, as well as the appropriate basis on which to settle them.  Equally important, full-scale discovery of the kind needed to try a complex case would defeat the Settlement's true purpose -- to put aside the burdens, costs, and uncertainties of litigation to accomplish a global peace.

(k)    Ms. Perryman also argues that *she* should be permitted to conduct discovery through her counsel regarding the Settlement and its claims-made structure. She hopes to set about proving that the Parties could have negotiated a hypothetical direct-payment structured settlement. The Court overruled this objection once before [ECF No. 145], but in light of the recently-expanded evidentiary record, and for the avoidance of doubt, overrules it again.

61

(i)      Absent members of a class settlement have no automatic right to discovery or an evidentiary hearing to substantiate their objections. *See, e.g., In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1337 n.6 (S.D. Fla. 2011). In this District, as elsewhere, "the sole purpose of any settlement-related discovery is to ensure the Court has sufficient information before it to enable the Court to determine whether to approve the Settlement." *Id.* Beyond that, settlement-related discovery causes delay and distraction and should be denied. In short, "the temptation to convert a settlement hearing into a full trial on the merits must be resisted." *Id.* at 1368 n.41 (internal quotation marks omitted); *see also Newman v. Sun Capital, Inc.*, No. 09-445, 2012 WL 3715150, at *12 (M.D. Fla. Aug. 28, 2012) (although objectors sought discovery "to form a reliable opinion of the value of the settlement assets to make the ultimate determination as to whether to accept the Settlement," the information already obtained and shared was "sufficient to allow [class members] to make intelligent decisions").

(ii)      The Court has sufficient information to enable it to approve the Settlement -- Ms. Perryman's assistance is unnecessary. The Court has before it the depositions and declarations of Defendants' representatives, the representations of counsel (sworn, briefed, and in-court), the circumstances of and decisions in comparable LPI class settlements, and other record evidence. This material is publicly filed, unredacted, and available to all Settlement Class Members. This factual record demonstrates that: (1) a direct-payment structured settlement is not feasible or even

desirable; (2) in any event, Defendants would not have agreed to a direct-payment structured settlement; and (3) a claims-made structured settlement is fair, reasonable, and adequate on its own terms. Courts approving LPI class settlements have denied objector discovery on these grounds. *See, e.g., Casey*, 2014 WL 4120599, at \*2-3 (since "criticism of the claims-made structure" does "not impact the fairness, reasonableness, or adequacy of the proposed settlement," "discovery related to a direct payment structure is unwarranted"); *Saccoccio*, 2014 WL 3738013, at \*1 (denying as irrelevant objectors' request for discovery of claims data because "this Settlement is fair and reasonable independent of the number of claims filed"). This Court has followed that approach.

The Court **ovverules** Ms. Perryman's objections[17] but will **deny** Class Counsel's motion for a show cause order [ECF No. 166] as unnecessary and moot.

---

[17]    Pointing to a favorable decision in her own case in which the trial judge determined that the filed rate doctrine does not bar LPI claims against Ocwen and ASIC, Ms. Perryman also argues [ECF No. 181] that the "defendants here did not face weak or uncertain claims, justifying this settlement which provides negligible relief to the class." But the opinion in *Perryman v. Litton Loan Servicing, LP*, No. 14-cv-02261-JST, 2014 WL 4954674 (N.D. Cal. Oct. 1, 2014) is a district court opinion, not a Circuit Court appellate decision like *Rothstein*.

Moreover, even if the filed rate doctrine were not a substantial hurdle (and it is), it is only one of *many* legal challenges, which Plaintiffs would have to confront. Perhaps most importantly, the Plaintiffs here would be forced to address the skepticism which many courts have raised about the fundamental, primary theory underlying the claims. Several courts adopt the perspective that the mortgagors received ample notice of the

11.    Accordingly, the Parties are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

12.    Pursuant to Rule 23(h), the Court hereby awards Class Counsel for the Settlement Class Attorneys' Fees and Expenses in the amount of $9.85 million, payable pursuant to the terms of the Settlement Agreement. The Court also awards Case Contribution Awards in the amount of $5,000 each to Named Plaintiffs Jennifer Lee, Douglas A. Patrick, Gerald Coulthurst, Lisa Chamberlin Engelhardt, Enrique Dominguez, Frances Erving, Johnnie Erving, John Clarizia, and Shelia D. Heard, payable pursuant to the terms of the Settlement Agreement.

