UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 0:14-cv-60649-GOODMAN

[CONSENT CASE]

JENNIFER LEE, et al., on behalf of
themselves and all others similarly situated,

        Plaintiffs,

v.

OCWEN LOAN SERVICING, LLC, et al.,

        Defendants.

_____/

## ORDER ON MOTION TO ENFORCE FINAL JUDGMENT

Tenacity is a trait which can be both admired and criticized.

In the case here, Charles Bishop ("Bishop") has surely been tenacious. He continues to pursue in state court claims foreclosed by a class action settlement approved by the Court. So that is certainly not something he and his lawyer can be proud of here. But his dogged attitude has *also* led to the pursuit of some claims which are not barred (or which *may* not be barred) by the settlement. That relentless approach may ultimately be unproductive, but, for now, it has led to a ruling permitting him to litigate those few still-available claims in state court.

The background underlying the discussion of Bishop's tenacity begins in 2014, when Plaintiff in the instant case, Jennifer Lee, filed a putative class action lawsuit which ultimately, years later, led to the Defendant-filed motion to enforce the final judgment at issue in this Order. Noting that its counsel asked Bishop's attorney to dismiss all of his litigation, Defendant's motion here contends, in a sub-headline, that "Bishop Refuses To Comply With The Relitigation Injunction." [ECF No. 201, p. 9]. In other words, Defendant implicitly suggests that Bishop is being unreasonably stubborn, not merely resolute.

Defendant PHH Mortgage Corporation ("PHH"), as successor by merger to Ocwen Loan Servicing, LLC ("Ocwen"),[1] filed the instant motion [ECF No. 201] seeking to enforce the September 14, 2015 Final Judgment [ECF No. 185] against Bishop.

PHH seeks an Order: (1) enforcing the Final Judgment and prohibiting Bishop from proceeding with his state law claims; (2) requiring Bishop to show cause why he should not be held in contempt of Court for knowingly violating the injunction provisions of the Final Judgment; and (3) awarding Ocwen its damages, including reasonable attorney's fees and costs. [ECF No. 204, p. 9]. For the reasons discussed below, PHH's motion is **granted in part and denied in part**.

---

[1]      Ocwen merged with PHH on June 1, 2019. [ECF Nos. 201, p. 2; 201-3, pp. 2-11]. In their filings, the parties refer to these two entities interchangeably.

I.      **Factual Background and Procedural History**

A.      **The *Lee* Class Action and Class Action Settlement**

In 2014, Jennifer Lee filed a putative class action in the United States District Court for the Southern District of Florida on behalf of herself and all others similarly situated. [ECF No. 1]. The action was brought against Ocwen, Assurant, Inc., and American Security Insurance Company and alleged a lender-placed insurance ("LPI") scheme which resulted in kickbacks (disguised as commissions and other benefits) that artificially inflated LPI premium rates. *Id.*

The parties entered into a Settlement Agreement. [ECF No. 111]. The Undersigned issued a Report and Recommendations [ECF No. 119] on January 13, 2015, recommending preliminary approval of the Class Action Settlement.

The parties then consented to the Undersigned conducting all future proceedings [ECF No. 121], and the District Court issued an order of full referral [ECF No. 124]. On January 23, 2015, the Undersigned approved and adopted the Report and Recommendations and granted the motion for preliminary approval. [ECF No. 125].

The Court provisionally certified the Settlement Class for settlement purposes, approved the procedure for giving Class Notice to the Settlement Class, and set a final approval hearing. [ECF Nos. 119; 125].

On June 11, 2015, the Court held a final approval hearing pursuant to Federal Rule of Civil Procedure 23(e)(1)(A). [ECF Nos. 157-59; 161]. The Court considered the parties' request that it approve the proposed class action settlement, overrule the settlement objections, and approve Class Counsel's fee application.

After notice to the Class Members and the expiration of an opportunity for class members to opt out, the Court approved the settlement on September 14, 2015 in a 75-page Order overruling all objections and approving in full the Class Action Settlement. [ECF No. 184].

The Court determined that it "ha[d] personal jurisdiction over the [p]arties and the Settlement Class Members, venue [was] proper, [and] the Court ha[d] subject-matter jurisdiction to approve the Settlement Agreement, including all exhibits, and to enter [a] Final Order." *Id.* at 7. It also found that "the prerequisites for a class action under Federal Rules of Civil Procedure 23(a) and 23(b)" were met and that "the Class Notice[,] substantially in the form approved by the Court in its preliminary approval order[,] was given in the manner ordered by the Court, constitute[d] the best practicable notice, and was fair, reasonable, and adequate." *Id.* at 6-7.

Concerning the notice provided to the Class Members, the Court specifically found that:

the distribution of the Mail Notice, Summary Publication Notice (published in USA Today), Internet media campaign, the creation of the [interactive

voice response] toll-free telephone number system, and creation of the Settlement Website, all as provided for in the Settlement Agreement and Preliminary Approval Order, (i) constituted the best practicable notice under the circumstances to Settlement Class Members, (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Litigation, their right to object or to exclude themselves from the proposed Settlement, and their right to appear at the Final Approval Hearing, (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice, and (iv) complied fully with the requirements of Federal Rule of Civil Procedure 23, the United States Constitution, the Rules of this Court, and any other applicable law.

*Id.* at 9.

The Court also found that "Defendants [had] timely sent notices of the proposed Settlement, including the materials required by [ ] [the Class Action Fairness] Act, to the appropriate state and federal officials" and that the parties had complied with their notice obligations under the Act. *Id.* at 9-10.

The Court approved the Settlement Agreement "as fair, reasonable, and adequate pursuant to Federal Rule 23(e)" and found that it "ha[d] been entered into in good faith" and was "in the best interests of, each of the [p]arties and the Settlement Class Members." *Id.* at 10.

The Court certified the following Settlement Class:

All borrowers in the United States who, within the Settlement Class Period (defined below), **were charged by Ocwen under a hazard, flood, flood gap or wind-only LPI Policy for residential property, and who, within the Settlement Class Period, either (a) paid to Ocwen the Net Premium for that LPI Policy or (b) did not pay to and still owe Ocwen the Net Premium**

**for that LPI Policy**. Excluded from the Settlement Class [were]: (a) individuals who are or were during the Settlement Class Period officers or directors of [ ] Defendants in the Action or any of their respective Affiliates; (b) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (c) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or to the borrower's escrow account; and, (d) all borrowers who file[d] a timely and proper request to be excluded from the Settlement Class.

*Id.* at 7-8 (emphasis added). The Court defined the Settlement Class Period as "commenc[ing] on January 1, 2008 . . . through and including January 23, 2015." *Id.* at 8.

The Class Action Settlement included the following Released Claims:

14. The Releases, which are set forth in Section 10 of the Settlement Agreement and which are also set forth below, are expressly incorporated herein in all respects and are effective as of the date of this Final Order; and **the Released Persons (as that term is defined below and in the Settlement Agreement) are forever released, relinquished, and discharged by the Releasing Persons (as that term is defined below and in the Settlement Agreement) from all Released Claims (as that term is defined below and in the Settlement Agreement)**.

***

    (b) <u>Released Claims of Settlement Class</u>

**Each member of the Settlement Class**, and their family members, heirs, guardians, assigns, executors, administrators, predecessors, and successors, other than the Named Plaintiffs, **shall, by operation of the Final Order, be deemed to have fully, conclusively, irrevocably, forever, and finally released, relinquished, and discharged the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that each member of the Settlement Class may have until the**

6

**close of the Settlement Class Period or may have had in the past**, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, **whether past or present**, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, **that were or could have been sought or alleged in the Litigation or that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning Ocwen's placement**, or the Assurant Defendants' issuance, **of LPI Policies during the Settlement Class Period, including but not limited to conduct, policies or practices concerning LPI Policies or to charges for Ocwen's Placement of LPI Policies during the Settlement Class Period**. In agreeing to this Release, Named Plaintiffs explicitly acknowledge that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

> (i) **The Release stated in Paragraph 14(b) above shall include, but not be limited to, all claims related to Ocwen's insurance requirements**; the relationship, whether contractual or otherwise, between Ocwen and the Assurant Defendants regarding LPI, including, but not limited to, t**he procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by Ocwen**; the payment or receipt of commissions, expense reimbursements, **alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by Ocwen**; any alleged "tying" arrangement involving Ocwen and LPI; any alleged breach of fiduciary duty by Ocwen concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage loans serviced by Ocwen; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen; the receipt or non-disclosure of any benefit under any LPI Policies or coverage under such LPI

Policies and charges for such coverage placed or charged by Ocwen; **the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by Ocwen**; and to the regulatory approval or non-approval of any LPI Policy, or the premium thereon, placed or charged by Ocwen.

(ii) The Release in Paragraph 14(b) above **shall not cover claims arising after the close of the Settlement Class Period**, nor insurance claims for losses relating to properties insured under any LPI Policy placed or charged for by Ocwen. Nothing in Section 10.1 shall be deemed a release of any Settlement Class Member's respective rights and obligations under this Agreement. Further, nothing in Paragraph 14(b), or any other provision of the Stipulation and Settlement Agreement, shall be deemed a release of: (a) claims by borrowers charged for LPI that was purchased by the Ocwen Acquired Companies prior to the time Ocwen acquired the Ocwen Acquired Companies, (b) claims by borrowers who were charged for LPI that was purchased by mortgage servicers other than Ocwen, or (c) any claims arising under Section 10(b) and/or 20(a) of the Exchange Act, including but not limited to claims asserted in *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Financial Corp.*, No. 14-81057 (S.D. Fla.); *Tuseo v. Ocwen Financial Corp.*, No. 14-81064 (S.D. Fla.), and/or *Frechter v. Ocwen Financial Corp.*, No. 14-81076 (S.D. Fla.).

(iii) Except to the extent that any such obligation is being released pursuant to Paragraph 14(b) above, this Final Order shall not be deemed a release of Defendants from any existing obligation to any Settlement Class Member under any loan, note, mortgage, or deed of trust. This provision is not meant to and does not limit the Releases in this Final Order or in the Settlement Agreement.

*Id.* at 68-71 (emphasis added).

8

The Court determined that "[t]he Releases were bargained for and [were] a material element of the Settlement Agreement," **the Settlement Agreement was the "exclusive remedy" for those Settlement Class Members who failed to timely opt out** and **"the Released Persons [would not] be subject to liability or expense for any of the Released Claims to any Settlement Class Member(s)."** *Id.* at 72-73 (emphasis added).

The Order granting final approval of the Class Action Settlement also stated that:

> This Final Order, the final judgment to be entered pursuant to this Final Order, and the Settlement Agreement (including the exhibits thereto) **may be filed** in any action against or by any Released Person (as that term is defined herein and the Settlement Agreement) **to support a defense of** *res judicata*, **collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim**.

*Id.* at 75 (emphasis added).

On the same day, the Court entered a Final Judgment, dismissing the Class Action with prejudice. [ECF No. 185]. The Final Judgment stated, in pertinent part, that:

> 2. Named Plaintiffs and **all Settlement Class Members who did not timely exclude themselves from the Settlement Class**, and their respective family members, heirs, guardians, administrators, executors, predecessors, successors, and assigns, **have released the Released Claims as against the Released Persons, and are, from this day forward, hereby permanently <u>barred and enjoined</u> from directly or indirectly (i) filing, commencing, prosecuting**, intervening in, or participating in (as class members or otherwise), **any lawsuit in any jurisdiction for the Released Claims**; or (ii) organizing any Settlement Class Members into a separate class for purposes of pursuing as a purported class action any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) based on or relating to the claims and

causes of action, or the facts and circumstances relating thereto, in this action and/or the Released Claims.

a. **"Released Claims" means any and all claims, actions, causes of action, suits**, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and **demands of any kind whatsoever that each member of the Settlement Class may have until the close of the Settlement Class Period or may have had in the past**, whether in arbitration, administrative, or **judicial proceedings, whether as individual claims** or as claims asserted on a class basis, **whether past or present, mature or not yet mature, known or unknown**, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, **that were or could have been sought or alleged in the Litigation or that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning Ocwen's placement, or the Assurant Defendants' issuance, of LPI Policies during the Settlement Class Period**, **including but not limited to conduct, policies, or practices concerning LPI Policies or to charges for Ocwen's Placement of LPI Policies during the Settlement Class Period**. In agreeing to this Release, Named Plaintiffs explicitly acknowledge that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

b. **The Released Claims of** both the Named Plaintiffs and **the Settlement Class Members shall include, but not be limited to, all claims related to Ocwen's insurance requirements; the relationship, whether contractual or otherwise, between Ocwen and the Assurant Defendants regarding LPI, including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies**

10

placed or charged by Ocwen; **the payment or receipt of commissions, expense reimbursements, alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by Ocwen**; any alleged "tying" arrangement involving Ocwen and LPI; **any alleged breach of fiduciary duty by Ocwen concerning LPI Policies**; any alleged tortious interference by the Assurant Defendants with mortgage loans serviced by Ocwen; **the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen**; **the receipt or non-disclosure of any benefit under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen; the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by Ocwen**; and to the regulatory approval or non-approval of any LPI Policy, or the premium thereon, placed or charged by Ocwen.

c. **"Released Persons" are, only with respect to Released Claims: (a) Defendants** and each of their respective divisions, parents, subsidiaries, predecessors (except for any Ocwen Acquired Companies with respect to the period of time before they were acquired by Ocwen), investors, parent companies, and Affiliates, whether past or present, any direct or indirect subsidiary of any of Defendants and each of their respective divisions, parents, subsidiaries, predecessors, investors, parent companies, and Affiliates, whether past or present, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities, including but not limited to Ocwen, Assurant, ASIC, SGIC, ABIC, VIIC, Insureco Agency & Insurance Services, Inc., American Bankers Insurance Group, Inc., and Homeward Residential Holdings, Inc. and its Affiliates for LPI placements after April 30, 2013, Litton Loan Servicing LP and its Affiliates for LPI placements after October 31, 2011, and Altisource Portfolio Solutions S.A., Altisource Solutions,

> Inc., and their Affiliates; (b) any other insurance carriers that issued or may have issued LPI for Ocwen insuring real property owned by any Settlement Class Member; and (c) any trustee of a mortgage securitization trust which included loans made to any Settlement Class Member, including, but not limited to, any direct or indirect subsidiary of any of them, and all of the officers, directors, employees, agents, brokers, distributors, representatives, and attorneys of all such entities.