13.    The terms of the Settlement Agreement and of this Final Order, including all exhibits thereto, shall be forever binding in all pending and future lawsuits maintained by the Named Plaintiffs and all other Settlement Class Members, as well as their family members, heirs, guardians, assigns, executors, administrators, predecessors, successors, and assigns.

---

consequences which would flow from a failure to keep in place sufficient insurance and that banks and mortgage servicers did not breach a contract or commit a fraud when they took advantage of the very rights that were outlined in the applicable transactional documents. In fact, the Undersigned has previously flagged my concerns over Plaintiffs' ability to avoid an adverse summary judgment on basic proof issues, such as damages causation. *See Montoya,* 2014 WL 4248208. *See also Feaz v. Wells Fargo Bank*, 745 F.3d 1098 (11th Cir. 2014) and *Wilson v. Everbank, N.A.,* No. 14-22264, 2015 WL 1600549, at *2-6 (S.D. Fla. Apr. 9, 2015).

14.     The Releases, which are set forth in Section 10 of the Settlement Agreement and which are also set forth below, are expressly incorporated herein in all respects and are effective as of the date of this Final Order; and the Released Persons (as that term is defined below and in the Settlement Agreement) are forever released, relinquished, and discharged by the Releasing Persons (as that term is defined below and in the Settlement Agreement) from all Released Claims (as that term is defined below and in the Settlement Agreement).

(a)     <u>Release and Waiver Definitions</u>

(i)     "Ocwen" means Ocwen Loan Servicing, LLC and its Affiliates, Litton Loan Servicing, LP and its Affiliates after October 31, 2011, and Homeward Residential Holdings, Inc., and its Affiliates after April 30, 2013;

(ii)     "Affiliate" of an entity means any person or entity which controls, is controlled by, or is under common control with such entity.

(iii)     "Assurant Defendants" means Assurant, Inc., ASIC, SGIC, VIIC, and ABIC.

(iv)     "Defendants" means all named defendants in the Lee Litigation, including Ocwen Loan Servicing, LLC and the Assurant Defendants.

(v)     "Lender-Placed Insurance" means the placement of hazard, flood, flood gap, and/or wind insurance pursuant to a mortgage loan agreement, home equity loan agreement, or home equity line of credit serviced by Ocwen to cover a

borrower's failure to maintain the required insurance coverage on the residential property securing the loan.

(vi)   "LPI Policy" means a lender-placed residential hazard, flood, flood gap, or wind-only insurance policy and such insurance coverage placed pursuant to a mortgage loan agreement, home equity loan agreement, or home equity line of credit serviced by Ocwen to cover a borrower's failure to maintain the required insurance coverage on the residential property securing the loan.

(vii)   "Ocwen Acquired Companies" means Litton Loan Servicing, LP, Homeward Residential Holdings, Inc., and their Affiliates.

(viii)   "Release" or "Releases" means the releases of all Released Claims by the Releasing Persons against the Released Persons.

(ix)   "Released Claims" means all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, demands, and any other forms of liability released pursuant to this Final Order and Judgment and Section 10 of the Settlement Agreement.

(x)   "Released Persons" means, only with respect to Released Claims: (a) Defendants and each of their respective divisions, parents, subsidiaries, predecessors (except for any Ocwen Acquired Companies with respect to the period of time before they were acquired by Ocwen), investors, parent companies, and Affiliates,

whether past or present, any direct or indirect subsidiary of any of Defendants and each of their respective divisions, parents, subsidiaries, predecessors, investors, parent companies, and Affiliates, whether past or present, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities, including but not limited to Ocwen, Assurant, ASIC, SGIC, ABIC, VIIC, Insureco Agency & Insurance Services, Inc., American Bankers Insurance Group, Inc., and Homeward Residential Holdings, Inc. and its Affiliates for LPI placements after April 30, 2013, Litton Loan Servicing LP and its Affiliates for LPI placements after October 31, 2011, and Altisource Portfolio Solutions S.A., Altisource Solutions, Inc., and their Affiliates; (b) any other insurance carriers that issued or may have issued LPI for Ocwen insuring real property owned by any Settlement Class Member; and (c) any trustee of a mortgage securitization trust which included loans made to any Settlement Class Member, including, but not limited to, any direct or indirect subsidiary of any of them, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities.