*Id.* at ¶ 2 (emphasis added).

The Court "retain[ed] jurisdiction over the construction, interpretation, consummation, implementation, and **enforcement** of the Settlement Agreement, including jurisdiction to enter such further orders as may be necessary or appropriate."

*Id.* at ¶ 3 (emphasis added).

### B.     The Foreclosure Action (CACE-13-012487)

On May 21, 2013, Raymond James Bank, NA ("Raymond James") filed a foreclosure action against Bishop in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-13-012487 (the "Foreclosure Action"). The foreclosure complaint alleged that the mortgage issued to Bishop "ha[d] been breached in that the payment due and payable on October 1, 2012, and all subsequent payments ha[d] not been paid." [ECF No. 213-13, ¶ 6].

12

The parties reached a settlement and the Foreclosure Action ended on June 18, 2015, when Raymond James filed a notice of voluntary dismissal without prejudice and discharge of *lis pendens*. [ECF No. 202-8].

**C.      Bishop's 2017 State Court Action (CACE-17-012681)**

Approximately 22 months after the Final Judgment [ECF No. 185] in *Lee*, on July 6, 2017, Bishop filed a lawsuit against Ocwen in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-17-012681 (the "2017 Lawsuit").

**1.      First Amended Complaint and Bench Trial**

At the time of the bench trial, the operative complaint in the 2017 Lawsuit was the First Amended Complaint [ECF No. 203-1]. It alleged four causes of action against Ocwen.

The first three causes of action were breach of contract claims for charges Ocwen assessed against Bishop for attorney's fees and costs (Count I), late charges (Count II), and purportedly unreasonable LPI premiums (Count III). *Id.* at ¶¶ 20, 37, 52. The last cause of action (Count IV) alleged fraud.

In Count IV, Bishop asserted that Ocwen "'force[-]placed' insurance[2] on the property." *Id.* at ¶ 64 (footnote added). Bishop alleged that Ocwen "knew they [sic] had an interest in the forced[-]placed insurance company" and "charged [] Plaintiff . . . more than three (3) times the going insurance rates for similar properties." *Id.* at ¶¶ 65-66; *id.* at ¶ 69 ("[Ocwen] charged premiums far in excess of what [was] reasonable knowing they [sic] had an interest in the insurance company charging the fraudulent rates."). Ocwen was then able to "file[ ] a foreclosure action" against Bishop's property. *Id.* at ¶ 68.

Count IV contained additional allegations concerning LPI:

70.     [Ocwen] had at all time material a **financial interest in the premium company charging the excessive insurance rates** and intentionally did not notified [sic] [ ] Plaintiff of the financial interest.

71.     The **failure to disclose the financial interest in the "forced[-]placed"** insurance company without any notice to [ ] Plaintiff [was] in violation of the laws of the United States and of Florida, which require[d] a disclosure that [ ] [D]efendant ha[d] an interest in the "insurance company."

72.     [Ocwen] knew they had an **interest in the "forced[-]placed" insurance company**.

---

[2]     The First Amended Complaint referred to LPI as "force[-]placed insurance." [ECF No. 203-1, ¶¶ 50, 64, 73]. The terms LPI and "force-placed insurance" are the same. *See Lee v. Ocwen Loan Servicing, LLC*, 101 F. Supp. 3d 1293, 1295 n.1 (S.D. Fla. 2015) (noting that "lender-placed insurance[ ] [is] sometimes deemed (usually by plaintiffs) as force-placed insurance"); *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 214 (3d Cir. 2020) ("This case is about force-placed insurance, sometimes called lender-placed insurance."); *Braynen v. Nationstar Mortg., LLC*, No. 14-CV-20726, 2015 WL 6872519, at *1 (S.D. Fla. Nov. 9, 2015) (noting that "[c]lass [c]ounsel and [p]laintiffs usually refer to the practice as force-placed insurance, while [d]efendants typically use the term lender-placed insurance ('LPI')").

73.     [Ocwen] **knowingly, intentionally, and fraudulently "force[-]placed" insurance on the property** without disclosing that they had an interest in the "force[-]placed" company.

74.     [Ocwen] **intentionally and knowingly charged premiums in excess of what was reasonable**.

75.     As such [Ocwen] intentionally, willfully and with the intent to committed [sic] a fraud upon [ ] Plaintiff, charged him **premiums far in excess of what a reasonable premium would be**.

*Id.* at ¶¶ 70-75 (emphasis added).

Lastly, Count IV alleged that Ocwen engaged in fraud when it assessed attorney's fees and costs against Bishop "without any legal authority." *Id.* at ¶¶ 76-77.

Ocwen filed an answer to the First Amended Complaint which did not include any affirmative defenses related to the *Lee* Class Action Settlement. Ocwen later moved to amend its answer in order to assert affirmative defenses based on "additional facts, exhibits, and legal authority . . . [which had] c[o]me to light through its investigation and discovery in this case[.]"

The proposed amended answer, attached as an exhibit to Ocwen's motion, included two affirmative defenses related to the *Lee* Class Action:

<u>**SEVENTH AFFIRMATIVE DEFENSE**</u>

The Amended Complaint is barred because the Court lacks subject matter jurisdiction over Plaintiff's claims, which were previously settled and released in federal court. Plaintiff is a member of the settlement class in a case with virtually identical issues to those presented here, *Jennifer Lee, et al., on behalf of themselves and all others similarly situated v. Ocwen Loan Servicing, LLC, et al.*, U.S. District Court, Southern District of Fla. Case No.

1:14-CV-60649, Plaintiff did not opt out, and the instant claims fall squarely within the Settlement Class Period running from January 1, 2008 through January 23, 2015. By operation of the *Lee* class action settlement, there is no remaining dispute between Plaintiff and Ocwen over which this Court can exercise jurisdiction.

## EIGHTH AFFIRMATIVE DEFENSE

The [sic] Plaintiff has waived and/or released his right to pursue the claims set forth in the Amended Complaint by operation of the class action settlement in *Jennifer Lee, et al., on behalf of themselves and all others similarly situated v. Ocwen Loan Servicing, LLC, et al.*, U.S. District Court, Southern District of Fla. Case No. 1:14-CV-60649. Plaintiff is a member of the *Lee* settlement class, did not opt out, and his claims fall squarely within the Settlement Class Period running from January 1, 2008 through January 23, 2015. By operation of the *Lee* class action settlement, which contains a comprehensive release provision, Plaintiff has waived and/or released the claims set forth in the [First] Amended Complaint.

The state court denied Ocwen's motion for leave to amend its answer. At the time, trial was set for the three-week period beginning on January 13, 2020 and Ocwen had filed its motion on December 5, 2019.

The trial was subsequently continued several times. Ocwen renewed its motion for leave to amend its answer and on June 22, 2020, the state court again denied the requested relief.

The parties also filed cross-summary judgment motions. The trial court granted partial summary judgment in favor of Bishop, finding that the notice revoking the escrow waiver was insufficient.

16

The case proceeded to a three-day bench trial in December 2020. [ECF No. 218-1, pp. 130-762]. On December 23, 2020, the state court entered a Second Amended Final Judgment in favor of Bishop and against Ocwen.

Ocwen appealed this final judgment (and other rulings) to the Florida Fourth District Court of Appeal.

### 2.    The Appeal

Ocwen succeeded in its appeal. *See Ocwen Loan Servicing, LLC v. Bishop*, 337 So. 3d 64 (Fla. 4th DCA 2022), review denied, No. SC22-622, 2022 WL 2443550 (Fla. July 5, 2022). The appellate court reversed the trial court for two reasons: (1) "the trial court misinterpreted the mortgage provision governing revocation of the escrow waiver" and (2) it should have granted Ocwen leave to amend its answer to assert "a potentially dispositive affirmative defense" (i.e., the preclusive effect of the *Lee* Class Action Settlement). *Id.* at 65.

In addressing the first issue, the district court recited the following facts concerning Bishop's mortgage:

> The mortgage contains an addendum "conditionally" waiving the collection of escrow funds, "subject to" any "[f]ailure of [the] [b]orrower to pay the [e]scrow [i]tems[,]" or failure by the borrower to provide evidence that he paid the required "insurance premiums, and any other escrow items[.]" The addendum provides that noncompliance with the waiver's conditions could result in the waiver becoming "null and void and of no further effect" at the "[l]ender's option[.]" The addendum allows for the servicer's forced[-]placement of insurance on the mortgaged property as a

17

remedy for the borrower's failure to provide proof of the required insurance.

The escrow waiver provided the borrower with the benefit of not having to pay escrow expenses, including property insurance, as part of his monthly mortgage payment, conditioned on his direct procurement and timely payment of those expenses by means other than an escrow account with the servicer.

When the borrower failed to respond to two notices from the servicer requesting evidence that the property was insured, the servicer issued a final written notice to the borrower advising him that "[t]hirty days from the date of this letter, we *will charge your escrow account* $38,692.93 for insurance coverage if you do not provide acceptable proof of coverage before that time." The notice advised that *an escrow account* "*may* be *established*," if the borrower did not already have one, and that his *monthly mortgage payment "may be increased* to include the cost of th[e] policy[.]" Thirty days later, the servicer placed insurance on the mortgaged property and imposed an escrow account to charge the borrower for the cost of the insurance.

*Id.* at 65-66 (alterations and emphasis in original).

The trial court had granted partial summary judgment to Bishop on the issue of notice, agreeing with Bishop's "argu[ment] that any revocation of the escrow waiver had to be by mutual written agreement and that the notice revoking the waiver was insufficient." *Id.* at 66.

The appellate court found, however, this argument

[was] inconsistent with the plain and unambiguous text of the escrow waiver provision in the mortgage. While the provision does provide that "waiver may only be in writing[,]" it is clear from the immediately preceding sentence that the "writing" requirement corresponds solely to the waiver of escrow funds. The requirement does not apply to the

18

servicer's ability to revoke the waiver based on the borrower's non-compliance with the waiver's conditions.

The servicer's ability to revoke the waiver is instead governed by the last sentence of the provision which states: "Lender *may revoke the waiver* as to any or all [e]scrow [i]tems *at any time by a notice*[.]"

*Id.* (alterations and emphasis in original).

The district court noted that "[n]othing in the mortgage required the revocation to occur by mutual written agreement" and that "[t]he relevant provision provide[d] only that notice be provided to the borrower of the servicer's intent to exercise its unilateral option of revoking the escrow waiver when the borrower's non-compliance support[ed] revocation." *Id.*

The appellate court also determined that "[t]he use of the term 'may' in [Ocwen's] notices . . . did not undercut the adequacy of notice provided to the borrower of [Ocwen's] intent to unilaterally revoke the escrow waiver as an available remedy" because "[t]he mortgage did not expressly require the inclusion of any specific language to notify the borrower of the servicer's intent to revoke the escrow waiver for non-compliance" and "[t]he notices tracked the permissive language of the mortgage and escrow waiver in advising the borrower of the servicer's available remedies, including revocation of the escrow waiver, for the borrower's non-compliance with the escrow waiver's conditions" *Id.*

The court also noted that the notice provision was a condition precedent to the revocation of the escrow waiver and stated that "'substantial compliance with conditions precedent [was] all that [was] required in the foreclosure context.'" *Id.* at 66-67 (quoting *Ortiz v. PNC Bank, Nat'l Ass'n*, 188 So. 3d 923, 925 (Fla. 4th DCA 2016) (citing *Green Tree Servicing, LLC v. Milam*, 177 So. 3d 7, 15-16 (Fla. 2d DCA 2015))). In any case, it determined that Ocwen's notices to Bishop "well exceeded the substantial compliance standard," "adequately informed [him] of the consequences of failing to provide acceptable proof of insurance coverage on the property, including the available permissive remedy of revocation of the escrow waiver." *Id.* at 67.

As to the second issue, the appellate court held that the trial court abused its discretion when it refused to allow Ocwen to amend its answer to assert affirmative defenses related to the *Lee* Class Action Settlement (i.e., that "[Bishop's] claims had been released by a prior class action settlement barring claims regarding the forced[-]placement of property insurance on the mortgaged property"). *Id.*

The district court noted that "[Ocwen] sought to amend its affirmative defenses only once to add the potentially dispositive class action settlement defense" and "timely renewed the request after a continuance of the trial was granted which provided [Bishop] with more than six months to prepare his case." *Id.* at 68. The appellate court also noted that there was no prejudice to Bishop because he "was well-aware of the defense by the

20

time [Ocwen] filed its renewed motion . . . [and had] asserted the defense in its prior summary judgment motion." *Id.*

The district court instructed the trial court, on remand, to (1) "enter partial summary judgment in favor of [Ocwen] on the interpretation of the mortgage's escrow waiver provision consistent with [the district court's] opinion" and (2) to allow Ocwen to amend its answer to assert the class action settlement defense. *Id.*

Bishop sought review of the Fourth District Court's opinion by filing a notice to invoke the discretionary jurisdiction of the Supreme Court of Florida, asserting that there was an express, direct conflict in the Florida intermediate appellate courts. The Supreme Court directed the parties to file jurisdictional briefs and on July 5, 2022, it "decline[d] to accept jurisdiction[.]" *Bishop v. Ocwen Loan Servicing, LLC*, No. SC22-622, 2022 WL 2443550, at *1 (Fla. July 5, 2022).