(xi)   "Releasing Persons" means Named Plaintiffs and all Settlement Class Members who do not properly and timely opt out of the Settlement, and their respective family members, heirs, guardians, executors, administrators, predecessors, successors, and assigns.

(xii)   "Settling Parties" means, collectively, Defendants, Named Plaintiffs, all Settlement Class Members, and all Releasing Persons.

(b)   Released Claims of Settlement Class

Each member of the Settlement Class, and their family members, heirs, guardians, assigns, executors, administrators, predecessors, and successors, other than the Named Plaintiffs, shall, by operation of the Final Order, be deemed to have fully, conclusively, irrevocably, forever, and finally released, relinquished, and discharged the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that each member of the Settlement Class may have until the close of the Settlement Class Period or may have had in the past, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, that were or could have been sought or alleged in the Litigation or that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning Ocwen's placement, or the Assurant Defendants' issuance, of LPI Policies during the Settlement Class Period, including but not limited to conduct, policies or practices concerning LPI

68

Policies or to charges for Ocwen's Placement of LPI Policies during the Settlement Class Period. In agreeing to this Release, Named Plaintiffs explicitly acknowledge that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

> (i)     The Release stated in Paragraph 14(b) above shall include, but not be limited to, all claims related to Ocwen's insurance requirements; the relationship, whether contractual or otherwise, between Ocwen and the Assurant Defendants regarding LPI, including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by Ocwen; the payment or receipt of commissions, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by Ocwen; any alleged "tying" arrangement involving Ocwen and LPI; any alleged breach of fiduciary duty by Ocwen concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage loans serviced by Ocwen; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen; the receipt or non-disclosure of any benefit under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen; the content, manner, or accuracy of any

communications regarding the placement of any LPI Policies by Ocwen; and to the regulatory approval or non-approval of any LPI Policy, or the premium thereon, placed or charged by Ocwen.

(ii)     The Release in Paragraph 14(b) above shall not cover claims arising after the close of the Settlement Class Period, nor insurance claims for losses relating to properties insured under any LPI Policy placed or charged for by Ocwen. Nothing in Section 10.1 shall be deemed a release of any Settlement Class Member's respective rights and obligations under this Agreement. Further, nothing in Paragraph 14(b), or any other provision of the Stipulation and Settlement Agreement, shall be deemed a release of: (a) claims by borrowers charged for LPI that was purchased by the Ocwen Acquired Companies prior to the time Ocwen acquired the Ocwen Acquired Companies, (b) claims by borrowers who were charged for LPI that was purchased by mortgage servicers other than Ocwen, or (c) any claims arising under Section 10(b) and/or 20(a) of the Exchange Act, including but not limited to claims asserted in *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Financial Corp.*, No. 14-81057 (S.D. Fla.); *Tuseo v. Ocwen Financial Corp.*, No. 14-81064 (S.D. Fla.), and/or *Frechter v. Ocwen Financial Corp.*, No. 14-81076 (S.D. Fla.).

(iii)     Except to the extent that any such obligation is being released pursuant to Paragraph 14(b) above, this Final Order shall not be deemed a release of Defendants from any existing obligation to any Settlement Class Member

70

under any loan, note, mortgage, or deed of trust. This provision is not meant to and does not limit the Releases in this Final Order or in the Settlement Agreement.

(c)     The Named Plaintiffs and Class Counsel further represent that there are no outstanding liens or claims against the Lee Litigation, it being recognized that the Named Plaintiffs will solely be charged with the responsibility to satisfy any other liens or claims asserted against the Lee Litigation.

(d)     Without in any way limiting their scope, the Releases cover by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, or any other fees, costs, and/or disbursements incurred by Class Counsel, the Named Plaintiffs, or any Settlement Class Members in connection with or related in any manner to the Lee Litigation or Patrick Litigation,[18] the settlement of the Lee Litigation, the administration of such Settlement, and/or the Released Claims, except to the extent otherwise specified in the Settlement Agreement.