### 3.   Third Amended Complaint

After the case was remanded, the trial court granted Ocwen's motion seeking to enforce the appellate mandate. [ECF No. 232-1]. The trial court's order entered "summary judgment in favor of [Ocwen] with respect to Count II [of the First Amended Complaint]" and dismissed Count II with prejudice. *Id.* The trial court also vacated its order denying Ocwen's motion for leave to file an amended answer and deemed Ocwen's amended answer filed. *Id.*

Bishop filed a Second Amended Complaint and later moved for leave to file a Third Amended Complaint. Over Ocwen's opposition [ECF No. 239-1], the state court granted Bishop's motion [ECF No. 245, p. 3] and the Third Amended Complaint [ECF No. 249-1] is now the operative complaint in the 2017 Lawsuit.

The Third Amended Complaint alleged seven causes of action: five causes of action for breach of contract (Counts I through III, VI, and VII), a cause of action for fraud (Count IV), and a cause of action for a declaratory judgment (Count V).

Count I alleged that when Bishop was diagnosed with a medical illness, he was unable to make his mortgage payments. *Id.* at ¶ 12. Ocwen[3] then commenced the Foreclosure Action due to Bishop's non-payment. *Id.*

During the pendency of the Foreclosure Action, the parties agreed to modify the mortgage and Ocwen accepted "a payment for the modification . . . as full and final settlement in the [F]oreclosure [Action]." *Id.* at ¶¶ 14, 16. Defendant voluntarily dismissed the Foreclosure Action "with no stipulation of settlement and no stipulation

---

[3]     The Foreclosure Action was actually filed by the mortgagee, Raymond James, not Ocwen (who was the loan servicer). *See* [ECF No. 213-13]. Nonetheless, Bishop's Third Amended Complaint reads as if Ocwen brought the Foreclosure Action, negotiated the settlement, and dismissed the lawsuit. The Undersigned summarizes the allegations in the Third Amended Complaint as they are pled but notes this inaccuracy.

for attorney's fees or costs" and "without any Court order awarding attorney's fees or costs to [ ] [D]efendant." *Id.* at ¶¶ 13, 15.

Bishop alleged in Count I that Ocwen breached the modified mortgage when it "charged [him] some $25,000.00 in attorney's fees and costs" for the Foreclosure Action and "proceeded to apply late charges to his mortgage for the failure to pay the attorney's fees and costs." *Id.* at ¶¶ 17-18, 22 ("[D]efendant has breached the mortgage contract by charging [ ] Plaintiff attorney's fees and costs without a court order as to entitlement and as to any amount of fees."). Bishop further alleged that because "[D]efendant voluntarily dismissed the [Foreclosure Action] prior to any [c]ourt order or stipulation granting entitlement to attorney's fees and costs, [ ] [D]efendant . . . was not entitled to attorney's fees and costs." *Id.* at ¶ 19.

Count II alleged that Ocwen was obligated under the mortgage to send notices to Plaintiff's address. *Id.* at ¶¶ 32, 37. Defendant "changed the escrow agreement and never sent notices to the correct address." *Id.* at ¶ 34. "[D]efendant breached the contract by failing to send the notices to the correct address" and "by accepting the payment on the mortgage and applying it to the escrow account and then charging late charges to [ ] Plaintiff." *Id.* at ¶ 38. According to Bishop, Defendant's failure "to send the notices to the correct address" caused him to incur "damages of credit impairment and late charges." *Id.* at ¶ 40.

Count III alleged that Bishop's mortgage required that the property be insured. *Id.* at ¶ 50. Bishop's property became uninsured when his "insurance was cancelled" and "there were no insurance carriers in Florida." *Id.* at ¶ 51.[4] When Bishop's property became uninsured, "[D]efendant charged Mr. Bishop $10,060.18 for an alleged premium" but "never obtained the policy." *Id.* at ¶¶ 52-53. "[D]efendant breached the contract by charging [Bishop] for a policy that they [sic] did not pay for." *Id.* at ¶ 54. Bishop alleges that "[i]f Ocwen never paid for the insurance, there never was any force-placed insurance because there was no insurance." *Id.* Bishop alleges he was "damaged by being charged for something he never received." *Id.* at ¶ 55.

Count IV alleged fraud. Bishop asserted that "[D]efendant charged [him] $10,060.18 for insurance but never paid for the insurance." *Id.* at ¶ 66. According to Bishop, "[D]efendant knowingly, intentionally, and fraudulently charged Plaintiff for the policy even though they [sic] knew they [sic] had not paid for it and that Mr. Bishop had already provided [ ] [D]efendant with proof that he had insurance." *Id.* at ¶ 69. Count IV further alleges that "[o]n or about October 19, 2012, [ ] Plaintiff obtained insurance and provided [ ] [D]efendant with a copy" but " [Defendant] never refunded the charges after it was discovered the policy was not paid for." *Id.* at ¶¶ 71-72; *id.* at ¶¶ 75-76 ("After

---

[4]     Presumably, Bishop means there were no insurance carriers writing *new* property insurance policies in Florida.

payment of the full $10,060.18[,] [ ] [D]efendant never reimbursed Mr. Bishop for the charges. . . . The payment included full payment for the $10,060.18 for the alleged insurance premium that was never paid for even though [Bishop] had a policy with Citizens Insurance.").

Count IV further alleged that this insurance scenario "[was] different than the Class [Action]" because "[D]efendant did not obtain any insurance and charged [Bishop] for something he never received." *Id.* at ¶ 74.

Count IV also alleged that Defendant engaged in fraud by charging Bishop attorney's fees and costs stemming from the foreclosure action:

> 77.   [The parties] settled the [foreclosure] case. There was no joint stipulation of settlement and no agreement to pay attorney's fees. There was no Court order reserving on the entitlement to attorney's fees.

> 78.   [D]efendant wilfully [sic], intentionally, without prior notice has charged [ ] Plaintiff attorney's fees and costs without any legal authority.

> 79.   [D]efendant has committed a fraud on [ ] Plaintiff by illegally charging [ ] Plaintiff legal fees and costs without a Court order in the [F]oreclosure [A]ction that has been dismissed by [ ] [D]efendant.

*Id.* at ¶ 77-79.

Count V alleged a claim for declaratory judgment. Bishop claimed that: "[t]here [was] a dispute as to the rights of [ ] Plaintiff and Defendant concerning the whether [sic] Mr. Bishop met the definitions of the Class and weather [sic] the Class Settlement precludes Mr. Bishop from pursuing any damages for insurance since the insuance [sic]

policy was never paid for." *Id.* at ¶ 123. According to Bishop, "he was not a member of the Class Action Settlement since there never was any insurance." *Id.* at ¶ 119.

Count VI alleged a breach of contract claim based on "fees and costs [unrelated to the mortgage foreclosure] that were either not paid for or not valid charges." *Id.* at ¶ 156. These charges include: filing fees and "[c]ivil [l]itigation fees" for a foreclosure action which was never filed, [p]roperty inspection fees for an inspection which was not needed or performed, loan document copy charge, "late charges that [ ] [D]efendant would receive the payment and then put the funds in a suspense account and charge late charges," property evaluation expenses, costs for certified mail, transaction history fees, certified copy charges and "servicer fees." *Id.* at ¶¶ 141-42, 144-53.

Lastly, in Count VII,[5] Bishop alleged that Ocwen "breached the mortgage contract by charging [ ] Plaintiff $10,060.18 allegedly for insurance" but "[D]efendant never paid for the insurance." *Id.* at ¶¶ 165-66. Bishop alleged that he provided Defendant with proof of insurance but Defendant still charged him $10,060.18 for insurance. *Id.* at ¶ 167. Bishop alleged that due to Defendant's actions, "[he] has been damaged in that his credit has been impaired and he has paid $10,060.18 for nothing." *Id.* at ¶ 169.

---

[5]     Count VII appears to be similar to (if not duplicative of) Count III.

### D.        Bishop's 2021 State Court Action (CACE-21-020019)

On November 4, 2021, Bishop commenced an action against PHH in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-21-020019 (the "2021 Lawsuit"). Bishop's claims in the 2021 Lawsuit were nearly identical to the claims he alleged in the First Amended Complaint in the 2017 Lawsuit, except that Bishop sought to hold PHH liable for Ocwen's actions and included a fifth count for "Class Action-Class Representation." [ECF No. 201-2].[6]

Counts I and II of the Complaint alleged breach of contract claims related to PHH's post-Foreclosure Action assessment of attorney's fees, costs, and late charges (resulting from Bishop's failure to timely pay the attorney's fees and costs) and PHH's purported failure to send notices to the correct address and "applying [mortgage payments] to the escrow account and then charging late charges to [ ] Plaintiff." *Id.* at ¶¶ 17, 20, 31-32, 34, 36-37.

Count III contained the following allegations related to LPI:

49.     Due to the insurance market in Florida [ ] Plaintiff was unable to obtain insurance.

50.     [D]efendant, **"force[-]placed" insurance on the property**.

---

[6]      The class action claim was misnumbered as "Count III" in Bishop's Complaint. The Complaint already had a Count III and sequentially, the class action claim should have been labeled Count V.

51.     **[D]efendant charged premiums that were far in excess of a reasonable premium**.

52.     **[D]efendant breached the contract by charging premiums that were unreasonable**.

53.     Plaintiff has been damaged by the unreasonable charges.

*Id.* at ¶¶ 49-53 (emphasis added).

Count IV asserted fraud and included the following allegations concerning LPI:

63.     [ ] Plaintiff, Charles E. Bishop, due to the inability to obtain homeowner's insurance in the State of Florida was unable to obtain insurance on the property.

64.     **[D]efendant "force[-]placed" insurance on the property**.

65.     **[D]efendant knew they [sic] had an interest in the forced[-]placed insurance company**.

66.     They [sic] knew the property was occupied.

67.     **They [sic] knew the premiums they charged [ ] Plaintiff were more than three (3) times the going insurance rates for similar properties.**

68.     After they [sic] knew they [sic] were **charging fraudulent rates**, [ ] [D]efendant filed a foreclosure action against him. . . .

69.     **[D]efendant charged premiums far in excess of what is reasonable knowing they [sic] had an interest in the insurance company charging the fraudulent rates**.

70.     **[D]efendant had at all time material a financial interest in the premium company charging the excessive insurance rates and intentionally did not notified [ ] Plaintiff of the financial interest**.

71.     **The failure to disclose the financial interest in the "forced[-]placed" insurance company without any notice to [ ] Plaintiff is in violation of the laws of the United States and of Florida**, which requires a disclosure that [ ] [D]efendant has an interest in the "insurance company."

28

72.     **[D]efendant knew they [sic] had an interest in the "forced[-]placed" insurance company**.

73.     **[D]efendant knowingly, intentionally, and fraudulently "force[-]placed" insurance on the property without disclosing that they [sic] had an interest in the "force[-]placed" company**.

74.     **[D]efendant intentionally and knowingly charged premiums in excess of what was reasonable.**

75.     As such [ ] [D]efendant intentionally, willfully and with the intent to committed [sic] a fraud upon [ ] Plaintiff, **charged him premiums far in excess of what a reasonable premium would be**.

76.     In addition, [ ] [D]efendant attempted to foreclose on [ ] Plaintiff. They settled the case. There was no joint stipulation of settlement and no agreement to pay attorney's fees. There was no Court order reserving on the entitlement to attorney's fees.

77.     [D]efendant wilfully [sic], intentionally, without prior notice has charged [ ] Plaintiff attorney's fees and costs without any legal authority.

78.     [D]efendant has committed a fraud on [ ] Plaintiff by illegally charging [ ] Plaintiff legal fees and costs without a Court order in the [F]oreclosure [A]ction that has been dismissed by [ ] [D]efendant.

*Id.* at ¶¶ 63-78 (emphasis added).

The Complaint's last count (improperly labeled Count III) sought to bring a class action against PHH for "charg[ing] fees and costs that [were] not valid charges against the mortgages they [sic] service." *Id.* at ¶ 82 (capitalization omitted). Confusingly, this count also included references to uninsured motorist coverage or benefits, *id.* at ¶ 82(H); 89, which appear to have been lifted from another pleading.

Bishop has not sought to amend the Complaint in the 2021 Lawsuit. Thus, the Complaint is the operative pleading in that case.

PHH filed a motion to consolidate the 2021 Lawsuit with the 2017 Lawsuit "for purposes of discovery *and trial*." The trial court granted in part the motion and consolidated the cases for purposes of discovery. The court withheld ruling on whether it would consolidate the cases for purposes of trial until this Court rules on the instant motion.

### E.    The Parties' Contentions

PHH filed the instant motion seeking to enforce the *Lee* Class Action Settlement Agreement and Final Judgment against Bishop. [ECF No. 201].

It asserted that the "claims and allegations in the [2017 and 2021 Lawsuits] [were] squarely within the scope of the Released Claims" in the *Lee* Class Action Settlement and that "Bishop's attempt to hold PHH liable for Ocwen's conduct relating to LPI violate[d] the Final Judgment's permanent injunction against the relitigation of Released Claims." *Id.* at 2, 7. It argued that allowing Bishop's claims to proceed in state court "threaten[ed] to unravel the global resolution of the Released Claims that the Settlement was intended to achieve." *Id.* at 3.