(e)     In connection with the foregoing Releases, the Named Plaintiffs and each Settlement Class Member expressly waive, and shall be deemed to have waived to the fullest extent permitted by law, any and all provisions, rights, benefits

---

[18]     The "Patrick Litigation" refers to *Patrick v. Ocwen Loan Servicing, LLC*, No. 1:14-cv-21089 (S.D. Fla.), a parallel action once pending in this district, which was later subsumed into the Lee Litigation.

conferred by Section 1542 of the California Civil Code, and any statute, rule and legal

doctrine similar, comparable, or equivalent to California Civil Code Section 1542, which

provides that:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

To the extent that anyone might argue that these principles of law are applicable

-- notwithstanding that the Settling Parties have chosen Florida law to govern this

Settlement Agreement -- the Named Plaintiffs hereby agree, and each Settlement Class

Member will be deemed to agree, that the provisions of all such principles of law or

similar federal or state laws, rights, rules, or legal principles, to the extent they are

found to be applicable herein, are hereby knowingly and voluntarily waived,

relinquished, and released. The Named Plaintiffs recognize, and each Settlement Class

Member will be deemed to recognize, that, even if they may later discover facts in

addition to or different from those which they now know or believe to be true, they

nevertheless agree that, upon entry of this Final Order, they fully, finally, and forever

settle and release any and all claims covered by the Releases.

(f)     The Releases were bargained for and are a material element of the

Settlement Agreement.

(g)     The Releases do not affect the rights of Settlement Class Members

who timely and properly submitted a Request for Exclusion from the Settlement in

accordance with the requirements of the Preliminary Approval Order and in Section 11 of the Settlement Agreement.

(h)     The administration and consummation of the Settlement as embodied in the Settlement Agreement shall be under the authority of the Court.

(i)     The Settlement Agreement shall be the exclusive remedy for any and all Settlement Class Members, except those who have properly requested exclusion (opted out), and the Released Persons shall not be subject to liability or expense for any of the Released Claims to any Settlement Class Member(s).

(j)     The Releases shall not preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein. The Releases set forth herein and in the Settlement Agreement are not intended to include the release of any rights or duties of the Settling Parties arising out of the Settlement Agreement, including the express warranties and covenants contained herein.

15.     Neither the Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein, nor this Final Order, nor any of its terms and provisions, nor the final judgment to be entered pursuant to this Final Order, nor any of its terms and provisions, shall be:

(a)    offered by any person or received against the Defendants as evidence or construed as or deemed to be evidence of any presumption, concession, or admission by the Defendants of the truth of the facts alleged by any person or the validity of any claim that has been or could have been asserted in the Lee Litigation or in any litigation, or other judicial or administrative proceeding, or the deficiency of any defense that has been or could have been asserted in the Litigation or in any litigation, or of any liability, negligence, fault or wrongdoing of the Defendants;

(b)    offered by any person or received against the Defendants as evidence of a presumption, concession, or admission of any fault, misrepresentation, or omission with respect to any statement or written document approved or made by the Defendants or any other wrongdoing by the Defendants;

(c)    offered by any person or received against the Defendants as evidence of a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing in any civil, criminal, or administrative action or proceeding;

(d)    offered or received in evidence in any action or proceeding against any Party hereto in any court, administrative agency, or other tribunal for any purpose whatsoever, other than to enforce or otherwise effectuate the Settlement Agreement (or any agreement or order relating thereto), including the Releases, or the Final Order, or the final judgment to be entered pursuant to this Final Order.

16.     This Final Order, the final judgment to be entered pursuant to this Final Order, and the Settlement Agreement (including the exhibits thereto) may be filed in any action against or by any Released Person (as that term is defined herein and the Settlement Agreement) to support a defense of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

17.     Without further order of the Court, the Parties may agree to reasonably necessary extensions of time to carry out any of the provisions of the Settlement Agreement.

18.     This Final Order, and the final judgment to be entered pursuant to this Final Order, shall be effective upon entry.  If the Final Order and the final judgment to be entered pursuant to this Final Order are reversed or vacated pursuant to a direct appeal in this Action or the Settlement Agreement is terminated pursuant to its terms, all orders entered and releases delivered in connection herewith shall be null and void.

19.     A final judgment will be entered soon.

      **DONE and ORDERED,** in Chambers, in Miami, Florida, September 14, 2015.

 

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
All counsel of record