Thus, PHH seeks an Order: (1) directing "Bishop to discontinue prosecuting the [2017 and 2021 Lawsuits] and . . . to dismiss [those actions]"; (2) "finding Bishop in

30

contempt of court"; and (3) "awarding [PHH] its compensatory damages, including attorney's fees and costs, incurred by virtue of the [2017 and 2021 Lawsuits]." *Id.*

In his first response, Bishop noted that PHH had attached to its motion the *original* complaint for the 2017 Lawsuit (instead of the then operative First Amended Complaint). [ECF No. 202, pp. 1-2]. Because PHH had attached the *wrong* complaint to its motion, the Court allowed Bishop to file an amended response. [ECF No. 208].[7]

The amended response [ECF No. 213] echoed many of the same arguments made by Bishop in his original response. Specifically, that "[n]one of the issues at trial were for the 'kickback scheme' or 'force[-]placed insurance' that were at issue in the Class Action complaint." *Id.* at 1-2. Bishop further argued that the foreclosure action was based on the failure to make mortgage payments and did not include allegations concerning insurance payments. *Id.* at 2. According to Bishop, "[t]he issue at trial was that Ocwen charged for attorney's fees, court filing fees that were never filed, inspection fees, unknown charges, late fees[,] and other undocumented charges that were charged after the mortgage foreclosure was dismissed on 6/18/2015." *Id.*

Bishop attached a copy of Ocwen's Payment Reconciliation Report [ECF No. 213-7] and represented that "there [were] only two (2) charges for insurance, one on

---

[7]   PHH represented to the Court that it would not be filing an amended reply because "[t]here [was] nothing contained in the Amended Response that merit[ed] a further reply from Ocwen." [ECF No. 207, p. 5].

12/18/2012 and one on 7/29/2014." *Id.* at 2-3. According to Bishop, there were "approximately two-hundred-forty (240) other charges that [were] not remotely insurance related," including "property inspection fees, loan document charges, late charges (even though [Bishop] was not late), title report fees, attorney's fee[s], [and] filing fees." *Id.* at 3. Bishop also noted that many of the charges reflected in the Reconciliation Report post-dated the Class Action Settlement: "the charges to Mr. Bishop extend beyond this Court's order approving settlement, (9/14/2015) all the way through 9/29/2016 and continue through today for charges unrelated to the Class Action." *Id.*

Bishop further argued that the first two breach of contract claims (Counts I and II) had nothing to do with LPI because Count I concerned Ocwen "wrongfully charg[ing] [Bishop] post[-]settlement attorney's fees and related charges that were not agreed to" and Count II concerned Ocwen's purported practice of "accepting the payment on the mortgage and applying it to the escrow account and then charging late charges to [ ] Plaintiff." *Id.* at 3-4.

Bishop acknowledged that Count III alleged that "[Ocwen] charged premium [sic] that were far in excess of a reasonable premium," but argued that "the facts at trial changed":

> During discovery and in the proof at trial, it was proven that **Ocwen charged Mr. Bishop for force[-]placed insurance but never paid the premium for it until after Mr. Bishop had provided proof that had [sic] insurance**. **The proof at trial was that Mr. Bishop had insurance in**

> **October, but Ocwen never paid for the policy until December**. . . . Therefore, the proof at trial was completely different than the allegations and there was a post[-]trial motion to amend the pleadings. There was additional proof at trial that in the state court case he was being charged for filing fees for a foreclose [sic] that was never filed. Those charges have nothing to do with the insurance issue. The proof at trial was that Mr. Bishop was charged for undocumented attorneys's [sic] fees that have nothing to do with insurance. The proof at trial and the allegations were that Ocwen reported Mr. Bishop to the credit bureau while he was current on his payments.

*Id.* at 4.

According to Bishop, "[t]he issue in the state court action [was] that Ocwen created an escrow account while he was current on his payments and this has nothing to do with the Class Action" and "the allegations in the complaint and the facts proven at trial [were] not related to any 'kickback scheme' or 'force[-]placed insurance.'" *Id.*

But Bishop contends that the only insurance-related issue at trial concerned "Bishop [having] previously asked Ocwen for proof that the [insurance] policy had been paid for" and "Ocwen never provid[ing] proof." *Id.* at 4-5. He stated that the evidence presented at trial showed that Ocwen "paid for the insurance [ ] months late after Mr. Bishop had provided proof of insurance." *Id.* at 5. Thus, had Bishop made "a claim under the unpaid policy . . . from July to December there would not have been coverage [during that time] since Ocwen did not pay for the policy." *Id.*

Bishop argued that another issue raised in the state court case that had "[n]othing to do with the Class Action" concerned "the implementation of an escrow account by

Ocwen when there was a wavier [sic] of the escrow with the 'Lender' not Ocwen." *Id.*

According to Bishop, "[he] would pay his mortgage on time" and "Ocwen would put his

payment into the escrow account, delay the credit to his mortgage and then charge him

a late fee and report him to the credit bureau." *Id.*

Bishop says "[t]he allegations and proof at trial were that at the time the escrow

was imposed[,] Mr. Bishop was current on his mortgage payments" and that "Ocwen

wrongfully created an escrow account, while he was current." *Id.* at 6. After the escrow

account was created "[Ocwen] charged [Bishop] $402.62 on 9/30/2015 and $1,030.38 on

6/31/2016 for filing fees for a foreclosure that the public records prove[d] was never filed

and he was current on his payments." *Id.*

As to his fraud count (Count IV), Bishop acknowledged that "[t]he original

allegations were that Ocwen had a financial interest in the insurance company and

charged premiums in excess of the market rate" and that "[t]he failure to disclose the

financial interest in Florida was a violation of the laws of Florida and the United States."

*Id.* Nonetheless, Bishop characterized the *Lee* Class Action Lawsuit as relating *solely* to

"'kick back' schemes." *Id.* He therefore argued that the allegations in Count IV were not

the same as those in the Class Action Lawsuit. *Id.*

Bishop further stated that "[i]t was proven at trial that Ocwen did not pay for the

insurance until *after* Mr. Bishop provided proof of insurance" and "[t]he judge entered a

34

general award of damages." *Id.* (emphasis added). [Those damages were later reversed by the appellate court's mandate.].

In sum, Bishop claimed that "none of the allegations in the [First] Amended Complaint were the same as the Class Action and the proof at trial changed with the evidence." *Id.*

In its optional reply, PHH argued that Bishop "completely ignore[d] the nature of his own claims and the broad scope of the defined term 'Released Claims' in both the Class Action Settlement and the Final Judgment." [ECF No. 204, pp. 1-2]. PHH maintained that "each claim" in both the 2017 and 2021 Lawsuits "relate[d], in some way, to Ocwen's LPI practices during the Settlement Class Period." *Id.* at 2.

PHH argued that although Count I of the First Amended Complaint in the 2017 Lawsuit concerned attorney's fees, those attorney's fees were "for a foreclosure action, which Bishop attribute[d] to Ocwen's LPI practices." *Id.* at 4. "Count II [was] about Ocwen's escrow notices about LPI charges to his escrow account." *Id.* "Count III allege[d] that Ocwen charged unreasonable amounts for [LPI]." *Id.* at 4-5. And Count IV contained allegations that "Ocwen's charges for [LPI] were fraudulent and that Ocwen had some undisclosed financial stake in American Security Insurance Company." *Id.* at 5.

PHH argued that even "Bishop's claims about credit reporting [were] relate[d] to LPI, because -- according to Bishop -- the amount Bishop failed to pay each month was

the amount Ocwen was escrowing to recover the LPI premium" and "Bishop's failure to repay the escrow advances for LPI resulted [in] charges for foreclosure related attorney's fees, inspections, and costs." *Id.* at 6 (citing transcript of closing argument in state court trial)]. PHH also noted that "Bishop's claims relating to Ocwen's use of an escrow account allege[d] that Ocwen did not provide the requisite notice to charge Bishop's escrow account for LPI." *Id.*

As to the 2021 Lawsuit, PHH noted that the Complaint filed in that action "re-raised, almost verbatim" the counts alleged in the 2017 Lawsuit and "tack[ed] on a Count V, which [sought] to bring claims on behalf of a class." *Id.* at 5.

In sum, PHH maintained that "[a]ll of Bishop's claims in the [2017] Lawsuit and [the 2021] Lawsuit fall within the broad definition of Released Claims insofar as they 'relate, concern, arise from, or pertain <u>in any way</u>' to Ocwen's LPI practices." *Id.* at 2 (emphasis in original).

## II.    Applicable Legal Standards

### A.    The All Writs Act

Ocwen invokes the Court's authority under the All Writs Act, 28 U.S.C. § 1651. [ECF No. 201, pp. 9-10]. "Federal courts may invoke the authority conferred by the All Writs Act to enjoin parties from prosecuting separate litigation to protect the integrity of

a judgment entered in a class action and to avoid relitigation of issues resolved by a class

action." *In re Managed Care*, 756 F.3d 1222, 1233 (11th Cir. 2014).

> The All Writs Act grants district courts jurisdiction to "issue all writs
> necessary or appropriate in aid of their respective jurisdictions and
> agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Under
> this statute, a district court may "issue such commands . . . as may be
> necessary or appropriate to effectuate and prevent the frustration of orders
> it has previously issued in its exercise of jurisdiction otherwise obtained."
> *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172, 98 S. Ct. 364, 372, 54 L.Ed.2d
> 376 (1977).

*TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1324 n.2 (11th Cir. 2020).

At the same time, federal courts must be mindful of the limitations of the Anti-

Injunction Act when enjoining a state court proceeding. *Love v. Blue Cross & Blue Shield*

*Ass'n*, No. 03-21296-CIV, 2021 WL 949940, at *2 (S.D. Fla. Mar. 12, 2021). "The Anti-

Injunction Act expressly prohibits federal courts from enjoining proceedings in state

courts unless one of three narrow exceptions applies." *Skyjet Elite, Corp. v. Lu Invs., Inc.*,

No. 21-61979-CIV, 2022 WL 4766863, at *2 (S.D. Fla. Feb. 25, 2022) (citing *Atl. Coast Line*

*R.R. Co. v. Locomotive Eng'rs*, 398 U.S. 281, 286–88 (1970); *Burr & Forman v. Blair*, 470 F.3d

1019, 1028 (11th Cir. 2006)).

"'The three excepted circumstances are (i) the express provisions of another act of

Congress authorizing such an order; (ii) necessity in aid of the federal court's jurisdiction;

and (iii) the need to protect or effectuate the federal court's judgments.'" *Williams v.*

*Encore Credit Corp.*, No. 1:20-CV-1297-TCB-JSA, 2020 WL 7496845, at *9 (N.D. Ga. Sept. 28,

2020), report and recommendation adopted, No. 1:20-CV-1297-TCB, 2020 WL 7496836 (N.D. Ga. Oct. 27, 2020) (quoting *Std. Microsystems Corp. v. Tex. Instruments, Inc.*, 916 F.2d 58, 60 (2d Cir. 1990)). "Because of the sensitive nature of federal interference with state court proceedings, the exceptions to the rule against injunctions must be narrowly construed." *Skyjet Elite, Corp.*, 2022 WL 4766863, at *2 (citing *Int'l Assoc. of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 129 (5th Cir. 1975)).[8]

The third exception is sometimes referred to as the relitigation exception. "[It] authorizes a federal court to issue an injunction to protect or effectuate its judgments" and is "[g]rounded in preclusion principles[.]" *Id.* at *3 (citation and internal quotation marks omitted).

Addressing the relitigation exception, the Eleventh Circuit has noted that:

> a federal court may enjoin state court proceedings **"only if preclusion is clear beyond peradventure."** [*Smith v. Bayer Corp.*, 564 U.S. 299, 307, 131 S. Ct. 2368, 2376, 180 L. Ed. 2d 341 (2011)]. "An injunction under the relitigation exception is appropriate where the state law claims would be precluded by the doctrine of res judicata." *Burr & Forman*, 470 F.3d at 1029–30. **"Any doubt regarding whether the requirements of res judicata have been met will be resolved against interference with the state court proceeding."** *Id.* at 1030.

---

[8]    The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

*Original Brooklyn Water Bagel Co. v. Bersin Bagel Group, LLC*, 817 F.3d at 725 (11th Cir. 2016) (emphasis added).

### B.    Res Judicata

The principles of res judicata (sometimes referred to as claim preclusion) are well-established. *Maldonado v. U.S. Atty. Gen.*, 664 F.3d 1369, 1375 (11th Cir. 2011). "It is by now hornbook law that the doctrine of res judicata 'bars the filing of claims which were raised or could have been raised in an earlier proceeding.'" *Id.* (quoting *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999)); *see also In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001) ("[A] final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action." (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)).

The Eleventh Circuit has explained that "for res judicata purposes, claims that 'could have been brought' are claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action." *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) (footnote omitted). "When events occurring before the date of the original pleading are discovered after it is filed, the original pleading can be amended. In either case, failure to advance such claims in the original action would seem to bar their relitigation in a second suit." *Id.* at n.9.

"[The] principles of res judicata, or claim preclusion, apply to judgments in class actions as in other cases." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998); *see also Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 874, 104 S. Ct. 2794, 2798, 81 L. Ed. 2d 718 (1984) ("[U]nder elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation.").

The party invoking the doctrine of res judicata has "the burden . . . to show that the later-filed suit is barred" by establishing the following four elements: "(1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action." *In re Piper Aircraft Corp.*, 244 F.3d at 1296 (citing *Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311, 314 (11th Cir. 1992); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 (11th Cir. 1990)).

All four elements must be present. "If even one of these elements is missing, res judicata is inapplicable." *In re Piper Aircraft Corp.*, 244 F.3d at 1296 (citing *Hart v. Yamaha–Parts Distrib., Inc.*, 787 F.2d 1468, 1473 (11th Cir. 1986)).

## III.   Analysis

Bishop argues that the state court (not this Court) should determine whether all or part of his claims are foreclosed by the Class Action Settlement. [ECF No. 213, p. 7]. He

notes that "[t]he case may be re-tried with the issue of the Class Action as an affirmative defense" and "[t]he Circuit Court is able to determine what, if any, damages there are outside the Class Action and which ones, if any are related." *Id.*

"Pursuant to its authority under the All Writs Act and res judicata principles, a district court may enjoin state court proceedings to enforce a settlement agreement if it incorporates the agreement into its order or retains jurisdiction over the agreement." *Aboltin v. Jeunesse LLC*, No. 617CV1624ORL40TS, 2020 WL 10498586, at *3 (M.D. Fla. Sept. 16, 2020).

In the instant case, the Court "retain[ed] jurisdiction over the construction, interpretation, consummation, implementation, and enforcement of the Settlement Agreement, including jurisdiction to enter such further orders as may be necessary or appropriate." [ECF No. 185, p. 7]. Moreover, the state court is aware of this federal proceeding and is waiting on a ruling from this Court. [ECF No. 245, p. 3 ("A response by the defendant is not due until fourteen (14) days after the District Court rules on whether some, all or part of the 3rd Amended Complaint violates the Class Action settlement.")]. Thus, the Court will proceed to determine whether some or all of Bishop's claims are precluded by the *Lee* Class Action Settlement.

As noted above, the elements of res judicata are: "(1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final

41

judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action." *In re Piper Aircraft Corp.*, 244 F.3d at 1296.

Here, the first two elements are easily met and warrant little discussion. There is no doubt that the United States District Court for the Southern District of Florida had jurisdiction over the *Lee* Class Action. Moreover, this Court issued a final judgment on the merits when it approved the Class Action Settlement [ECF No. 184] and issued a Final Judgment [ECF No. 185]. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1340 (11th Cir. 2012) ("For purposes of determining res judicata, an order approving a settlement agreement provides a final determination on the merits.").

The Court will address the remaining two elements below.

### A.      Identity of the Parties

"The third element asks whether the state court action involved the same parties or their privies." *Battle v. Am. Home Mortg. Servicing Inc.*, No. 2:15-CV-563-FTM-38CM, 2016 WL 688210, at *3 (M.D. Fla. Feb. 19, 2016). For the reasons discussed below, the Undersigned finds that the third element is met as to the three parties at issue here: Ocwen, PHH, and Bishop.

### 1.     Ocwen

The parties do not dispute that Ocwen was a named defendant in the *Lee* Class Action and a "Released Person," as defined by the Class Action Settlement. Therefore, the third element is met as to Ocwen.

### 2.     PHH

PHH was *not* a defendant in the *Lee* Class Action. However, "[u]nder the third element of res judicata, if the cases do not involve the same parties, res judicata may still bar a subsequent action when a party in the new suit is in privity with one involved in the prior decision." *Palms of Destin Club, LLC v. Commc'ns Processing Sys. Inc.*, No. 21-12202, 2022 WL 293960, at *5 (11th Cir. Feb. 1, 2022).

The Eleventh Circuit has defined privity as:

> a relationship between one who is a party of record and a nonparty that is sufficiently close so a judgment for or against the party should bind or protect the nonparty. Privity exists where the nonparty's interests were represented adequately by the party in the original suit. Privity also exists where a party to the original suit is so closely aligned to a nonparty's interest as to be his virtual representative.

*Id.* (quoting *NAACP v. Hunt*, 891 F.2d 1555, 1560–61 (11th Cir. 1990)).

Ocwen merged with and into PHH on June 1, 2019 and PHH was a successor by merger. [ECF Nos. 201, p. 2; 201-3, pp. 2-11]. Thus, privity exists between Ocwen and PHH.

As the district court in *Pritchett v. PHH Mortg.* explained:

"A classic example of privity is the successor in interest." *Patel v. Capital One Fin. Corp.*, No. 1:18-CV-03430-LMM-JFK, 2019 WL 2714507 at *6, 2019 U.S. Dist. LEXIS 113007 at *15-16 (N.D. Ga. Apr. 17, 2019) (finding that "[a]s a successor in interest, Bayview [the new servicer] is in privity with RCS [the old servicer and] a party to the prior action" for purposes of res judicata). Here, **PHH is Ocwen's successor-in-interest by merger.** *See* [*Fusco v. Ocwen Loan Servicing, LLC*, No. 20-CV-80090, 2020 WL 2519978, at *1 n.1. (S.D. Fla. Mar. 2, 2020)] ("Ocwen Loan Servicing, LLC no longer exists as a standalone entity, having been merged into another wholly-owned subsidiary of Ocwen Financial Corporation in or around June 2019. Its successor-in-interest for purposes of this action is PHH Mortgage Corporation, which assumed certain obligations from Ocwen."); *Eneanya v. Ocwen Loan Serv.*, No. 4:19-CV-01846, 2020 WL 977226, at *2, 2020 U.S. Dist. LEXIS 34233 at *1 n.1 and *5-6 (S.D. Tex. Feb. 28, 2020) (noting that **PHH was a successor-in-interest to Ocwen because Ocwen merged with PHH on June 1, 2019 and finding that for purposes of res judicata, "the parties in the first lawsuit and second lawsuit are in privity with one another, as it is undisputed that PHH is a successor-in-interest to Ocwen"**). In addition, "the privity between [PHH] and the prior servicer[ ] satisfies the third requirement that the parties in both suits be the same." *Beckman v. Newrez LLC*, No. 1:19-CV-0143-MLB-JFK, 2019 WL 5322647 at *8, 2019 U.S. Dist. LEXIS 183811 at *21 (N.D. Ga. June 10, 2019), adopted by 2019 WL 5387980, 2019 U.S. Dist. LEXIS 183807 (N.D. Ga. Aug. 29, 2019) (dismissing fifth lawsuit filed against servicers based on res judicata). **Privity exists between PHH and Ocwen "given that both entities, as servicers of the loan at issue, have been tasked, albeit at different times, with enforcing the same property right."** 2019 WL 5322647, at *8, 2019 U.S. Dist. LEXIS 183811, at *21-22 (finding that although NewRez had not been named in the previous four lawsuits, it was still in privity with the previous servicer-defendants based on this rationale and collecting cases). **Thus, for purposes of res judicata, PHH is in privity with Ocwen.**

No. 219CV00264SCJJCF, 2020 WL 10227915, at *4 (N.D. Ga. Apr. 29, 2020), report and

recommendation adopted, No. 219CV00264SCJJCF, 2020 WL 10227917 (N.D. Ga. June 29,

2020) (emphasis added; some alterations in original).

The Undersigned finds *Pritchett* and the cases cited by *Pritchett* to be persuasive

and similarly concludes that PHH is in privity with Ocwen for purposes of the third

element of res judicata.

### 3.   Bishop

Bishop argues he was not part of the Settlement Class for two reasons: (1) he never

received actual notice and (2) he does not fall within the definition of the "Settlement

Class" as that term is defined in the Class Action Settlement Agreement. For the reasons

discussed below, Bishop's arguments are unavailing, and the Court finds that Bishop **was**

part of the *Lee* Settlement Class.

The Court will address the definition of the Settlement Class first and then proceed

to address the issue of class notice.

The Settlement Class in *Lee* was defined as:

> **All borrowers in the United States who, within the Settlement Class
> Period (defined below), were charged by Ocwen under a hazard, flood,
> flood gap or wind-only LPI Policy for residential property, and who,
> within the Settlement Class Period, either (a) paid to Ocwen the Net
> Premium for that LPI Policy or (b) did not pay to and still owe Ocwen the
> Net Premium for that LPI Policy.** Excluded from the Settlement Class are:
> (a) individuals who are or were during the Settlement Class Period officers
> or directors of [ ] Defendants in the Action or any of their respective

Affiliates; (b) any justice, judge, or magistrate judge of the United States or any State, their spouses, and persons within the third degree of relationship to either of them, or the spouses of such persons; (c) borrowers whose LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded to the borrower or to the borrower's escrow account; and, (d) all borrowers who file a timely and proper request to be excluded from the Settlement Class.

[ECF No. 184, pp. 7-8]. There is no question that Bishop is part of the Settlement Class and falls squarely within this definition.

Bishop's response states "Ocwen's 'Payment Reconciliation Report'" reflects "two (2) charges for insurance, one on 12/18/2012 and one on 7/29/2014." [ECF No. 213, pp. 2-3]. Both dates fall within the Class Period. Moreover, Raymond James instituted the Foreclosure Action on May 21, 2013 (also within the Class Period) and Bishop alleges in one of his operative complaints that the foreclosure action was instituted due to Bishop's inability to obtain insurance. [ECF No. 201-2, ¶ 12 ("Due to the inability to obtain insurance and per the terms of the mortgage to maintain insurance the defendant [sic] foreclosed.")].

Bishop also alleges in his Third Amended Complaint that he paid Ocwen the premium for LPI and was never reimbursed: "**After payment of the full $10,060.18** [ ] [D]efendant never reimbursed Mr. Bishop for the charges. . . . **The payment included full payment for the $10,060.18 for the alleged insurance premium** that was never paid for even though [Bishop] had a policy with Citizens Insurance." [ECF No. 249-1, ¶¶ 75-76].

Therefore, Bishop is a "borrower[ ] in the United States who, within the Settlement Class Period . . . [was] **charged by Ocwen** under a hazard, flood, flood gap or wind-only LPI Policy for residential property, and who, within the Settlement Class Period . . . **paid to Ocwen the Net Premium for that LPI Policy**[.]" [ECF No. 184, pp. 7-8 (emphasis added)].

Bishop's contention (asserted in his Third Amended Complaint) that he is not a Class Member because the "Class Action . . . only covered class members where Ocwen had *actually* obtained insurance for them" [ECF No. 249-1, ¶ 73 (emphasis added)] is not persuasive because the Third Amended Complaint alleges that he was charged by Ocwen for LPI and he paid it. [ECF No. 249-1, ¶¶ 75-76]. He therefore falls within the definition of the Settlement Class. Moreover, Bishop's amended response suggests that Ocwen *did* procure insurance, albeit belatedly. [ECF No. 213, p. 10 ("At trial it was proven in Count IV that Ocwen did not pay for the insurance **until after Mr. Bishop provided proof of insurance**." (emphasis added))].

The Court's finding that Bishop falls within the definition of the Settlement Class does not end the inquiry. "Due process requires that the members of a Rule 23 class action receive adequate notice and representation, otherwise they are not bound by the judgment." *Njie v. Experian Info. Sols., Inc.*, 549 F. Supp. 3d 1361, 1367 (N.D. Ga. 2021) (citing *Juris*, 685 F.3d at 1317–28).

47

Bishop argues that "[t]here is no proof that Mr. Bishop ever participated in the Class Action." [ECF No. 213, p. 8]. He also asserts that: "[t]he record in the trial in the Circuit Court proved he never got notice of the Class Action." [ECF No. 213, p. 8].[9] He states, without supporting authority, that: "[w]ithout any proof at trial that Mr. Bishop *actually* received notice of the Class Action, [PHH] lacks standing to file the motion and due process was denied." *Id.* at 8 (emphasis added).

But Bishop's assertions and denials do not carry the day. *See Aboltin*, 2020 WL 10498586, at *3 n.5 ("Although [the] [p]laintiffs argue that Ms. Young never received class notice or notice of a settlement . . ., the [c]ourt previously found that notice to the settlement class satisfied due process requirements . . . . [The] [p]laintiffs' bare assertion

---

[9]      Bishop stated that "[a]t trial Ocwen never called a witness to state Mr. Bishop participated in the Class Action or knew of the Class Action. There was an affidavit but no proof and Mr. Bishop multiple times stated Ocwen had his address wrong." [ECF No. 213, p. 8].

But it appears the trial court considered the affidavit as evidence at trial. On the issue of notice, the Fourth DCA summarized the trial evidence as follows:

> During the bench trial, the servicer proffered documents related to the class action litigation and its settlement, **including an affidavit** from the settlement administrator asserting that the borrower was bound by the settlement because he never opted out of the class action litigation after being notified of his membership in the class.

*Bishop*, 337 So. 3d at 67 (emphasis added).

of non-receipt, without any other evidence to support this contention, is insufficient to overcome the [c]ourt's finding.").

Moreover, "[c]ourts have consistently recognized that, even in Rule 23(b)(3) class actions, due process does not require that class members *actually* receive notice." *Juris*, 685 F.3d at 1321 (emphasis added). Thus, Bishop "cannot escape the preclusive effect of the settlement simply by arguing that he did not receive *actual* notice." *Pey v. Wachovia Mortg. Corp.*, No. 11-2922 SC, 2011 WL 5573894, at *8 (N.D. Cal. Nov. 15, 2011) (emphasis added). As the *Pey* Court noted "allowing absent class members to easily escape the preclusive effect of settlement by claiming that they did not receive actual notice would undermine the ability of the class action mechanism to prevent numerous identical suits with potentially inconsistent results." *Id.* at *7.

On the issue of notice, PHH has filed a supplemental declaration from Ann Haan, the program manager for the court-appointed Claims Administrator. [ECF No. 201-4]. In this supplemental declaration, Ms. Haan attests that on March 13, 2015, the Claims Administrator mailed a total of 399,843 Class Action Notices to the then known Class Members and an additional 1,211 notices on May 29, 2015 to individuals who called a toll-free number requesting the notice. *Id.* at ¶ 5.

Out of this amount, 51,019 Notices were returned undeliverable and 50,239 of these returned Notices did not have a valid forwarding address. *Id.* at ¶ 6. The Claims

49

Administrator sent an additional Notice for those addresses for which it had forwarding information from the United States Postal Service. *Id.* at ¶ 7. And, "[f]or returned [N]otices with no forwarding address, and for which an updated address had been acquired through the NCOA[10] search, a [N]otice was re-mailed to the [original] property address of the class member[.]" *Id* (footnote added).

The Claims Administrator also posted the Notice on the settlement website www.LeeSettlementinfo.com, which recorded 25,717 unique visitors between March 13, 2015 and May 29, 2015. *Id.* at ¶ 8.

By May 29, 2015, the Claims Administrator received a total of 195 requests to be excluded from the Settlement Class. *Id.* Ms. Haan attached a list of individuals who opted out of the Class Action Settlement as an exhibit to her supplemental declaration. [ECF No. 201-4, pp. 6-10]. Bishop's name does not appear on this list.

PHH also filed a copy of the December 20, 2019 affidavit of Patrick Hughes, a project manager for the Claims Administrator. [ECF No. 204-2]. Mr. Hughes' affidavit was filed in the 2017 Lawsuit in response to Bishop's summary judgment motion. The affidavit states, in relevant part, that:

---

[10]      Ms. Haan's initial declaration explained that: "[p]rior to mailing, [the Claims Administrator] verified the defendant-provided address information through the National Change of Address database ('NCOA'). NCOA contains all requested changes of address which have been filed with the United States Postal Service and are currently in effect." [ECF No. 144-4, ¶ 7].

4.      Charles E. Bishop was a class member in the *Lee* Class Action and [the Claims Administrator] mailed a Notice packet[11] to Mr. Bishop on March 13, 2015, to his address of 771 SE 22nd Ave, Pompano Beach, FL 33062. A true and correct copy of a reproduction of the Notice mailed to Mr. Bishop is attached to this affidavit as Exhibit A.

5.      [The Claims Administrator] never received a Claim Form, Request for Exclusion or any other form of correspondence from Mr. Bishop. As of this date, the Notice packet mailed to Mr. Bishop has not been returned as undeliverable or with any sort of forwarding address.

*Id.* at ¶¶ 4-5 (footnote added).

The Court has already determined that "the Class Notice[,] substantially in the form approved by the Court in its preliminary approval order[,] was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate." [ECF No. 184, p. 6]. Therefore, the requirements of due process are met. *See Gordon v. Hunt*, 117 F.R.D. 58, 63 (S.D.N.Y. 1987) ("[The] combination of mailed notice to all class members who can be identified by reasonable effort and published notice to all others is the long-accepted norm in large class actions.").

In sum, Bishop was a member of the Settlement Class. He was mailed a notice of the Settlement by the Claims Administrator. The settlement notice was not returned as undeliverable; and Bishop did not timely object to or request exclusion from the Settlement Class. Because Bishop is part of the *Lee* Settlement Class, in accordance with

---

[11]      The Notice packet included the Settlement Notice, Claim Form Instructions, and Claim Form. [ECF No. 204-2, pp. 9-21 (Exhibit A)].

the Settlement Agreement and Final Judgment, he has "released the Released Claims as against the Released Persons." [ECF No. 185, p. 3].

Nonetheless, the Court's conclusion that Bishop is bound by the *Lee* Class Action Settlement, however, does not necessarily mean that *every* one of his claims in the 2017 Lawsuit and the 2021 Lawsuit is barred. Res judicata applies only to claims that were actually brought or could have been brought. *Manning*, 953 F.2d at 1359.

The Court will address Bishop's state court claims below.

## B.     Identity of the Causes of Action

"The fourth element of res judicata requires that a party must show the same cause of action is involved in both cases." *Kreger v. Medicredit, Inc.*, No. 8:16-CV-1481-T-33JSS, 2016 WL 3906960, at *4 (M.D. Fla. July 19, 2016) (citing *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010)). "A court 'must look to the factual issues to be resolved [in the second cause of action], and compare them with the issues explored in' the first cause of action." *Id.* (quoting *S.E.L. Maduro v. M/V Antonio De Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987) (alteration in original).

The causes of action need not be identical in both cases. "[T]wo cases are generally considered to involve the same cause of action if the latter case 'arises out of the same nucleus of operative fact, or is based upon the same factual predicate,' as the former one." *Maldonado*, 664 F.3d at 1375 (quoting *Ragsdale*, 193 F.3d at 1239). "In determining whether

claims share the 'same operative nucleus of fact,' [courts] consider whether the 'primary right and duty are the same.'" *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 417 (11th Cir. 2009) (citing *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007)).

PHH takes the position that "each claim raised by Bishop in the [2017] Lawsuit and [the 2021] Lawsuit relates, in some way, to Ocwen's LPI practices during the Settlement Class Period." [ECF No. 204, p. 2]. For this reason, PHH argues that Bishop should be enjoined from prosecuting *all* of the claims asserted in both actions.

Bishop seeks to distinguish the *Lee* Class Action from his state court claims on multiple grounds.

For instance, Bishop asserts that "there are no claims for '[k]ick [b]ack' schemes. Therefore, none of the causes of action are identical and none of the damages are the same." [ECF No. 213, p. 12]. But Bishop takes too narrow a view of the claims encompassed by *Lee*. Noticeably absent from Bishop's amended response is any discussion of the terms of the Class Action Settlement and the claims they release.

To the extent Bishop's amended response discusses the *Lee* Class Action, he focuses on allegations in the Complaint [ECF No. 1]. [ECF No. 213, pp. 2-3]. Bishop states that "[t]he allegations in the [C]omplaint were that there was a '[k]ick-back' scheme between Ocwen and several insurance companies." *Id.* at 2.

Setting aside the fact that the operative complaint in *Lee* was the First Amended Class Action Complaint [ECF No. 106] (not the original Complaint [ECF No. 1] cited by Bishop), "[w]hen assessing the res judicata effect of a prior action, [courts] are not limited to the allegations raised in a . . . complaint." *TVPX ARS, Inc.*, 959 F.3d at 1326 (citing *Adams*, 493 F.3d at 1290–91). Courts "may also consider the parties' settlement documents to determine the claims at issue in a prior action." *Id.*

In *TVPX ARS, Inc.*, for instance, the Eleventh Circuit considered the "complaint, settlement, and class notice . . . taken together," in determining that the class action claims in that case "[were] not limited only to [the insurer's] marketing practices" but also "encompassed an 'overarching scheme of fraud and deception' that extended to the manner in which [the insurer] administered various aspects of its universal life policies[.]" *Id.*

Here, the First Amended Class Action Complaint, the Class Action Settlement, and the Class Notice make clear that the claims released by the *Lee* Class Action Settlement were broad.

The *Lee* Class Action was not limited, as Bishop claims, *solely* to "kickback schemes" involving LPI. The court-approved notice sent to the Class summarizes the *Lee* Class Action as follows:

> This lawsuit involves lender-placed insurance ('LPI'), which is insurance (hazard, flood, flood gap, or wind-only) that is placed on a borrower's

property to protect the borrower and mortgage lender when the borrower's insurance policy lapses, or when the borrower does not maintain a homeowner's insurance policy that is acceptable to the mortgage lender. When an LPI Policy is placed pursuant to the borrower's mortgage contract, Ocwen pay [sic] premiums to the LPI insurer who writes the policy, and then Ocwen charges the borrowers for those premiums.

The [sic] Plaintiffs have brought claims on behalf of all persons in the Settlement Class . . . **Plaintiffs allege that when a borrower was required to have insurance for his or her property pursuant to a residential mortgage or home equity loan or line of credit, and evidence of acceptable coverage was not provided (for example, when the insurance policy did not exist or had lapsed), Ocwen would place insurance in a manner such that Ocwen allegedly received an unauthorized benefit. Plaintiffs allege further that Ocwen did so primarily to receive 'kickbacks' in the form of commissions from the Assurant Defendants. Plaintiffs also allege that the way in which LPI policies were obtained and placed caused the rates and the amount of coverage to be excessive.**

[ECF No. 111-2, pp. 4-5 (emphasis added)].

Moreover, the claims released by the Class Action Settlement are extensive:

(b) <u>Released Claims of Settlement Class</u>

**Each member of the Settlement Class**, and their family members, heirs, guardians, assigns, executors, administrators, predecessors, and successors, other than the Named Plaintiffs, **shall, by operation of the Final Order, be deemed to have fully, conclusively, irrevocably, forever, and finally released, relinquished, and discharged the Released Persons from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that each member of the Settlement Class may have until the close of the Settlement Class Period or may have had in the past**, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis, **whether past or present**, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute,

ordinance, regulations, contract, common law, or any other source, **that were or could have been sought or alleged in the Litigation or that relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices concerning Ocwen's placement**, or the Assurant Defendants' issuance, **of LPI Policies during the Settlement Class Period, including but not limited to conduct, policies or practices concerning LPI Policies or to charges for Ocwen's Placement of LPI Policies during the Settlement Class Period**. In agreeing to this Release, Named Plaintiffs explicitly acknowledge that unknown losses or claims could possibly exist and that any present losses may have been underestimated in amount or severity.

> (i) **The Release stated in Paragraph 14(b) above shall include, but not be limited to, all claims related to Ocwen's insurance requirements**; the relationship, whether contractual or otherwise, between Ocwen and the Assurant Defendants regarding LPI, including, but not limited to, t**he procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged "backdating," or alleged excessiveness of any LPI Policies placed or charged by Ocwen**; the payment or receipt of commissions, expense reimbursements, **alleged "kickbacks," or any other compensation under any LPI Policies placed or charged by Ocwen**; any alleged "tying" arrangement involving Ocwen and LPI; any alleged breach of fiduciary duty by Ocwen concerning LPI Policies; any alleged tortious interference by the Assurant Defendants with mortgage loans serviced by Ocwen; the disclosure or non-disclosure of any payment, expenses, fees, charges, or features pertaining to or under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen; the receipt or non-disclosure of any benefit under any LPI Policies or coverage under such LPI Policies and charges for such coverage placed or charged by Ocwen; **the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by Ocwen**; and to the regulatory approval or non-

approval of any LPI Policy, or the premium thereon, placed
or charged by Ocwen.

[ECF No. 184, pp. 68-70 (emphasis added)].

Thus, the "Released Claims" in *Lee* were not limited, as Bishop contends, to a "kickback" scheme involving LPI. As will be discussed in more detail below, *most* of Bishop's claims are swallowed up by the Class Settlement's broad definition of "Released Claims."

Bishop also argues that the Court's Order approving the *Lee* Class Action Settlement did not exclude **future** damages. Bishop reasons that:

If this Court's order did allow damages for future charges by Ocwen it would allow Ocwen to restart the same business practices that this Court ordered to be stopped. Therefore, the charges after the settlement for charges that were not related to the Class Action settlement were and are properly before the Circuit Court

[ECF No. 213, p. 7]. But it does not appear that there are any "future" charges listed in the Reconciliation Report that concern LPI. Bishop identified two charges on the Reconciliation Report "for insurance, one on 12/18/2012 and one on 7/29/2014." [ECF No. 213, p. 3]. Both dates fall within the Class Period of January 1, 2008 through January 23, 2015.

He further states that "[a]ny unrelated charges **prior** to the Class Action are properly before the Circuit Court." *Id.* (emphasis added). But he does not identify *which* claims pre-date the Class Period (January 1, 2008 through January 23, 2015).

57

The Undersigned notes that Bishop's operative complaints do not include many references to dates. The Complaint in the 2021 Lawsuit contains no date allegations and the Third Amended Complaint in the 2017 Lawsuit contains a lone reference to October 19, 2012 as the date Bishop "obtained insurance and provided [ ] [D]efendant with a copy." [ECF No. 249-1, ¶ 71]. Notably, this date falls within the Class Period. Bishop does not specifically identify any charges that pre-date January 1, 2008, the beginning of the Class Period.

The Court will now proceed to address the claims alleged in Bishop's operative complaints.

### 1.     Third Amended Complaint (2017 Lawsuit)

At this time, the operative complaint in the 2017 Lawsuit is the Third Amended Complaint. "Once an amended complaint is filed, the original pleadings are considered abandoned and are no longer a part of the plaintiff's averments." *TVPX ARS, Inc.*, 959 F.3d at 1327 (cleaned up). Thus, the Court will focus on the claims asserted by Bishop in the Third Amended Complaint (and not the First Amended Complaint) in determining whether res judicata applies to some or all of these claims.

As noted above, the Third Amended Complaint [ECF No. 249-1] asserts seven causes of action against Ocwen: Counts I, II, III, VI and VII are breach of contract claims, Count IV alleges fraud and Count V seeks declaratory judgment. *Id.* For the reasons

discussed below, Counts II, III, part of Count IV, Count V, part of Count VI and Count VII are barred under the principles of res judicata.

  **a)**  **Count I: Breach of Contract Based on Attorney's Fees and Costs in the Foreclosure Action**

Count I alleges that Ocwen "breached the mortgage contract by charging [ ] Plaintiff attorney's fees and costs without a court order as to entitlement and as to any amount of fees." [ECF No. 249-1, ¶ 22]. This count alleges that after the Foreclosure Action was voluntarily dismissed without a stipulation or court order on attorney's fees and costs (or a retention of jurisdiction by the court on this issue), Ocwen "charged [ ] Plaintiff some $25,000.00 in attorney's fees and costs" incurred in the Foreclosure Action. *Id.* at ¶¶ 13, 15, 17.

The breach of contract claim in Count I is not a claim that was sought or could have been sought or alleged in the *Lee* Class Action. It does not concern LPI or Ocwen's practices with respect to LPI. It concerns Ocwen charging Bishop approximately $25,000 in attorney's fees and costs, incurred by the mortgagee in bringing the Foreclosure Action against Bishop.

Ocwen contends that the "foreclosure related fees and costs . . . arose from a foreclosure action that Bishop contends was a direct result of Ocwen's LPI practices" and thus, this (and all other claims) "fall within the broad definition of Released Claims insofar as they "relate, concern, arise from, or pertain <u>in any way</u>" to Ocwen's LPI

practices." [ECF No. 204, p. 2 (emphasis in original); *id.* at 4 ("Bishop argues that some allegations in the [2017] Lawsuit and the [2021] Lawsuit do not relate to Ocwen's LPI practices. However, Count I relates to attorney's fees for a foreclosure action, which Bishop attributes to Ocwen's LPI practices.")]. In other words, Ocwen argues that because it was the LPI that caused Bishop to default under the mortgage and resulted in the Foreclosure Action, Count I is barred by the *Lee* Class Action Settlement.

In other pleadings (Counts I of the First Amended Complaint and the 2021 Complaint),[12] Bishop has alleged that the Foreclosure Action was commenced because Bishop could not obtain insurance. But the *reason* why the foreclosure action was initiated in the first place is immaterial to the breach alleged by Bishop. That the LPI was the catalyst for Bishop's default on the mortgage is of no moment. The Foreclosure Action could have just as easily been filed (with the property being fully insured) because Bishop failed to make his monthly payment of principal and interest and the breach of contract claim alleged in Count I would remain the same.

The breach of contract claim in Count I is not a claim that was sought or "could have been sought or alleged in the [*Lee* Class Action]" nor does it "relate, concern, arise from, or pertain in any way to the Released Persons' conduct, policies, or practices

---

[12]    *See* [ECF Nos. 201-2, ¶12 ("Due to the inability to obtain insurance and per the terms of the mortgage to maintain insurance [ ] [D]efendant foreclosed."); 203-1, ¶ 12 (same)].

concerning Ocwen's placement . . . of LPI Policies during the Settlement Class Period. [ECF No. 184, p. 68].

The *Lee* Class Action Settlement simply does not cover the scenario alleged by Bishop in Count I, where the parties settled a foreclosure action without any stipulations on attorney's fees and costs and the state court dismissed that action *without* awarding attorney's fees and costs (or reserving on the issue) and Ocwen purportedly then proceeded to charge Bishop for the attorney's fees and costs incurred as a result of the foreclosure litigation.

Nor does it "relate, concern, arise from, or pertain in any way" to LPI. [ECF No. 184, p. 68]. The crux of the *Lee* Class Action and the *Lee* Class Action Settlement was lender-placed insurance. There were no causes of action involving foreclosures in the *Lee* First Amended Class Action Complaint. [ECF No. 106]. In fact, the word foreclosure appears only once in the *Lee* operative complaint, and it is a reference to a named plaintiff making an extra payment in order to avoid foreclosure. *Id.* at ¶ 94 ("Mr. Dominguez made a catch-up payment of approximately $3,000 at Ocwen's instruction to avoid foreclosure.").

For these reasons, the *Lee* Class Action Settlement does **not** have preclusive effect over Count I.

**b)      Count II: Breach of Contract Based on Escrow Account**

Count II alleges a breach of contract claim based on Ocwen's purported failure to provide adequate notice under the mortgage, creating an escrow account, and then improperly applying part of the mortgage payment to the escrow:

> 32.      [D]efendant, was obligated to send notices to [ ] Plaintiff at his address.
>
> 33.      [D]efendant failed to send notices to [ ] Plaintiff at his address.
>
> 34.      [D]efendant changed the escrow agreement and never sent notices to the correct address.
>
> 35.      [P]laintiff paid the mortgage based upon the original agreement.
>
> 36.      [D]efendant took the mortgage payment and applied part of the mortgage payment to the escrow and then shorted the principal and interest and charged [ ] Plaintiff late charges.
>
> ***
>
> 38.      [D]efendant breached the contract by failing to send the notices to the correct address.
>
> 39.      [D]efendant breached the contract by accepting the payment on the mortgage and applying it to the escrow account and then charging late charges to [ ] Plaintiff.
>
> 40.      Due to the failure of [ ] [D]efendant to send the notices to the correct address [ ] Plaintiff has damages of credit impairment and late charges.

[ECF No. 249-1, ¶¶ 32-36, 38-40].

Count II of the Third Amended Complaint is materially indistinguishable from Count II of the First Amended Complaint. It is unclear why Bishop is re-asserting it given

the appellate court's instructions to the trial court[13] and the trial court's subsequent order

enforcing the mandate, which states: "The Court enters summary judgment in favor of []

Defendant with respect to Count II, and **Count II is hereby dismissed with prejudice**."

[ECF No. 232-1, p. 1 (emphasis added)]. Bishop even includes the following statement

under Count II of the Third Amended Complaint: "WAS DISMISSED BY THE 4TH

DISTRICT COURT OF APPEAL." [ECF No. 249-1, p. 5].

 Even if this claim was not dismissed with prejudice (and it appears that it was), it

would still be precluded by the *Lee* Class Action Settlement. It is beyond reasonable

dispute that the notice at issue in Count II is the notice Ocwen provided to Bishop that it

would be creating an escrow account due to Bishop's purported failure to provide proof

of insurance.

 The appellate court summarized the contents of the notices mailed to Bishop as

follows:

> **When the borrower failed to respond to two notices from the servicer**
> **requesting evidence that the property was insured, the servicer issued a**
> **final written notice to the borrower advising him that "[t]hirty days from**
> **the date of this letter, we will charge your escrow account $38,692.93 for**
> **insurance coverage if you do not provide acceptable proof of coverage**
> **before that time."** The notice advised that an escrow account "may be
> established," if the borrower did not already have one, and that his monthly
> mortgage payment "may be increased to include the cost of th[e] policy[.]"

---

[13] *See Bishop*, 337 So. 3d at 68 ("On remand, the trial court shall enter partial summary judgment in favor of the servicer on the interpretation of the mortgage's escrow waiver provision consistent with this opinion.").

(emphasis added). **Thirty days later, the servicer placed insurance on the mortgaged property and imposed an escrow account to charge the borrower for the cost of the insurance.**

*Bishop*, 337 So. 3d at 65–66 (emphasis added).

Under the broad definition of "Released Claims" in the *Lee* Class Action Settlement, which includes "the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by Ocwen" [ECF No. 184, pp. 69-70], Count II is foreclosed by res judicata.

### c) Count III: Breach of Contract Based on $10,060.18 Payment for Insurance Premium

Count III alleges that Ocwen charged Bishop $10,060.18 for an insurance premium but never obtained the policy:

50. The original mortgage had a clause that required the property to be insured.

51. Since there were no insurance carriers in Florida and **Mr. Bishops [sic] insurance was cancelled, his property was uninsured.**

52. **[D]efendant charged Mr. Bishop $10,060.18 for an alleged premium**.

53. **[D]efendant charged premiums but never obtained the policy.**

54. [D]efendant breached the contract by charging him for a policy that they did not pay for. **If Ocwen never paid for the insurance, there never was any force-placed insurance because there was no insurance.**

55. Plaintiff has been damaged by being charged for something he never received.

[ECF No. 249-1, ¶¶ 50-55].

To the extent Bishop is arguing that this claim does not concern LPI because Ocwen purportedly never obtained a policy on his property, this argument is not well taken. Bishop's amended response suggests that Ocwen *did* procure insurance, albeit belatedly. [ECF No. 213, p. 10 ("At trial it was proven in Count IV that Ocwen did not pay for the insurance *until* **after Mr. Bishop provided proof of insurance**." (emphasis added))]. Moreover, claims released by the *Lee* Class Action Settlement are broad and include:

> any and all claims, actions, causes of action, suits. . . that **relate, concern, arise from, or pertain in any way to** the Released Persons' **conduct, policies, or practices concerning Ocwen's placement** . . . **of LPI Policies during the Settlement Class Period**, including but not limited to conduct, policies or practices concerning LPI Policies **or to charges for Ocwen's Placement of LPI Policies during the Settlement Class Period**.

[ECF No. 184, pp. 68-69 (emphasis added)].

In *Weller v. HSBC Fin. Corp.*, 187 F. Supp. 3d 1263 (D. Colo. 2016), a defendant to a class action settlement filed a motion seeking to enforce the class settlement and enjoin a plaintiff, Lakisha Rochelle Griffin, who had filed a similar lawsuit in another federal court. The district court noted that "the scope of the '[r]eleased [c]laims' set forth in the [s]ettlement [a]greement [was] exceptionally broad" and "include[d], *inter alia*, 'all claims related to any [r]eleased [p]arty's placement of and charges for or related to LPFI Policies during the [c]lass [p]eriod." *Id.* at 1267 (footnote omitted).

65

The *Weller* Court reasoned that "[g]iven that expansive definition, the minor factual distinctions between Ms. Griffin's circumstances, **including the allegation that defendants force[-]placed flood insurance despite receiving proof that she had acquired insurance independently, [did] not put her claims outside the scope of the [r]eleased [c]laims**." *Id.* at 1267–68 (emphasis added).

Similarly here, Bishop's claim that Ocwen charged him for LPI but never procured a policy does not place him outside the ambit of the *Lee* Class Action Settlement. Count III is barred by *res judicata*.

### d) Count IV: Fraud

Count IV alleges fraud based on the following conduct:

65.     Plaintiff, Charles E. Bishop, did not have insurance on the property.

66.     **[D]efendant charged Plaintiff Charles Bishop $10,060.18 for insurance but never paid for the insurance.**

67.     Since they [sic] never paid for the policy, there was no policy.

***

69.     **[D]efendant knowingly, intentionally, and fraudulently charged Plaintiff for the policy even though they knew they had not paid for it and that Mr. Bishop had already provided [ ] [D]efendant with proof that he had insurance.**

70.     As such [ ] **[D]efendant intentionally, willfully and with the intent to committed [sic] a fraud upon [ ] Plaintiff, charged him premiums for insurance they [sic] did not pay for.**

71.     On or about October 19, 2012, [ ] Plaintiff obtained insurance and provided [ ] [D]efendant with a copy.

66

72.     [D]efendant never refunded the charges after it was discovered the policy was not paid for.

73.     [D]efendant has alleged Mr. Bishop was a class member of a Class Action that only covered class members where Ocwen had actually obtained insurance for them.

74.     In this case, which is different than the Class, [ ] [D]efendant did not obtain any insurance and charged him for something he never received.

75.     **After payment of the full $10,060.18 [ ] [D]efendant never reimbursed Mr. Bishop for the charges**.

76.     The payment included full payment for the $10,060.18 for the alleged insurance premium that was never paid for even though he had a policy with Citizens Insurance.

77.     They settled the case. There was no joint stipulation of settlement and no agreement to pay attorney's fees. There was no Court order reserving on the entitlement to attorney's fees.

78.     **[D]efendant wilfully, intentionally, without prior notice has charged [ ] Plaintiff attorney's fees and costs without any legal authority.**

79.     **[D]efendant has committed a fraud on [ ] Plaintiff by illegally charging [ ] Plaintiff legal fees and costs without a [c]ourt order in the foreclosure action that has been dismissed by [ ] [D]efendant.**

[ECF No. 249-1, ¶¶ 65-67, 69-79 (emphasis added)].

Bishop's fraud claim appears to be premised on two separate acts by Ocwen: (1) charging Bishop $10,060.18 for insurance that Ocwen purportedly never procured and (2) charging Bishop approximately $25,000 in attorney's fees and costs for the Foreclosure Action without any purported legal authority to do so. [ECF No. 249-1, ¶¶ 66, 79].

The first ground based on the $10,060.18 insurance payment is precluded for the same reasons as Count III. Bishop's allegations pertaining to why his case is different from *Lee* [ECF No. 249-1, ¶¶ 73-74] does not save his claim because, as explained in the discussion concerning Count III, the claims released by the *Lee* Class Action Settlement are broad enough to include insurance charges.

Nonetheless, Bishop may still assert a fraud claim premised on Ocwen charging Bishop approximately $25,000 in attorney's fees and costs for the Foreclosure Action. As discussed above in the analysis concerning Count I, the *Lee* Class Action did not concern foreclosure actions and the Class Action Settlement did not release any claims related to the purported wrongful assessment of attorney's fees and costs incurred during a Foreclosure Action.

In sum, Bishop may prosecute his fraud claim to the extent that it is based on Ocwen's assessment of fees and costs for the Foreclosure Action, but he may not proceed on any claims related to the payment of insurance.

### e) Count V: Declaratory Judgment

Count V seeks a declaratory judgment that Bishop "is not part of the Class Action settlement" and "he does not meet the definitions in the United States District Court' [sic] order on the sentiment [sic] issue." [ECF No. 249-1, p. 15]. Count V is a thinly veiled attempt to circumvent the Court's "jurisdiction over the construction, interpretation,

consummation, implementation, and enforcement of the Settlement Agreement." [ECF No. 185, p. 7]. It is also a claim "that relate[s], concern[s], arise[s] from, or pertain[s] in any way to . . . conduct, policies, or practices concerning Ocwen's placement . . . of LPI Policies during the Settlement Class Period[.]" [ECF No. 184, p. 68]. Count V is barred by the Class Action Settlement.

> ### f)      Count VI: Breach of Contract Based on Fees and Charges in the Reconciliation Report

Count VI alleges a breach of contract claim based on certain fees and costs reflected in Ocwen's Payment Reconciliation Report. [ECF No. 249-1, ¶¶ 128-158]. Bishop alleges that Ocwen "has breached the mortgage contract by charging [him] for fees and costs that were either not paid for or not valid charges." *Id.* at 156.

Bishop attached a copy of Ocwen's Payment Reconciliation Report [ECF No. 213-7][14] to its amended response and represented that "there [were] only two (2) charges for insurance, one on 12/18/2012 and one on 7/29/2014." [ECF No. 213, pp. 2-3]. Bishop also asserted that there were "approximately two-hundred-forty (240) other charges that [were] not remotely insurance related," including "property inspection fees, loan document charges, late charges (even though [Bishop] was not late), title report fees,

---

[14]      Bishop has since filed a re-typed version of the Reconciliation Report [ECF No, 255-3] because the original document is difficult to read. Ocwen has filed a notice pointing out errors in the re-typed Reconciliation Report. [ECF Nos. 258; 258-1].

attorney's fee[s], [and] filing fees." *Id.* at 3. Bishop states that many of the charges reflected in the Reconciliation Report *post-date* the Class Action Settlement: "the charges to Mr. Bishop extend beyond this Court's order approving settlement, (9/14/2015) all the way through 9/29/2016 and continue through today for charges unrelated to the Class Action." *Id.*

Bishop alleges in Count VI that the Reconciliation Report includes: (1) "charges for filing fees for a foreclosure *that was never filed*"; "'Civil Litigation fees' where there was no civil litigation"; and "'Property inspection fees' where no inspection was performed or needed." [ECF No. 249-1, ¶¶ 141-44 (emphasis added)]. Bishop also lists *other* charges:

145.    There are loan document copy charges that are not valid.

146.    There are late charges that [ ] [D]efendant would receive the payment and then put the funds in a suspense account and charge late charges.

147.    There are property evaluation expenses.

148.    Certified mail costs.

149.    Transaction history fee costs.

150.    Loan document copy fee.

151.    Clerk of Court certified copy charges.

152.    Civil litigation fees not related to the foreclosure.

153.    Prior servicer fees.

*Id.* at ¶¶ 145-56.

By Bishop's own admission, the Reconciliation Report includes at least two charges "for insurance, one on 12/18/2012 and one on 7/29/2014." [ECF No. 213, p. 3]. Both dates fall within the Class Period of January 1, 2008 through January 23, 2015. Thus, Bishop cannot assert any claims for charges related to lender-placed insurance.

To the extent any fees and/or charges [ECF No. 249-1 at ¶ 146] are directly related to Ocwen's administration of the escrow by allocating Bishop's mortgage payment to pay for LPI premiums, Bishop cannot prosecute them or recover for those charges because they have been released by the *Lee* Class Action Settlement, which includes "any and all claims . . . that relate, concern, arise from, or pertain in any way to . . . conduct, policies or practices concerning LPI Policies or to charges for Ocwen's Placement of LPI Policies during the Settlement Class Period." [ECF No. 184, pp. 68-69]. Thus, insurance charges, servicer fees (to the extent they relate to LPI), and late fees due to the manner in which Ocwen allocated Bishop's mortgage payments to the escrow account in order to pay for LPI premiums are released claims which cannot be prosecuted by Bishop.

Whether Bishop can prosecute other fees and charges will turn on *why* they were assessed. For instance, if certified mail costs were incurred [ECF No. 249-1, ¶ 148] because Ocwen sent a certified notice to Bishop advising him that he needed to provide proof of insurance on his property, that his insurance had lapsed, that Ocwen was creating an escrow account, or that Ocwen had placed insurance on the property, then Bishop cannot

71

recover for these costs because they are "conduct, policies or practices concerning LPI Policies or . . . charges for Ocwen's Placement of LPI Policies during the Settlement Class Period" which includes, "the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by Ocwen." [ECF No. 184, pp. 68-70].

If, however, to use a different example, the subject of the certified mailing (or mailings) to Bishop was a notice that Bishop's loans were being transferred to a different loan servicer, then that charge for the certified mailing would *not* be part of the Class Action Settlement and Bishop may proceed with his claim that Ocwen breached the mortgage contract by charging him for a certified mailing. [It may be that Defendant will later file a motion to dismiss or move for summary judgment in the state court. The Undersigned does not pass on the ultimate merits of any of Bishop's claims and is merely examining them for purposes of determining whether the allegations fall within the broad scope of "Released Claims" under the *Lee* Class Action Settlement.].

There are other charges in Count VI which -- based on the limited information available to the Court -- do not appear (on their face) to be insurance-related charges, including: court filing fees related to an unfiled, second foreclosure action; civil litigation fees; and certified copy charges paid to the Clerk of the Court. [ECF No. 249-1, ¶¶ 141-42, 151].

Ocwen contends that "property inspection fees, late charges, [etc.,]. . . arose from a foreclosure action that Bishop contends was a direct result of Ocwen's LPI practices" and thus, this (and other claims) "fall within the broad definition of Released Claims insofar as they "relate, concern, arise from, or pertain <u>in any way</u>" to Ocwen's LPI practices." [ECF No. 204, p. 2 (emphasis in original)].

The Court finds Ocwen's reading of the admittedly broad settlement release to be too expansive. If, for instance, a Class Member (who did not have an escrow account) allowed his or her property insurance policy to lapse, causing Ocwen to create an escrow account and obtain LPI on the property and, a year later, Ocwen failed to pay property taxes on behalf of the Class Member even though there were sufficient funds in the escrow account to cover the taxes, the Class Member would *still* have a claim against Ocwen for the unpaid property taxes -- even though the reason the escrow account was created in the first place was for the LPI.

Here, if the property inspection fees and property evaluation expenses [*id.* at ¶¶ 144, 147] were incurred for purposes of placing insurance on the property, then they would be included in the Released Claims. But if they were charged for a different purpose (for instance, in preparation for filing a second foreclosure action against Bishop), then they would not be part of the *Lee* Class Action Settlement.

The parties will need to specify with greater detail in the state court proceedings (either on summary judgment and/or trial) which items on the Reconciliation Report stem from LPI and which items do not.

> g) **Count VII: Breach of Contract Based on $10,060.18 Insurance Premium Payment**

Lastly, Count VII alleges a breach of contract claim for Ocwen's assessment of an insurance charge against Bishop for a policy that Ocwen purportedly did not procure. [ECF No. 249-1, pp. 165-69]. As noted earlier, this claim is similar to (if not duplicative of) Count III and concerns the $10,060.18 insurance premium payment Bishop made to Ocwen. As noted throughout this order, Bishop's amended response suggests that Ocwen *did* procure insurance, albeit belatedly. [ECF No. 213, p. 10 ("At trial it was proven in Count IV that Ocwen did not pay for the insurance **until after Mr. Bishop provided proof of insurance**." (emphasis added))].

Count VII is precluded by the *Lee* Class Action Settlement for the same reasons as Count III. It "relate[s], concern[s], arise[s] from, or pertain[s] in any way to . . . conduct, policies, or practices concerning Ocwen's placement . . . of LPI Policies during the Settlement Class Period, **including** . . . **charges for Ocwen's Placement of LPI Policies during the Settlement Class Period**." [ECF No. 184, pp. 68-69 (emphasis added)]. Bishop cannot proceed with this claim.

For the reasons discussed herein, Bishop is prohibited from prosecuting Counts II, III, the portion of Count IV relating to the $10,060.18 insurance payment, Count V, part of Count VI (those items on the Reconciliation Report which stem from LPI), and Count VII.

### 2.     Complaint (2021 Lawsuit)

As noted above, Bishop never moved to amend the Complaint [ECF No. 201-2] in the 2021 Lawsuit.[15] Therefore, the original Complaint is the operative pleading in the 2021 Lawsuit.

The Complaint alleges five causes of action (although two of them are labeled "Count III") against PHH. Counts I, II, and III are breach of contract claims. Count IV is a fraud claim. What should numerically be Count V seeks to bring a class action against PHH for its purported practice of improperly assessing (unspecified) fees in its processing of mortgages.

Count I -- premised on charging Bishop for the attorney's fees and costs of the dismissed Foreclosure Action -- is *not* barred by the *Lee* Settlement Agreement for the same reasons as discussed above.

---

[15]     The state court has consolidated the 2017 and 2021 Lawsuits only for discovery purposes.

Count II is barred by the Class Action Settlement because it concerns the adequacy of PHH's notices to Bishop which resulted in the creation of the escrow account due to Bishop's purported failure to show proof of insurance. The broad language of "Released Claims" in the *Lee* Class Action Settlement includes "the content, manner, or accuracy of any communications regarding the placement of any LPI Policies by Ocwen." [ECF No. 184, pp. 69-70].

Count III alleges that "[PHH] breached the contract by charging premiums that were unreasonable." [ECF No. 201-1, ¶ 52]. It is clearly encompassed by the *Lee* Class Action Settlement.

Count IV alleges fraud based on both PHH's LPI practices and its assessment of attorney's fees and costs against Bishop for the Foreclosure Action. *Id.* at ¶¶ 57-80.

Count IV is **replete** with allegations concerning LPI and LPI premiums that are at the core of the *Lee* Class Action:

63.    Plaintiff, Charles E. Bishop, due to the inability to obtain homeowner's insurance in the State of Florida was unable to obtain insurance on the property.

64.    **[D]efendant "force[-]placed" insurance on the property.**

65.    [D]efendant knew they [sic] **had an interest in the forced[-]placed insurance company.**

*** 

67.    They [sic] knew **the premiums they [sic] charged [ ] Plaintiff were more than three (3) times the going insurance rates** for similar properties.

76

***

69.     [D]efendant charged **premiums far in excess of what is reasonable** knowing they [sic] **had an interest in the insurance company** charging the fraudulent rates.

70.     [D]fendant had at all time **material a financial interest in the premium company charging the excessive insurance rates** and intentionally did not notified [sic] [ ] Plaintiff of the financial interest.

71.     The **failure to disclose the financial interest in the "forced[-]placed" insurance company** without any notice to [ ] Plaintiff is in violation of the laws of the United States and of Florida, which requires a disclosure that [ ] [D]efendant has an interest in the "insurance company."

72.     [D]efendant knew they [sic] h**ad an interest in the "forced[-]placed" insurance company**.

73.     [D]efendant knowingly, intentionally, and fraudulently **"force[-]placed" insurance on the property without disclosing that they [sic] had an interest in the "force[-]placed" company**.

74. [D]efendant intentionally and knowingly **charged premiums in excess of what was reasonable**.

75. As such[,] [D]efendant intentionally, willfully and with the intent to committed [sic] a fraud upon [ ] Plaintiff, charged him **premiums far in excess of what a reasonable premium would be**.

*Id.* at ¶¶ 63-65, 67, 69-75 (emphasis added). The portion of Bishop's fraud claim which concerns LPI or PHH's practices with respect to LPI are barred by the Lee Class Action Settlement under the principles of res judicata.

Count IV also contains allegations concerning attorney's fees and costs incurred in the Foreclosure Action:

76.     In addition, [ ] [D]efendant attempted to foreclose on [ ] Plaintiff. They settled the case. There was no joint stipulation of settlement and no agreement to pay attorney's fees. There was no [c]ourt order reserving on the entitlement to attorney's fees.

77.     [D]efendant wilfully, intentionally, without prior notice has **charged [ ] Plaintiff attorney's fees and costs without any legal authority**.

78     **[D]efendant has committed a fraud on [ ] Plaintiff by illegally charging [ ] Plaintiff legal fees and costs** without a [c]ourt order in the foreclosure action that has been dismissed by [ ] [D]efendant.

*Id.* at ¶¶ 76-78 (emphasis added). Bishop's fraud claim based on the Foreclosure Action allegations is not barred by the *Lee* Class Action Settlement for the reasons already discussed in this Order.

The last count (numerically Count V, but numbered Count III) seeks to allege a class action against PHH for its purported practice of improperly assessing (unspecified) fees in its processing of mortgages. Bishop does not identify what these fees are and, to add confusion to the mix, Bishop includes allegations concerning uninsured motorist insurance which appear to be part of a different pleading. In any case, to the extent this count concerns LPI or PHH's practices concerning LPI during the Class Period, Bishop is precluded by the *Lee* Class Action Settlement from prosecuting this claim.

In sum, Counts II, III, the portion of Count IV related to LPI, and Count V (to the extent it concerns LPI during the Class Period) of the Complaint in the 2021 Lawsuit are precluded by the *Lee* Class Action Settlement.

IV.     **Conclusion**

Based on the foregoing, the Court **grants in part and denies in part** PHH's motion to enforce the Final Judgment [ECF No. 201]. The Court finds that Bishop was part of the *Lee* Settlement Class and that the Class Notice provided to Bishop complied with due process.

Res judicata applies to *some* of Bishop's claims. Bishop is precluded from prosecuting the following claims alleged in the Third Amended Complaint in the 2017 Lawsuit: Counts II, III, the portion of Count IV related to the $10,060.18 insurance payment, Count V, part of Count VI (those items on the Reconciliation Report which stem from LPI) and Count VII. Bishop is also precluded from prosecuting the following claims alleged in the Complaint in the 2021 Lawsuit: Counts II, III, the portion of Count IV related to LPI and Count V (to the extent it concerns LPI during the Class Period).

Under the Court's authority to protect and enforce the *Lee* Final Judgment, the Court hereby enjoins Bishop from prosecuting the aforementioned claims. Bishop will file notices in the state court actions dismissing those claims within fourteen (14) days from the date of this Order.

If the claims identified above are not dismissed by the court-imposed deadline, then PHH/Ocwen will file a notice on CM/ECF attaching copies of the most recent state court dockets. The Undersigned will then issue an order deeming Bishop to be in

contempt of the Court, at which point a hearing will be scheduled to determine the appropriate remedy before entry of a final order of contempt.

Ocwen's request for attorney's fees and costs is **denied**. Ocwen has failed to support its entitlement to fees and costs with any legal authority. *See Weller v. HSBC Fin. Corp.*, 187 F. Supp. 3d 1263, 1269 (D. Colo. 2016) ("Although defendants also request attorney fees and costs incurred in filing this motion, they have provided no legal authority, nor any factual substantiation, to support such an award. The motion thus is denied insofar as it seeks such relief.").

Ocwen's request for contempt relief is **denied without prejudice** and with leave to refile if Bishop does not comply with this Order.

Bishop's Motion to Update the Court as to the Court's Order of August 4, 2022 [ECF No. 237] is **denied as moot**. The Court has reviewed and considered the relevant documents filed in the 2017 Lawsuit (and the 2021 Lawsuit) as noted in this Order.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on March 8, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All Counsel of Record